# EXHIBIT B

Dockets.Justia.com

*94 TMR 800, **

Copyright © 2004, International Trademark Association,
The Trademark Reporter

July, 2004 - August, 2004

94 TMR 800

**LENGTH:** 9287 words

ARTICLE AND REPORT: PLAYING THE NUMBERS: A QUANTITATIVE LOOK AT SECTION 2(d) CASES BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

John M. Murphy *

* The author is an attorney practicing trademark law in Chicago, Illinois. Mr. Murphy wishes to thank Andrew Downer, an associate at the firm of Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, for his research assistance in connection with this article.

**TEXT:**
**[*800] I. INTRODUCTION**

This article is a statistical snapshot of recent decisions by the Trademark Trial and Appeal Board, intended to: (1) measure the length of proceedings before the Board; (2) determine the reasons for delay; (3) identify the types of evidence and issues considered most important by the Board in cases involving likelihood of confusion claims; and (4) identify policy issues and suggest reforms that might result in faster disposition of cases. The data suggest that, in many cases, the length of Board proceedings is disproportionate to the complexity of the issues involved. In addition, the data show that most Board proceedings are decided on narrow grounds, and that much of the evidence submitted is not persuasive. These findings, in turn, suggest that Board proceedings might be streamlined through more restricted or better-managed discovery.

The data sets examined in this article include the following:

1. All final decisions of the Trademark Trial and Appeal Board involving Section 2(d) claims from calendar 2003. These decisions are posted on the Board's website. Of the 67 decisions issued, only a few were designated "for publication" by the Board. A small number of decisions were the subject of appeals or motions for reconsideration as of the writing of this article.

2. All summary judgment decisions of the Board issued during calendar 2003 and published on LEXIS. In all, there were 46 such decisions. This data set overlaps with the first data set in that decisions granting summary judgment are "final" and, therefore, posted on the Board's website. Decisions denying summary judgment are interlocutory and are available only on LEXIS.

**[*801]** 3. All trademark opposition decisions involving likelihood of confusion claims issued by the United Kingdom Patent Office in calendar 2003. These decisions are posted on the U.K. Patent Office website. There were 148 such decisions in all.

4. A sample of 102 Community Trade Mark opposition decisions involving likelihood of confusion claims, issued during November and December 2003. These decisions are published on the website for the Office for Harmonization in the Internal Market (OHIM).

5. All final decisions of the Trademark Trial and Appeal Board involving Section 2(d) claims issued during calendar 1971. These decisions, 203 in all, were published, either in full or digest form, in United States Patents Quarterly. n1

n1 In the late 1970s, United States Patents Quarterly ceased the publication in digest form of decisions designated "not for publication" by the Board. Currently, such decisions are available only through the Board's website or LEXIS.

## II. LENGTH OF BOARD PROCEEDINGS

The data confirms the sentiment of many practitioners that litigation before the Board does not move quickly enough. The time to final decision in the 67 cases examined ranged from 216 days n2 to 18.2 years. n3 The median time to decision was 3.2 years. n4 A more complete breakdown appears below:

| YEARS | NUMBER OF CASES | PERCENT OF TOTAL |
|---|---|---|
| Less than 1 year | 2 | 3% |
| 1 to 2 years | 8 | 12% |
| 2 to 3 years | 17 | 25% |
| 3 to 4 years | 24 | 36% |
| 4 to 5 years | 4 | 6% |
| 5 to 6 years | 5 | 7% |
| 6 to 7 years | 3 | 4% |
| 7 to 8 years | 2 | 3% |
| 8 to 9 years | 1 | 1% |
| 9 to 10 years | 0 | 0% |
| More than 10 years | 1 | 1% |
| TOTAL | 67 | 98% n5 |

n2 *Build-A-Bear Workshop v. Silver Dollar City, Inc.,* Canc. No. 92041922 (T.T.A.B. December 1, 2003).

n3 *Shen Mfg. Co. Inc. v. Ritz Hotel Ltd.,* Consolidated Opp. Nos. 71,706; 72,817; 72,818; 73,756; 74,517; 74,778; 75,003 (T.T.A.B. August 7, 2003).

n4 The length of the proceeding is measured from the date on which the notice of opposition or petition for cancellation was filed until the date of the Board's final decision. In addition, the formal termination of the proceeding by the Board may not take place until some time after the issuance of the decision.

n5 Error due to rounding.

[*802] By comparison, the median interval between filing and disposition for federal civil cases that go to trial has ranged, in recent years, from 18 months (or 1.5 years) to 21.3 months (or about 1.8 years). n6 It is safe to say that most federal civil cases are more complex than a typical opposition or cancellation proceeding.

n6 *See* Administrative Office of the United States Courts, 2002 Annual Report of the Director, Table C-5 (20.8 months); 2001 Annual Report of the Director, Table C-5 (21.3 months); 2000 Annual Report of the Director, Table C-5 (20.1 months); 1999 Annual Report of the Director, Table C-5 (19 months); 1998 Annual Report of the Director, Table C-5 (18 months); 1997 Annual Report of the Director, Table C-5 (18

The Board itself is not the major source of delay. On average, the Board took 224 days (or 0.6 years) to issue a decision once the parties filed their final papers or concluded oral arguments. Rather, litigants are the primary culprits. While federal judges usually exercise tight control over their dockets and actively press matters forward to resolution, the Board grants requests to extend discovery and trial dates as a matter of course. In the cases surveyed, the Board granted an average of 4.2 requests for extension or suspension. In 31% of the 67 cases surveyed, the Board granted more than five extensions, and in 10% of the cases, the Board granted ten or more extensions. In one case, the Board granted 22 extensions. n7

n7 *Shen Mfg. Co. Inc. v. Ritz Hotel Ltd.,* Consolidated Opp. Nos. 71,706; 72,817; 72,818; 73,756; 74,517; 74,778; 75,003 (T.T.A.B. December 1, 2003).

## III. SUMMARY JUDGMENT

During the late 1980s and early 1990s, the Board was inclined toward granting motions for summary judgment in Section 2(d) opposition and cancellation proceedings, following the decisions of the Federal Circuit in *Pure Gold, Inc. v. Syntex (U.S.A.) Inc.,* in which the court rejected the notion that "summary judgment is generally inappropriate in trademark cases," and *Sweats Fashions, Inc. v. Pannill Knitting Co.,* n8 in which the court recognized that "summary judgment may no longer be regarded as a disfavored procedural shortcut."

n8 *Pure Gold, Inc. v. Syntex (U.S.A.) Inc.,* 739 F.2d 624, 222 U.S.P.Q. 741 (Fed. Cir. 1984); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 4 U.S.P.Q.2d 1542 (Fed. Cir. 1987).

The trend reversed in the mid-1990s, following Federal Circuit decisions that backtracked from *Pure Gold* and *Sweats* **[*803]** *Fashions.* In *Old Tyme Foods, Inc. v. Roundy's Inc.,* n9 the court reversed the Board's grant of summary judgment, concluding that it did not draw all reasonable inferences in the defendant's favor when it concluded that the marks OLD TIME and YE OLDE TYME were confusingly similar. n10 The court also held that the Board improperly discounted evidence that the parties had coexisted for a long period with no evidence of actual confusion. In *Opryland USA Inc. v. The Great American Music Show, Inc.,* n11 the Federal Circuit held that the Board improperly discounted evidence of the fame of the plaintiff's mark, and that the Board should have granted plaintiff's Rule 56(f) motion. n12 Finally, in *Lloyd's Food Products, Inc. v. Eli's, Inc.,* n13 the court held that the Board improperly granted summary judgment to the plaintiff. The court cited the Board's failure to consider evidence that the plaintiff's mark was diluted by third party use, and the Board's reliance on questionable evidence of actual confusion.

n9 961 F.2d 200, 22 U.S.P.Q.2d 1542 (Fed. Cir. 1992).

n10 This is a rather surprising conclusion. It is hard to imagine that additional evidence developed through discovery would have altered the Board's analysis of the similarity of the marks.

n11 970 F.2d 847, 23 U.S.P.Q.2d 1471 (Fed. Cir. 1992).

n12 Again, this is a rather surprising decision. In its Rule 56(f) motion, plaintiff stated: "On information and belief, 'The OPRY' is perceived by the public in Tennessee and in South Carolina to be GRAND OLE OPRY, and CAROLINA OPRY to be associated with, sponsored by, or licensed by GRAND OLE OPRY. . . . Discovery is ongoing, and OPRYLAND intends to conduct substantial discovery in this matter. Until discovery has been completed, OPRYLAND cannot fully respond to the present motion." The Board concluded, sensibly enough, that the plaintiff failed to identify the additional discovery it required with sufficient particularity. *Id.* at 852.

n13 987 F.2d 766, 25 U.S.P.Q.2d 2027 (Fed. Cir. 1993).

In 2003, the Board granted only 9 of the 46 summary judgment motions before it in Section 2(d) cases, or about 20% of the total. Plaintiffs stood only a 12% chance of prevailing on motions for summary judgment, while defendants prevailed 31% of the time. This disparity is not surprising, since the ultimate burden in an *inter partes* proceeding is on the plaintiff. While a plaintiff moving for summary judgment must prove that there are no genuine issues of fact with respect to any of the confusion factors, a defendant moving for summary judgment need only show that the marks at issue are sufficiently dissimilar that confusion is unlikely. As the Federal Circuit noted in *Kellogg Co. v. Pack'Em Enterprises, Inc.,* n14 nothing else matters if the parties' marks are not similar.

n14 951 F.2d 330, 333, 21 U.S.P.Q.2d 1142, 1145 (Fed. Cir. 1991).

In five cases, the parties filed cross-motions for summary judgment. The Board granted summary judgment (to the defendant) in only one of these cases. The Board's approach is **[*804]** typified by *Ava Enterprises v. Audio Boss USA, Inc.,* n15 in which it stated that "the mere fact that cross-motions for summary judgment on an issue have been filed does not necessarily mean that there are no genuine issues of material fact, and that trial is unnecessary."

n15 Opposition No. 91125266, 2003 T.T.A.B. LEXIS 530 (October 24, 2003).

## IV. EVIDENCE CONSIDERED IN BOARD PROCEEDINGS

Of the 67 cases involving Section 2(d) claims that the Board decided in 2003, twelve were disposed of without reaching the issue of likelihood of confusion. In those cases, the plaintiff failed to establish ownership of its pleaded mark, failed to establish priority, or was collaterally estopped by a prior judicial proceeding. The outcomes of the remaining 55 cases are summarized below:

| OUTCOME | NUMBER | PERCENT |
| --- | --- | --- |
| Judgment for Plaintiff | 37 | 66% |
| Judgment for Defendant | 14 | 27% |
| Mixed Result | 4 | 7% |
| TOTAL | 55 | 100% |

The parties in the above 55 cases submitted a wide variety of evidence to prove or disprove likelihood of confusion. Evidence submitted by plaintiffs included sales and advertising figures (22 cases), excerpts from dictionaries and other reference works (4 cases), brand awareness studies (3 cases), other types of market research (7 cases), and evidence of actual confusion (5 cases). Defendants submitted evidence of third-party uses and registrations (14 cases), and dictionaries or other reference works (4 cases).

Litigation survey evidence figured in only one case. In *Duke University v. Haggar Clothing Co.,* n16 the plaintiff introduced a survey to show that the fame of its DUKE trademark was not lessened by third-party use of similar trademarks. The Board admitted the survey over the objection of the defendant, which argued that it did not constitute proper rebuttal. Nonetheless, the Board stated that it would have held for opposer even absent the survey evidence, since most of the third party marks cited by the defendant were irrelevant. n17 Moreover, the parties used nearly **[*805]** identical marks (DUKE and DUKE AMERICA) in connection with clothing. n18

n16 Opposition No. 108,304 (August 21, 2003).

n17 Specifically, the Board stated that "some of this evidence is irrelevant because the marks in their entireties are dissimilar or the marks consist of or incorporate 'DUKES,' rather than 'DUKE'. . . ." The Board discounted another third party use on the ground that the goods in question were sold through different

channels of trade—the channels through which the plaintiff's goods traveled. The Board discounted the one remaining third party use on the ground that "use by a single entity does not mandate that we must conclude that the source-identifying significance of opposer's famous mark has become diluted."

n18 Obviously, Duke University uses its mark primarily in connection with educational services, but like most colleges and universities, it licenses its mark for use in connection with t-shirts and other types of clothing.

Parties introduced expert testimony not relating to consumer surveys in four cases. None of this testimony significantly influenced the Board. In *Numa, Inc. v. Sequent Computer Systems, Inc.,* n19 the defendant introduced the testimony of a retired professor, who testified that the plaintiff's mark NUMA was a well-recognized acronym for "non-uniform memory access." The Board accepted this testimony as true, but concluded that NUMA was not generic for the services at issue, namely, "installation, maintenance and repair of computer hardware." In *North American Bear Co. v. Vermont Teddy Bear Co.,* n20 the defendant took the testimony of "a practitioner in the field of patents and trademarks for over 35 years," who testified that there was no likelihood of confusion between the parties' respective marks. The Board gave little weight to this testimony, because the expert's conclusion was based on the parties' actual use of their respective marks, rather than the marks as shown and the goods as described in the applicant's application and the opposer's pleaded registration. In *Bridgestone/Firestone North American Tire, LLC v. Silverstone Berhad,* n21 the plaintiff introduced the testimony of an English professor, who opined that "the word 'Firestone' has become synonymous with the manufacture and sale of tires in this country, and that the use of another 'STONE'-suffixed mark would likely be attributed to opposers." The Board agreed with the defendant that this testimony was entitled to little weight because the opinions of the expert "were not based on identifiable facts and data or reliable principles and methods, and . . . were not tested or otherwise subjected to peer review." n22 Finally, the defendant in *Applebee's International, Inc. v. Societe Des Produits Nestle S.A.* n23 introduced the testimony of a brand development and marketing expert who testified that there was no likelihood of confusion **[*806]** between the parties' respective entrees served in restaurants and dinner mixes purchased in grocery stores. The Board gave little weight to this testimony, since the expert did not consider the possibility that consumers might conclude that the parties' goods, while sold through different channels, emanated from the same source.

n19 Consolidated Opposition No. 116,011 and Cancellation No. 29,387 (February 11, 2003).

n20 Opposition No. 107,763 (February 25, 2003).

n21 Consolidated Opposition Nos. 94,177; 94,757 and 100,956 (March 21, 2003).

n22 Nonetheless, the Board ultimately concluded that the marks FIRESTONE and SILVERSTONE were confusingly similar and entered judgment for the plaintiff.

n23 Opposition No. 115,117 (September 11, 2003).

## V. DECISIVE ISSUES IN BOARD PROCEEDINGS

As the readers of this article know, the Board evaluates likelihood of confusion based on the thirteen factors identified in *In re E.I. duPont deNemours & Co.* n24 Other tribunals manage with a more succinct list of confusion factors, and in most cases where likelihood of confusion was an issue, the Board's decision turned on just a few factors. A detailed analysis appears below:

| FACTOR | JUDGMENT FOR PLAINTIFF (N=37) | JUDGMENT FOR DEFENDANT (N=15) | MIXED RESULT (N=4) | ALL CASES (N=56) |
|---|---|---|---|---|
| Inherent | 2 (5%) | 4 (27%) | 0 (0%) | 6 (11%) |

| | | | | |
|---|---|---|---|---|
| distinctiveness (or lack thereof) of plaintiff's mark | | | | |
| Fame of plaintiff's mark | 16 (43%) | 0 (0%) | 0 (0%) | 16 (29%) |
| Similarity (or dissimilarity) of marks | 37 (100%) | 11 (73%) | 4 (100%) | 52 (93%) |
| Similarity (or dissimilarity) of goods | 35 (95%) | 6 (40%) | 4 (100%) | 45 (80%) |
| Channels of trade | 7 (19%) | 1 (7%) | 0 (0%) | 8 (14%) |
| Overlap (or lack thereof) in purchasers | 5 (14%) | 2 (13%) | 0 (0%) | 7 (13%) |
| Defendant's intent | 3 (8%) | 0 (0%) | 0 (0%) | 3 (5%) |
| Actual confusion (or lack thereof) | 1 (3%) | 2 (13%) | 0 (0%) | 3 (5%) |
| Third party uses and registrations | 0 (0%) | 2 (13%) | 0 (0%) | 2 (4%) |

n24 476 F.2d 1357, 1361, 177 U.S.P.Q. 563, 567 (C.C.P.A. 1973).

There is an element of subjectivity in deciding which issues are "decisive." Nonetheless, it is clear that the decisive factors in most cases are (1) the parties' respective marks, (2) their respective goods or services, and (3) the fame of the earlier mark. The first two factors were the *only* decisive issues in almost half **[*807]** (45%) of the cases. This is not surprising, since these are the only two *duPont* factors that are grounded in the Lanham Act. n25 Adding fame to the mix accounts for over 65% of the cases. Evidence of fame is particularly important in marginal cases where there are arguable differences between the parties' respective marks or goods. The table below illustrates the relative complexity of the cases in greater detail:

| NUMBER OF DECISIVE FACTORS | NUMBER OF CASES |
|---|---|
| 1 | 6 |
| 2 | 19 |
| 3 | 17 |
| 4 | 8 |
| 5 | 2 |
| 6 | 2 |
| 7 | 1 |

n25 15 U.S.C. § 1052(d).

The parties' channels of trade are frequently mentioned, but were decisive in only 14% of the cases examined. That is to say, similar goods are presumed to travel in similar channels of trade, so that in cases where the goods are similar, the parties' channels of trade are given little or no independent consideration. Trade channels are important only in cases where the goods are different, and the plaintiff must show that

they are not. In other similar reasons, the overlap of mark of overlap between the parties' purchaser base figures in only about 13% of the cases.

The intent of the defendant was decisive in only a few cases where the plaintiff presented particularly compelling evidence. In *Cabell-Wayne Association of the Blind, Inc. v. Fowler,* n26 the defendant was a disgruntled former employee of the plaintiff. After leaving the plaintiff's employment, he registered the domain name cwab.org, and repeatedly used CWAB (plaintiff's acronym and the verbal portion of the composite mark at issue) in the context of disparaging remarks on his website regarding his former employer. The design portion of defendant's mark, consisting of a man, a woman and a dog in silhouette, was virtually identical to the logo used by plaintiff. The Board held that "applicant's actions, taken as a whole, demonstrate his hostility to opposer as well as a blatant disregard for opposer's intellectual property rights." To similar effect is *R.E. Whittaker Company, Inc. v. Crystal Magic,* **[\*808]** *Inc.,* n27 in which the defendant, after purchasing samples of the plaintiff's product and visiting the plaintiff's headquarters, launched a competing carpet cleaner that not only bore a similar mark but copied the plaintiff's trade dress. Finally, in *Mattel, Inc. v. Mount,* n28 the defendant failed to respond to the plaintiff's requests for admission, and thereby admitted that it selected its mark with an intent to cause confusion.

n26 Opposition No. 122,156 (T.T.A.B. October 20, 2003).

n27 Consolidated Cancellation Nos. 30,339; 30,519; and 30,370 (T.T.A.B. March 5, 2003).

n28 Opposition No. 117,521 (T.T.A.B. May 29, 2003).

In one case, the Board gave significant weight to actual confusion evidence submitted by the plaintiff, n29 and in two cases, the Board gave weight to the absence of actual confusion over a significant period of time. n30 For the most part, the Board dismissed or minimized evidence of third-party uses and registrations. In some cases, the alleged third party uses were for marks or goods distinguishable from the marks or goods at issue in the proceeding. In other cases, there were evidentiary issues, or simply not enough third party use to make a significant difference. The Board gave substantial weight to evidence of third party use in only two cases. n31

n29 *Stoller v. York International Corp.,* Opposition No. 121,420 (T.T.A.B. June 4, 2003).

n30 *State Fair of Texas v. Judson-Atkinson Candies, Inc.,* Opposition No. 121,897 (T.T.A.B. April 15, 2003); *Toro Co. v. GrassMasters, Inc.,* Opposition No. 111,729 (T.T.A.B. February 4, 2003).

n31 *State Fair of Texas v. Judson-Atkinson Candies, Inc.,* Opposition No. 121,897 (T.T.A.B. April 15, 2003); *Toro Co. v. GrassMasters, Inc.,* Opposition No. 111,729 (T.T.A.B. February 4, 2003).

## VI. POLICY ISSUES

### A. Should More Cases Be Resolved on Summary Judgment?

Board proceedings are uniquely suited to summary judgement. As noted above, almost half of all Section 2 (d) cases are decided by comparing the parties' marks and their respective goods or services. Ordinarily, the manner in which the defendant uses its mark is not an issue "since the display may be changed at any time as may be dictated by the fancy of the . . . owner of the mark." n32 Similarly, the Board is constrained to compare the parties' goods **[\*809]** or services as they are described in their respective applications or registrations, and to presume that these goods or services travel in all customary channels of trade. n33 These peculiarities of Board proceedings reduce the number of facts open to dispute and limit the need for discovery. Consequently, the current reluctance of the Board to grant summary judgment is misplaced. As stated in *Pure Gold,* "too often we see voluminous records which would be appropriate to an infringement or unfair competition suit but are wholly unnecessary to resolution of the issue of registrability of a mark." n34

n32 *Vornado, Inc. v. Breuer Electric Mfg. Co.,* 390 F.2d 724, 727, 156 U.S.P.Q. 340, 342 (C.C.P.A. 1968). In rare instances, "trade dress may nevertheless provide evidence of whether the word mark projects a confusingly similar commercial impression." *Kenner Parker Toys Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 355, 22 U.S.P.Q.2d 1453, 1458 (Fed. Cir. 1992) (*quoting Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.,* 748 F.2d 669, 674 (Fed. Cir. 1984)).

n33 *J&J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 1463, 18 U.S.P.Q.2d 1889, 1892 (Fed. Cir. 1991). The plaintiff's actual use of its mark may be relevant if it pleads common law rights in a mark or if the defendant counterclaims for cancellation of the plaintiff's registration.

n34 739 F.2d at 627 n.2, 222 U.S.P.Q. at 744 n.2 (Fed. Cir. 1984).

## B. Is Discovery Necessary in Board Proceedings?

"An American is incapable of handling a case without discovery and deposition. Discovery is his shower and deposition is his breakfast." n35 While we view open, party-managed discovery as essential, practitioners in other countries view our system with a mixture of bemusement and frustration.

n35 Oscar G. Chase, *American 'Exceptionalism' and Comparative Procedure,* 50 Am. J. Comp. L. 277 (Spring 2002), *citing* John Lew, as quoted in The Daily Deal, May 15, 2001, at 5.

Discovery in oppositions and cancellation proceedings in other countries is limited or nonexistent. In the United Kingdom, for example, the Hearing Officer may order production of specific documents, only if they "relate to the matters in question in the proceedings" and "their disclosure is necessary to dispose fairly of the proceedings or to reduce costs." n36 Even if these tests are met, the Hearing Officer may refuse to order disclosure "if the value of the material to the applicant [is] outweighed by the burden it would impose on the opponent." n37 Parties submit statutory declarations in support of their respective positions, and while declarants are subject to cross-examination before the Hearing Officer, n38 there are no discovery depositions. The rules governing opposition and cancellation proceedings involving Community Trade Marks do not allow for discovery of any kind. n39 This is **[*810]** consistent with the general hostility in civil law countries towards American-style discovery. n40

n36 Tribunal Practice Note 1/2000; Trade Marks Rules 2000, § 57.

n37 Tribunal Practice Note 1/2000.

n38 *Id.;* Trade Marks Rules 2000, § 55(2).

n39 Regarding Community Trade Mark opposition procedures, see Rules 15 through 22, Commission Regulation No 2868/95 of 13 December 1995 implementing Council Regulation No 40/94 on the Community Trade Mark.

n40 "The civilians view discovery with repugnance, not only because they find it unnecessary but also because they think it inappropriately intrusive for one private party to be able to rummage through the files of an adversary simply because they are involved in litigation. In civil law countries, compulsory production of evidence is viewed as more properly a governmental function and discovery is objectionable because it allows litigants to exercise powers and functions that should be reserved for the court." Chase, *supra* note 35, at 293.

Generally speaking, the American system of discovery as embodied in the Federal Rules of Civil Procedure and the Trademark Rules of Practice values fact-finding and truth-seeking over judicial efficiency and the protection of personal or business privacy. n41 The rules applicable in the U.K. Patent Office and the Office for Harmonization in the Internal Market emphasize privacy and efficiency to a greater degree. While in the United States, "the time-honored cry of 'fishing expedition' [cannot] serve to preclude a party from inquiring into the facts underlying his opponent's case," n42 it has been consistently held that "a fishing proceeding . . . is never allowed in the English courts." n43

n41 Comparing German and U.S. civil procedure, one commentator has stated that "the differences [regarding discovery] reflect a fundamental difference in value choices. Both systems recognize the importance of truth for the fact-finding process and both recognize the importance of protecting areas of personal or business privacy from unreasonable invasion, but the two systems strike very different balances between the two goals. Our expansive system of discovery appears to make truth on the whole more important than privacy in civil litigation. The Germans' system of specific disclosure duties and expansive privileges shows greater concern for protecting privacy interests and less concern for finding the truth." John C. Reitz, *Why We Probably Cannot Adopt the German Advantage in Civil Procedure,* 75 Iowa L. Rev. 987, 1003 (May 1990).

n42 *Hickman v. Taylor,* 329 U.S. 495, 507 (1947).

n43 *Radio Corp. of America v. Rauland Corp.,* [1956] QB 618; [1956] 1 All E.R. 549. The English courts distinguish between requests for specific, relevant documents (which are allowed), and requests for broad categories of documents, or documents that are not relevant but may lead to the discovery of admissible evidence (which are not allowed). *Re Asbestos Insurance Coverage Cases,* [1985] 1 All E.R. 716; *Rio Tinto Zinc Corp. v. Westinghouse Electric Corp.,* [1978] AC 547, [1978] All E.R. 434.

The fundamental assumption behind the American system is that broader fact finding improves the quality of judicial or administrative decisions. "Quality" is a subjective notion that does not lend itself to quantitative analysis. Nonetheless, we may compare the results of proceedings before the Trademark Trial and Appeal Board with the results of similar proceedings in other jurisdictions, and determine whether American-style discovery leads to different outcomes. n44

n44 Like the Trademark Trial and Appeal Board, the OHIM Opposition Board and the U.K. Patent Office are constrained to make determinations solely as to the registrability of marks.

As noted in the beginning of this article, we have examined the results of (1) all opposition and cancellation proceedings **[*811]** involving likelihood of confusion claims decided by the Board in 2003; (2) all 2003 opposition decisions by the United Kingdom Patent Office involving likelihood of confusion claims; n45 and (3) a sample of 2003 decisions by the OHIM Opposition Division involving likelihood of confusion claims. n46 The results are tallied below:

| OUTCOME | United States, 2003 (N=67) | United Kingdom, 2003 (N=148) | Community Trade Mark, Nov.-Dec. 2003 (N=102) |
|---|---|---|---|
| Judgment for Plaintiff | 58% | 31% | 25% |
| Judgment for Defendant | 36% | 52% | 53% |
| Mixed Result | 6% | 18% | 22% |

n46 The sample consists of 102 cases decided between November 28, 2003 and December 22, 2003. The Opposition Division decided over 1,800 cases in 2003. Likelihood of confusion claims fall under Article A.8 (1) of Council Regulation No. 40/94 of 20 December 1993 on the Community Trade Mark.

Relative to its counterparts, the Trademark Trial and Appeal Board is decidedly more friendly towards plaintiffs. Of course, there may be factors besides the availability of discovery that explain this fact. Both OHIM and the U.K. Patent Office are more willing than the Board to "split the difference" by holding in favor of plaintiffs as to some goods but not others. In addition, the fame of the plaintiff's mark plays a greater role in Board proceedings. While in theory famous marks are entitled to broader protection in the U.K. and before the OHIM Opposition Board, n47 plaintiffs submitted evidence of fame in none of the OHIM cases surveyed that were published in English n48 and in only five of the 148 U.K. decisions surveyed. n49 Moreover, the U.K. Patent Office and OHIM **[\*812]** may take a more jaundiced view of market research and survey evidence than the Trademark Trial and Appeal Board. n50

n47 *Sabel BV v. Puma AG,* Case No. 251/95 (November 11, 1997) ("A sign may have a particularly distinctive character either *per se* or because of the reputation the mark enjoys with the public. The more distinctive its character, the greater the risk of confusion.").

n48 The decisions in eight of the cases surveyed were published in French or German.

n49 This may result from a reluctance by plaintiffs to disclose sales figures, advertising figures, market research data or other types of proprietary information typically submitted as evidence of fame. While the Trademark Trial and Appeal Board grants blanket protective orders as a matter of course, the U.K. Patent Office and OHIM issue confidentiality orders only in exceptional circumstances. *Compare* Fed. R. Civ. P. 26 (c); 37 C.F.R. § 2.120(f); T.B.M.P. (2d Ed. June 2003) § 526; U.K. Patent Office, Law Practice Direction, "Confidentiality of Evidence Filed in Inter Partes Proceedings" ("Orders for confidentiality will not . . . be issued as a matter of course. Requests must . . . be supported by full and detailed reasons in each case"); Guidelines Concerning Proceedings Before the Office for Harmonization in the Internal Market (Trade Marks and Designs), Part E, section 7.4.1.3 ("If a special interest in keeping a document confidential is invoked, the Office must check whether a special interest is sufficiently shown. . . .The special interest must exist because of the confidential nature of the document or its status as a trade or business secret.").

n50 *See, e.g., Swiss Miss Trade Mark,* [1997] RPC 219; *Ferrero oHG mbH v. Stefania S.p.A.,* Decision No. 2567/2000.

In addition, the U.K. Patent Office and the OHIM Opposition Board may set the bar higher in determining what constitutes a significant level of confusion. The Board has found confusion to be likely in cases where surveys demonstrated confusion among as few as 11% to 15% of survey respondents. n51 Certain European decisions suggest a different view. For example, in *Estee Lauder Cosmetics GmbH v. OHG Lancaster Group GmbH,* n52 a false advertising case, the European Court of Justice held that "it would . . . be inappropriate for a national court to base its final decision as to confusion on statistical evidence regarding the probable effect on 10% to 15% of potential consumers."

n51 *Blue Cross and Blue Shield Ass'n v. Harvard Community Health Plan,* 17 U.S.P.Q.2d 1075 (T.T.A.B. 1990) (market research by applicant suggested confusion among 14% of respondents); *Miles Labs, Inc. v. Naturally Vitamin Supplements, Inc.,* 1 U.S.P.Q.2d 1445 (T.T.A.B. 1986) (stating "we cannot agree that 15% is 'small,' and concluding that confusion among 18.1% of survey respondents 'well within the range of percentages accepted as probative'"); *McDonough Power Equipment, Inc. v. Weed Eater, Inc.,* 208 U.S.P.Q. 676 (T.T.A.B. 1981) (confusion among 11% of respondents held significant).

n52 Case No. C-220/98 (European Court of Justice September 16, 1999).

In all three jurisdictions surveyed, the burden is on the plaintiff to demonstrate likelihood of confusion. In the United States, however, this burden is mitigated by the "second comer" doctrine. The Board and its reviewing courts have long recognized that "in the event of doubts about the likelihood of confusion, the Board . . . should resolve those doubts against the newcomer." n53 No comparable doctrine exists in United Kingdom or European Community case law.

n53 *Kenner Parker Toys Inc. v. Rose Art Indus. Inc.,* 963 F.2d 350, 355, 22 U.S.P.Q.2d 1453, 1458 (Fed. Cir. 1992); *accord Geigy Chem. Corp. v. Atlas Chem. Indus., Inc.,* 438 F.2d 1005, 1008, 169 U.S.P.Q. 39, 40 (C.C.P.A. 1971).

Moreover, the cost of *inter partes* proceedings in the United Kingdom or before OHIM is far lower than in the United States. The relatively high cost of proceedings before the Board may dissuade potential plaintiffs with marginal claims from seeking to enforce their rights. According to an article in the *INTA Bulletin,* only 2-2.5% of published marks are opposed in the United States, and 3-4% in the United Kingdom, compared to 25% of all Community Trade Marks. n54

n54 Barbara E. Cookson and Patrick J. Gallagher, *Trademark Oppositions: Effective Proceedings or Procedural Warfare?, INTA Bulletin,* vol. 58, issue 16 (September 1, 2003). More oppositions are probably filed before the OHIM Opposition Board than in the United Kingdom because the U.K. Patent Office, unlike OHIM, issues *ex parte* refusals based on prior registered marks. Compare U.K. Trade Marks Act 1994, § 37 (2); Council Regulation (EC) No 40/94 of 20 December 1993 on the Community Trade Mark, § 8.

   **[\*813]** Finally, it bears mention that OHIM does not consider "relative" grounds for refusal in its pre-publication examination of trademark applications. n55 That is to say, it does not consider possible conflicts with prior registered marks. This may explain, in part, why the number of oppositions filed before OHIM vastly exceeds the number of oppositions filed in the U.S. or the U.K. However, this fact does not explain why OHIM is more friendly towards defendants. If anything, one would expect the OHIM Opposition Board to be more friendly towards plaintiffs, since the examination process in the United States and the United Kingdom tends to weed out obvious instances of confusing similarity, leaving only the relatively close cases to be resolved through the opposition process.

n55 *Compare* Council Regulation (EC) 40/94 of 20 December 1993 on the Community Trade Mark, § 8; U.K. Trade Marks Act, § 37(2); Lanham Act, 15 U.S.C. § 1052(d).

## C. How Much Discovery is Necessary?

Notwithstanding the additional factors described above, it is likely that the availability of discovery accounts for at least part of the difference in outcomes before the Trademark Trial and Appeal Board, the U.K. Patent Office and the OHIM Opposition Board. If the Board's decisions are on the whole just and fair, and the development of facts through discovery is, at least in some cases, important to the decision-making process, it follows that the delay, expense and nuisance of discovery proceedings may be justified.

This is not to say that litigants before the Board must have access to all of the discovery tools available to parties in a federal civil action. The issues in Board proceedings are relatively narrow, and the relevant facts are often obvious. We all know that aspirin is sold at the drugstore, and that consumers pay closer attention when purchasing a new car than when buying a pack of chewing gum. Nonetheless, parties spend a great deal of time and effort in "discovering" facts that are neither surprising nor controversial. While certain confusion factors, such as the defendant's intent, require closer scrutiny, cases where such factors play a significant role are statistically rare. Nonetheless, the Board is repeatedly confronted with boilerplate interrogatories and document requests more suited to a federal civil action than an opposition or cancellation proceeding. n56 Before considering potential solutions, a brief historical review of Board practice is in order.

**[\*814]  1. Historical Background**

Before passage of the Lanham Act, there was no discovery in the modern sense in opposition or cancellation proceedings. Consistent with federal civil practice of the era, the applicant in an opposition proceeding could request a "Bill of Particulars" from the opposer, specifying, in greater detail, "the nature of his right to oppose and further and better particulars of any matter stated in the notice of opposition." n57 This procedure was of significant value to the applicant since the Trademark Rules required the pleading of specific facts, rather than modern notice pleading. n58

n57 William D. Shoemaker, *Trade-Marks,* Vol. 2, § 310, pp. 922-23 (1931).

n58 *Id.,* § 304, pp. 906-07.

The rules in effect after passage of the Lanham Act stated generally that the Federal Rules of Civil Procedure were applicable where appropriate and not otherwise prohibited. n59 In practice, discovery was more restricted than is presently the case. For example, the Commissioner of Patents n60 sustained objections to interrogatories that called for a legal conclusion or opinion, or related to matters not peculiarly within the knowledge of the responding party. n61

n59 Edward C. Vandenburgh III, *Trademark Law and Procedure* (2d Ed. 1968), § 10.35, pp. 410-11.

n60 The Trademark Trial and Appeal Board did not come into existence until 1958.

n61 *Levi Strauss & Co. v. Kotzin,* 107 U.S.P.Q. 357, 361 (Commr. 1955); *Am. Chewing Prods. Corp. v. Gumakers of Am. Inc.,* 75 U.S.P.Q. 333, 334 (Commr. 1947).

In 1955, the Patent Office amended the Trademark Rules so that the Federal Rules of Civil Procedure did not apply, except as specifically stated. n62 Although discovery depositions were allowed, n63 interrogatories were severely restricted. n64 Requests for admission were limited to facts within the knowledge of both parties. n65 To obtain documents, parties filed a "motion to produce" **[\*815]** with the Board. n66 Such motions were not granted as a matter of course. As stated in one decision, "the purpose . . . is not to discover what exists; but its purpose is to force the production of items which do exist. An order to produce will not be entered until the existence of documents is established and then only upon a showing of good cause." n67

n62 *Id. See also* Saul Lefkowitz, *Trademarks and Attorneys in Action in Adversary Proceedings Before the Trademark Trial and Appeal Board,* 56 TMR 793, 808 (1966).

n63 Lefkowitz, *id.*

n64 Initially, parties were allowed interrogatories concerning (1) the issues of abandonment, nonuse, title or fraud; (2) the existence, description, nature, custody or location of any books, documents, or other tangible things; (3) the identity and addresses of persons having knowledge of designated facts material to the issues involved in the case; (4) a more particular description of the goods of the interrogated party; and (5) the first date of use that the interrogated party could claim for its mark. In 1959, the Board abolished interrogatories entirely. In 1963, the rules were amended again so that parties could serve a single interrogatory concerning the name and address of the person or persons having knowledge of the facts contained in the pleading of the adverse party. Abraham Bogorad, *The Impact of the Amended Rules*

n65 *Lefkowitz, supra* note 62, at 809.

n66 *Id.* at 810.

n67 *Yamato Koki Kogo K.K. v. Carl Braun Camerawerk,* 120 U.S.P.Q. 490, 491 (T.T.A.B. 1959). The opposer sought production of all documents relating to the date of first use on which the applicant intended to rely--certainly a reasonable request by contemporary standards. *See* Trademark Board Manual of Procedure (2d Ed. 2003), § 414(5). The Board denied the request.

The 1955 rules reflected a belief by the Patent Office that unrestricted pretrial discovery caused more trouble than it was worth. n68 This view was at odds with that of many practitioners, who felt that discovery would facilitate settlement and reduce the cost of proving important facts. n69

n68 Vandenburgh, *supra* note 59, at 410.

n69 *Id.*

The Board undertook a major overhaul of discovery and trial procedures in 1972. One noted commentator, hyperbolically but in the spirit of the times, called the new rules a "trademark liberation movement." n70 Since 1972, 37 C.F.R. § 2.116 has provided that "except as otherwise provided, and wherever applicable and appropriate, procedure and practice in *inter partes* proceedings shall be governed by the Federal Rules of Civil Procedure." Parties are permitted to take any discovery within the scope of Fed. R. Civ. P. 26(b)(1), which is to say, regarding "any matter, not privileged, which is relevant to the claim or defense of any party. . . ." The objective of the new rules was "to establish a simpler, more effective and expeditious procedure which would result in an orderly disposition of cases with the least amount of delay and friction." n71

n70 Saul Lefkowitz, *The Newly Amended Rules Governing the Inter Partes Procedure Before the Trademark Trial and Appeal Board,* 63 TMR 297, 301 (1973) (referring specifically to new procedures for taking trial testimony).

n71 Abraham Bogorad, *Recent Changes in the Rules Controlling the Discovery Practice Before the Trademark Trial and Appeal Board,* 63 TMR 305 (1973).

## 2. The Effect of "Trademark Liberation"

The expectations of the Board and the bar in 1972 seem rather naive in retrospect. It is unlikely that the pace of Board proceedings has accelerated over the last three decades. In 1971, the year before the Trademark Rules were amended, the Board decided 202 *inter partes* cases involving likelihood of confusion claims--over three times the number decided in 2003. Given the **[*816]** increased quantity of discovery, and the corresponding increase in discovery disputes, it is unlikely that litigation before the Board has become less expensive.

Moreover, broader discovery has not significantly altered the outcomes of decisions by the Board. The table below compares results before and after the 1972 amendments:

| OUTCOME | Section 2(d) Proceedings, 2003 (N=67) | Section 2(d) Proceedings, 1971 (N=202) |
|---|---|---|

| | | |
|---|---|---|
| Judgment for Plaintiff | 58% | 56% |
| Judgment for Defendant | 36% | 44% |
| Mixed Result | 6% | 0% |

On the other hand, the data suggest a higher rate of pretrial disposition in Board proceedings since the rules were amended. Between fiscal 1971 and fiscal 2003, the total number of *inter partes* cases disposed of by the Board after hearing dropped from 215 to 90, a decrease of 58.1%. During the same period, the number of *inter partes* cases filed with the Board increased dramatically, from 1,490 to 6,914--an increase of 464%. n72

n72 The figures quoted here are not strictly comparable to those used elsewhere in this article, since they include all *inter partes* cases (oppositions, cancellations, interferences and concurrent use proceedings) regardless of the claims involved or the basis of the Board's decision.

However, this increased rate of pretrial disposition may result not from facts disclosed through discovery, but from the expense and nuisance of discovery, and the fact that many cases become moot long before they are ready for trial. In this sense, the goals of trademark liberation have not been served.

## VII. PROPOSALS FOR REFORM

It is unrealistic to expect the elimination of discovery in Board proceedings, and unclear whether the benefits of doing so would outweigh the negative consequences. Similarly, a return to pre-1972 discovery practice would be undesirable. The rules were changed because of a broad consensus that they were unworkable and unfair. The suggestions below are largely based on changes in federal civil practice that have taken place over the last thirty years.

### [*817]  A. Mandatory Disclosures

The mandatory disclosure provisions of Fed. R. Civ. P. 26(a)(1) have been roundly criticized. In part, this results from the fact that federal district courts are courts of general jurisdiction. It is difficult, if not impossible, to fashion mandatory disclosures that provide useful information regardless of whether the plaintiff's claim involves employment discrimination, product liability, civil antitrust violations or trademark infringement.

The Trademark Trial and Appeal Board, by contrast, is a specialized tribunal. Parties seek certain types of information regardless of the peculiarities of their case. While mandatory disclosure or description of "documents . . . the disclosing party may use to support its claims or defenses" n73 is unlikely to produce useful results, the mandatory identification of likely deponents would allow parties to better plan their discovery strategy. In order to maximize the usefulness, of disclosures, parties might be required to identify individuals with knowledge of specific, relevant facts, such as (1) the selection and adoption of the defendant's mark; (2) the marketing, advertising and sale of the parties' goods or services; (3) any instances of actual confusion; (4) any third-party uses or registrations believed to be relevant by the parties; and (5) the facts supporting any affirmative defenses or counterclaims. Documents relating to these subject areas might also be subject to automatic disclosure.

n73 Fed. R. Civ. P. 26(a)(1)(B).

### B. Limits on Written Discovery

The Trademark Rules of Practice currently allow each party to serve seventy-five interrogatories. n74 By contrast, litigants in a federal civil action are allowed only twenty-five interrogatories absent leave from the court. n75 It is difficult to justify this disparity. By permitting parties to serve seventy-five interrogatories, the Board encourages poor draftsmanship and abuse of the discovery process. Limitations on document

n74 37 C.F.R. § 2.120(d)(1).


n75 Fed. R. Civ. P. 33(a).

Likewise, the Board imposes no limits on the number of depositions a party may take. This fact, combined with the Board's willingness to grant unlimited enlargements of the discovery period, delays the disposition and increases the cost of litigation. Under the Federal Rules of Civil Procedure, parties are limited to **[\*818]** ten depositions absent leave from the court. n76 Fewer would suffice in most Board proceedings.


n76 Fed. R. Civ. P. 30(a)(2)(A).

### C. Setting and Monitoring a Schedule

Under the present Trademark Rules, the Board issues an initial scheduling order after proceedings are instituted. n77 The initial discovery period is set for 180 days. n78 Discovery and trial dates are generally extended if the parties so stipulate. n79 This is in contrast to the United Kingdom, where the Patent Office "will only consider postponing an appointed hearing in exceptional circumstances." n80 Similarly, Fed. R. Civ. P. 16(b)(6) provides that the court's initial scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge. . . ."


n77 37 C.F.R. § 2.120(a).


n78 Id.


n79 Id.; T.B.M.P. (2d Ed. June 2003) § 403.04.


n80 Tribunal Practice Notice 1/2001.

In many cases, the parties may not be able to complete discovery within 180 days. In view of this fact, the Board might schedule an initial telephone conference with counsel within a short time after the issuance of the initial trial order and the exchange of mandatory disclosures. The Board would accommodate the reasonable requests of the parties at this stage, but require a specific showing of good cause before granting further extensions. As in the federal courts, an unsupported or belated assertion that further discovery is required, n81 that the issues are complex, n82 or a stipulation between the parties n83 would not suffice.


n81 In re Imperial Credit Indus. Secs. Litig., 252 F. Supp. 1005, 1017 (C.D. Cal. 2003); Truehart v. Blandon, 684 F. Supp. 1368, 1372 (E.D. La. 1988).


n82 Gestetner Corp. v. Case Equip. Co., 108 F.R.D. 138, 141-42 (D. Me. 1985).


n83 Chiropractic Alliance of New Jersey v. Parisi, 164 F.R.D. 618, 621-22 (D.N.J. 1996).

The Board's present practice is to suspend proceedings in six-month increments while parties are negotiating settlement. n84 The Board will suspend proceedings on its own initiative if the word "settlement" appears in a request for extension of discovery or trial dates. n85 This is directly contrary to

practice in the United Kingdom where "the Registrar is highly likely to agree to a postponement of an appointed hearing date where the parties are attempting to settle proceedings." n86

n84 37 C.F.R. § 2.117(c); T.B.M.P. (2d Ed. July 2003) § 510.03(a).

n85 *Id.*

n86 Tribunal Practice Notice 1/2001.

**[\*819]** Perhaps the U.K. Patent Office believes that firm deadlines are more likely to result in early settlement than indefinite continuances. The empirical evidence suggests otherwise; less than 2% of all U.S. oppositions are decided on the merits, compared to 20% of all oppositions in the United Kingdom and 28% before OHIM. On the other hand, it may well be faster and less expensive to litigate an opposition through to a decision before OHIM on the U.K. Patent Office than it is to negotiate a settlement in a Board proceeding.

## VIII. CONCLUSION

Litigation before the Trademark Trial and Appeal Board can be an arduous and expensive process. This is largely because of the broad scope of discovery permitted under the Trademark Rules of Practice and the laissez-faire attitude of the Board towards case management. No other jurisdiction permits American-style discovery in opposition and cancellation proceedings and, indeed, the scope of discovery permitted before the Board exceeds, in some respects, the scope of discovery permitted in federal civil actions. Even the limited discovery permitted under the Trademark Rules before 1972 far exceeded what is currently available in the United Kingdom or before the OHIM Opposition Board.

The Trademark Trial and Appeal Board is considerably more likely than the United Kingdom Patent Office or the OHIM Opposition Board to enter judgment for the plaintiff in proceedings involving likelihood of confusion. This tendency probably has something to do with the broader discovery permitted under the Trademark Rules, although there may be other contributing factors. Moreover, a comparison of proceeding outcomes in 1971 and 2003 suggests that discovery could be limited significantly without rendering the process more favorable to either plaintiffs or defendants.

A wholesale abandonment of discovery in Board proceedings would be inconsistent with the values underlying our adjudicative system. A return to pre-1972 practice would be similarly impractical. Nonetheless, the relative simplicity of the issues involved in trademark opposition and cancellation proceedings suggests that more proceedings should be decided on summary judgment. The number of depositions should be curtailed, and written discovery should be subject to limitations at least as stringent as those that apply in federal civil actions. Mandatory disclosures may further reduce written discovery. Moreover, greater involvement of the Board in case management might greatly reduce the delay, nuisance and expense of Board proceedings. Such reforms are both modest in scope and consistent **[\*820]** with the evolution of federal civil practice over the past three decades.

Service: **Get by LEXSEE®**
Citation: **94 TMR 800**
View: Full
Date/Time: Wednesday, March 28, 2007 - 5:40 PM EDT

 About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.