JAMES M. WAGSTAFFE (95535)
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Facsimile: (415) 371-0500

JAMES E. MAGLEBY (Utah Bar No. 7247, admitted *pro hac vice*)
JASON A. MCNEILL (Utah Bar No. 9711, admitted *pro hac vice*)
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 350
Salt Lake City, UT  84101-3605
Telephone: (801) 359-9000
Facsimile: (801) 359-9011

Attorneys for Defendant and Counterclaimant
PODFITNESS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| APPLE COMPUTER, INC., | Case No. C 06-05805 SBA |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| PODFITNESS, INC., and DOES 1-100, Inclusive, | Hon. Saundra Brown Armstrong |
| Defendants. | |
| PODFITNESS, INC., | DATE:  April 8, 2008<br>TIME:  1:00 p.m.<br>CTRM:  3 |
| Counterclaim Plaintiff, | |
| v. | |
| APPLE COMPUTER, INC., | |
| Counterclaim Defendants. | |

Dockets.Justia.com

**TO PLAINTIFF AND PLAINTIFF'S ATTORNEYS OF RECORD:**

NOTICE IS HEREBY GIVEN that on April 8, 2008 at 1:00 p.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Saundra Brown Armstrong, located in Courtroom 3, at 450 Golden Gate Avenue, San Francisco, CA, Defendant Podfitness, Inc. ("Podfitness") will move this Court for an order granting summary judgment in favor of Podfitness on Apple's First, Second, Fourth, Fifth, Sixth, Seventh and Eighth claims for relief.

This motion is based upon this Notice of Motion, the Memorandum of Points and Authorities filed contemporaneously herewith, the declarations of Jeff Hays and Greg Wayment filed contemporaneously herewith, and all pleadings, records, and files in this action, and on such oral and documentary evidence as may be presented on this motion.

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... i

II.   BACKGROUND ........................................................................................ 2

      A.    Apple ............................................................................................ 2

            1.    Apple's iPod Products ..................................................... 2

            2.    Apple's Application for, Registration of, the "IPOD" Mark ................... 3

            3.    Apple Does Not Own Any Rights to "POD" ........................... 4

      B.    Podfitness ..................................................................................... 5

            1.    Podfitness' Business is Limited to Exercise and Fitness ............ 5

            2.    The Podfitness Name ....................................................... 6

      C.    Pod-formative, i-formative, and Even iPod-formative Words Abound on the Internet and in Commerce ............................................... 7

III.  LEGAL STANDARD .............................................................................. 8

IV.   ARGUMENT ........................................................................................... 9

      A.    Apple Cannot Establish the Requisite Likelihood of Confusion ......... 9

      B.    The Relevant Marks Are Not Similar, as a Matter of Law ................ 10

            1.    Apple's is Estopped from Claiming a Likelihood of Confusion Based on its Prior Representations to the PTO ............. 10

            2.    Apple Cannot Otherwise Establish a Likelihood of Confusion ............ 12

      C.    Apple and Podfitness Offer Distinct Goods and Services ................. 15

      D.    Apple and Podfitness use of the Internet Differently ...................... 16

V.    THE REMAINING SLEEKCRAFT FACTORS LIKEWISE ESTABLISH NO LIKELIHOOD OF CONFUSION AS A MATTER OF LAW ..................... 16

      A.    The Strength of the IPOD Mark is Inapt ...................................... 16

      B.    No Intent to Infringe ................................................................ 18

      C.    Evidence of Actual Confusion is de minimis ................................ 19

      D.    No Evidence of a Likelihood of Expansion .................................. 20

      E.    Consumers' Degree of Care Weighs Against Confusion ................. 20

ii

VI.   IN ANY EVENT, LIMITED USE OF THE "IPOD" MARK IS "FAIR USE" ............. 23

VII.  ALL OTHER "LIKELIHOOD OF CONFUSION" AND INFRINGEMENT CLAIMS
      SHOULD BE REJECTED........................................................................... 25

VIII. CONCLUSION ......................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

## <u>*Cases*</u>

<u>Abercrombie & Fitch Co. v. Hunting World, Inc.,</u>
537 F. 2d 4 (2nd Cir. 1976)..........................................................................14

<u>AMF Inc. v. Sleekcraft Boats,</u>
599 F. 2d 341 (9th Cir. 1979) .....................................................1, 9, 16, 20

<u>Anderson v. Liberty Lobby,</u>
477 U.S. 242 (1986)...................................................................................9

<u>Beer Nuts, Inc. v. Clover Club Foods, Co.,</u>
805 F. 2d 920 (10th Cir. 1986) .................................................................21

<u>Brookfield Communications, Inc. v. West Coast Entertainment Corp.,</u>
174 F. 3d 1036 (9th Cir. 1999) .................................................................15

<u>c.f., Top Tobacco, L.P. v. North Atlantic Operations Co.,</u>
509 F. 3d 380 (7th Cir. 2007) ...................................................................11

<u>c.f., Zhang v. American Gem Seafoods, Inc.,</u>
339 F. 3d 1020, 1028 (9th Cir. 2003) .......................................................17

<u>Cairns v. Franklin Mint Co.,</u>
292 F. 3d 1139, 1152-53 (9th Cir. 2002) .............................................24, 25

<u>Celotex Corp. v. Catrett,</u>
477 U.S. 317 (1986)...................................................................................9

<u>Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Cente*r*,</u>
109 F. 3d 275 (6th Cir. 1997) ...................................................................20

<u>Freedom Card, Inc. v. JPMorgan Chase & Co.,</u>
432 F. 3d 463 (3rd Cir. 2005) ............................................................passim

<u>Gruner + Jahr USA Publ'n v. Meredith Corp.,</u>
991 F. 2d 1072 (2d Cir. 1993)...................................................................14

<u>In Re E.I. DuPont de Nemours & Co.,</u>
426 F. 2d 1357 (U.S.C.C. Pa. 1973) ...........................................3, 4, 12, 15

<u>Instant Media, Inc. v. Microsoft Corp.,</u>
2007 WL 2318948 (N.D. Cal. 2007) ...................................................passim

<u>Interstellar Starship Servs. Ltd. v. Epix, Inc.,</u>
304 F. 3d 936 (9th Cir. 2002) ...................................................................10

<u>JouJou Designs, Inc. v. JOJO Ligne Internationale, Inc.,</u>
821 F. Supp. 1347 (N.D. Cal. 1992) ......................................................9, 25

<u>KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,</u>
408 F. 3d 596 (9th Cir. 2005) ...................................................................23

iv

Lampi Corporation v. American Power Products, Inc.,
    1995 WL 723764 (N.D. Ill. Dec. 5, 1995) .................................................. 11, 12

M2 Software, Inc. v. Madacy,
    421 F. 3d 1073 (9th Cir. 2005) ....................................................................... 16

Microware Systems Corp. v. Apple Computer, Inc.,
    126 F. Supp. 2d 1207 (S.D. Iowa 2000) ....................................... 13, 18, 19, 25

Moose Creek, Inc. v. Abercrombie & Fitch Co.,
    331 F. Supp. 2d 1214 (C.D. Cal. 2004) ............................................. 10, 14, 20

Murray v. Cable Nat'l Broad. Co.,
    86 F. 3d 858 (9th Cir. 1996) .......................................................................... 15

New Kids on the Block v. New America Pub.,
    971 F. 2d 302 (9th Cir. 1992) ............................................................. 2, 23, 24

Nutri/System, Inc. v. Con-Stan Indus., Inc.,
    809 F. 2d 601 (9th Cir. 1987) ........................................................................ 20

Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.,
    130 F. 3d 88 (4th Cir. 1997) .................................................................... 11, 18

PostX Corp. v. docSpace Co., Inc.,
    80 F. Supp, 2d 1056 (N.D. Cal. 1999) ........................................................... 18

Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.,
    254 F. Supp.2d 985 (N.D. Ill. 2002) .............................................................. 17

Savin Corp. v. Savin Group.,
    391 F. 3d 439 (2d Cir. 2004) .......................................................................... 20

Surfvivor Media, Inc. v. Survivor Prods.,
    406 F. 3d 625 (9th Cir. 2005) ................................................................. passim

Thane Int'l v. Trek Bicycle Corp.,
    305 F. 3d 894 (9th Cir. 2002) .................................................................. 10, 19

Therma-Scan, Inc. v. Thermoscan, Inc.,
    295 F. 3d 623 (6th Cir. 2002) ........................................................................ 19

Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.,
    2007 WL 4234454 (C.A. 7 (Ill.) ..................................................................... 14

Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.,
    22 F. 3d 1527 (10th Cir. 1994) ...................................................................... 18

Zazu Designs v. L'Oreal, S.A.,
    979 F. 2d 499 (7th Cir. 1992) ........................................................................ 15

CASE NO. C 06-05805 SBA      NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT

### *Statutes*

15 U.S.C. § 1115...........................................................................................23

### *Other Authorities*

J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION,
    Volume 4, § 25:51.50 at 25-145 (2006).....................................2, 23

CASE NO. C 06-05805 SBA

NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT

# I.    INTRODUCTION

Defendant Podfitness is the creator of a cutting edge and successful fitness technology which combines workouts developed by the world's best known trainers with each user's own music library, to create the perfect customized workout using any portable digital music (i.e., "MP3") player.  Apparently believing that it has a monopoly on *anything* associated with the word "pod," Plaintiff Apple Computer ("Apple") filed the instant action against Podfitness claiming, astonishingly, that the name "Podfitness" somehow violates Apple's "IPOD" trademark.  As set forth below, Podfitness is entitled to summary judgment on Apple's trademark and related claims

First, Apple cannot demonstrate any likelihood of confusion, the lynchpin of any trademark claim.  More specifically, Apple cannot establish any likelihood of confusion between its "IPOD" mark and use by Podfitness of its "PODFITNESS" mark, under either the "internet trinity," or all eight factors of <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F. 2d 341 (9th Cir. 1979).  Apple is bound by its prior representations to the United States Patent & Trademark Office (the "PTO"), in which it argued (and prevailed), that the market for its iPod MP3 player was so limited and particular that there would be *no confusion* between its product and three (3) other identical "IPOD" marks; that consumers of Apple's iPod MP3 exercise a great deal of care in purchasing decisions; and that the marks "POD" and "IPODZ" were so different in sight, sound, and meaning, that there could be no confusion.  Whether viewed "'as judicial estoppel, an admission, waiver, or simply hoisting (the plaintiff) by its own petard,'" Apple's prior statements to the PTO regarding its IPOD trademark establish no likelihood of confusion.  <u>See</u> <u>Freedom Card, Inc. v. JPMorgan Chase & Co.</u>, 432 F. 3d 463, 476 (3rd Cir. 2005) (affirming summary judgment dismissal of trademark claims for no likelihood of confusion, including because of plaintiff's prior representations to PTO).  In addition, the <u>Sleekcraft</u> factors, including the critical differences in sight, sound and meaning between IPOD and PODFITNESS, and well-established Ninth Circuit precedent, confirm that there is no likelihood of confusion as a matter of law.

Second, even if it could demonstrate a likelihood of confusion, Apple's claims fail under the fair use doctrine.  At most, because Podfitness' services are compatible with MP3 players

1

including Apple's iPod, Podfitness has made a few scattered references to Apple's iPod product

on its website and in advertising materials.  Such references are nominative fair use.  <u>See</u>, e.g.,

<u>New Kids on the Block v. New America Pub.</u>, 971 F. 2d 302, 307 (9th Cir. 1992).  In fact, the

leading trademark treatise ironically selects Apple products to demonstrate fair use:

> (T)he hypothetical seller of software trademarked BLOTTO should be entitled to advertise:  'BLOTTO for your Apple IIGS® personal computer.'  Or a seller of software under the MACSTAR trademark should be permitted to state: 'MACSTAR for the Macintosh® SE computer.

J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, Volume 4, § 25:51.50 at 25-145

(2006).  References by Podfitness to the iPod product are exactly of this same type of fair use.

In short, this Court should summarily adjudicate Apple's First, Second, Fourth, Fifth,

Sixth, Seventh and Eighth claims for relief, which will significantly shorten and narrow in scope

the remaining discovery and issues for trial.

## II.  BACKGROUND

### A.  APPLE

#### 1.  Apple's iPod Products

Apple is the creator of one type of portable handheld digital media player, sometimes

referred to as an "MP3" player, which is offered and sold under the trademark "IPOD."  (<u>See</u>

First Amended Complaint (hereinafter, "FAC") ¶ 2).  Apple claims to have first marketed the

iPod player, using the IPOD mark,[1] on or about October 23, 2001.  (<u>See</u> FAC ¶ 9).  Apple's iPod

products are marketed through, among other things, certain department stores, member-only

warehouse stores, large retail chains, and specialty retail stores, as well as through the channels

for Apple's Mac products, and also through its website and online store (www.apple.com/store).

(<u>See</u> Declaration of Greg Wayment ("Wayment Decl.") ¶3, Exs. 1, 2).[2]  Notably, neither the

---

[1]  References to a product or company (i.e., the iPod MP3 player or Podfitness the company) are written in regular-case (i.e., as "iPod" or "Podfitness") and references to marks (such as "IPOD" or "PODFITNESS") are in capitals.

[2]  Notably, search results for "iPod" yield not only Apple's website, but also multiple sites that are clearly not associated with Apple, but which sell iPods, iPod-accessories, or iPod-related services, all using the IPOD mark.  (<u>See</u> Wayment Decl. ¶ 4, Ex. 2).

DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

Apple website nor the Apple store markets any products under the "POD" mark.

## 2. Apple's Application for, Registration of, the "IPOD" Mark

Apple holds three federal trademark registrations for the IPOD mark. Two of them cover "portable and handheld digital electronic devices ... (and) computer software for use ... on portable and handheld digital electronic devices," and the other pertains to "public Internet kiosk enclosure containing computer hardware." (See FAC ¶¶ 15-17). In addition, Apple has applied to register nine additional IPOD-related marks. (See FAC ¶¶ 18-19, 21-27).

The PTO initially rejected Apple's first two trademark applications. (See Wayment Decl. ¶ 5, Ex. 3). In its Office Action denying Application No. 75/982,871 ("871 Application"), dated October 21, 2001, the PTO indicated that while there were no similar registered marks, there were six similar applications that had been filed *prior* to the '871 Application, and that "(t)here may be a likelihood of confusion between the applicant's mark and the marks in the above-noted applications . . . ." (Wayment Decl. ¶ 5, Ex. 3 at 1 [APD000066]).[3] Of the six prior registrations, three were for the exact same "IPOD" mark, two were for "POD", and one was for "IPODZ." (Wayment Decl. ¶ 5, Ex. 3 at 1 and 4-10 [APD000066, APD000069- APD000075].

To assuage the PTO's concerns and ultimately convince the PTO to approve its applications, Apple represented to the PTO that there was "*no likelihood of confusion between Applicant's mark and the prior-filed marks*" because (among other things) the "IPOD" was different in appearance and sound from the "POD" mark. (Id. ¶ 6, Ex. 4 at 2 and 3-10 [APD000046-APD000052] (emphasis added)). Citing the multi-factor test of In Re E.I. DuPont de Nemours & Co., 426 F. 2d 1357, 1361-62 (U.S.C.C. Pa. 1973), Apple first argued its goods were unrelated to the goods/services sold under the prior marks, and that they were marketed to different consumers. (See Wayment Decl. ¶ 6, Ex. 4 at 3-6 [APD000047- APD000049]). Particularly germane here, Apple vigorously argued that POD and IPODZ were "*clearly different*" from IPOD in "appearance, pronunciation, meaning, and commercial impression" thus making "confusion *unlikely*." (Wayment Decl. ¶ 6, Ex. 4 at 5 [APD000050] (emphasis added)).

---

[3] The "APD" prefix denotes the Control Number for Apple's document production.

DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

Apple also emphasized to the PTO that potential customers would exercise sufficient care that they would not be confused. Specifically, Apple claimed that "(c)onsumers are likely to use care in purchasing expensive goods. <u>DuPont</u>, 426 F. 2d at 1361-62. Apple's IPOD product sells for about $400-$500…. *Individual consumers of prestige personal electronics devices such as Apple's IPOD player are also mindful of brand sources*. These two consumer groups – distinct from each other but both focused on distinguishing product source – *are not likely to mistakenly believe that Apple's IPOD and the various applied-for goods are related with respect to source*." (<u>Id.</u> ¶ 6, Ex. 4 at 6 [APD000051] (emphasis added)).

Finally, Apple argued to the PTO that any possible confusion with the prior marks was further reduced because Apple's goods were sold in entirely distinct sales channels than the prior applicant's products and services.[4] As a result, Apple claimed that there was no "interface" between Apple and the prior applicants. (<u>Id.</u> ¶ 6, Ex. 4 at 7 [APD000052]). Apple later reiterated its position "that the well-known Apple IPOD music player *could not be confused as to source* with the unrelated goods in the referenced applications." (<u>Id.</u> ¶ 7, Ex. 5 [APD000099] (emphasis added)).

Relying on Apple's detailed representations and explanation as to why their IPOD registration would not be confusing given the preexisting registrations, the PTO approved Apple's trademark application on April 27, 2004, and issued Trademark Registration No. 2,835,698. (<u>See</u> FAC ¶ 16 and Ex. B thereto).

### 3. Apple Does Not Own Any Rights to "POD"

On July 29, 2004, Apple filed United States Trademark Application Serial No. 78/459,101 for the "POD" mark. (<u>See</u> FAC ¶ 28). Critically, however, Apple's application is

---

[4] Apple has been very aggressive in drawing such distinctions. In 2007, when it could not obtain an agreement from Cisco Systems, Inc. ("Cisco") to license Cisco's previously registered trademark for IPHONE, Apple's CEO Steve Jobs introduced the iPhone product to the media and public anyway, without permission. (<u>See</u> Wayment Decl. ¶ 8, Ex. 6 at 4-5). Apple's excuse was that there were very defined channels of trade, and that even though the iPhone mark was already being used to sell telephones, that Apple was "the first company ever to use iPhone for a *cell* phone," and so there would be no confusion. (<u>See</u> Wayment Decl. ¶ 9, Ex. 7 at 2). Apple should be held to its view of relevant channels.

based upon an *intent to use*, rather than on actual past use.  Apple has no *registration* for "POD", and the registration has been opposed and challenged by a number of parties.

## B.  PODFITNESS

### 1.  Podfitness' Business is Limited to Exercise and Fitness

Podfitness is an Internet-based company that markets an innovative customized audio personal training service.  Subscribers to Podfitness' service can create individually-tailored downloadable fitness workouts that can be downloaded to and played through the user's portable digital media player, such as Microsoft's Zune player, an iPod, or virtually any other MP3 music player.  Each user is able to select from a multitude workout regimes designed by a veritable "who's who" list of fitness trainers.  The workout is tailored specifically to each user's fitness profile, personal goals and available equipment.  (See Declaration of Jeff Hays ("Hays Decl.") ¶¶ 8, 10-12 and Ex. B).  The Podfitness system offers the user the innovative option of selecting workout programs developed from a wide array of world-class trainers.  (Id. ¶¶ 8, 10, 12, 14 and Ex. B).[5]  The workouts are combined with music tracks on the subscriber's portable digital media player to create a dynamic and unique workout experience.  Podfitness' market is therefore a subset of persons using MP3 players, with the primary target audience *necessarily* those persons interested in fitness and workout programs, i.e., physical exercise.  (See Hays Decl. ¶ 15 and Ex. B).

Podfitness makes it clear that it is not affiliated with Apple and that it does not sell iPods.  The Podfitness subscription service is available only through the Internet.[6]  Since the programs are played through the user's own portable music player, it is inevitable that limited references

---

[5]  Podfitness has gathered an incredible group of nationally-known trainers and fitness/workout experts, including "America's Trainer" Kathy Smith, supermodel trainer David Kirsch, Mr. Olympia Jay Cutler, and running legend Jeff Galloway, among a host of others. (See Hays Decl. ¶ 14 and Ex. B).

[6]  However, Podfitness has also built or is building strategic partnerships with technology, fitness, and media companies like Microsoft, Fitness Magazine, Polar USA, Cooper Aerobics Center, and Lady Foot Locker.  Podfitness has been featured on the Tyra Banks show, CNN Headline News, E! News Live, and in the pages of Shape, Life & Style Weekly, Consumer Digest, Wall Street Journal, LA Times, New York Times, Washington Post, and Better Homes and Gardens.  Self magazine gave Podfitness the highest rating of its training "gadgets" review, an "A." rating.  (See Hays Decl. ¶ 13 and Ex. B).

are made on Podfitness' website to the iPod, among other products.  But such references hardly are confusing.  (Hays Decl. ¶ 17 and Ex. B).  Throughout its site, Podfitness repeatedly makes it clear that their product works on any number of digital media players, such as the competing Microsoft Zune, and is *not* limited to the iPod.  (Hays Decl. ¶¶ 15-16, 18-21 and Ex. B).  Indeed, Podfitness' sites and advertising include an unequivocal disclaimer, stating that "iPod is a registered trademark of Apple, Inc.  Podfitness is *not affiliated with or endorsed or supported by Apple, Inc.*"  (See Hays Decl. ¶ 25 and Ex. B, passim (emphasis added)).

In fact, the first version of Podfitness was *not compatible with Apple's Mac product*, and could only be used through the Microsoft Windows platform.  (See Hays Decl. ¶ 26 and Ex. D at 293-294).  Today, the Podfitness homepage prominently states that "Podfitness is now allied with Microsoft Health Vault," and prominently displays Microsoft as a Podfitness corporate partner.  (See Hays Decl. ¶12 and Ex. B).  Microsoft is, of course, a chief *rival* of Apple.

### 2. The Podfitness Name

The name Podfitness was chosen partly in response to the increasing popularity of the term "podcast" or "podcasting,"[7] but also because it was a domain name still available to purchase.  At the time, because of the media and other discussion about the popularity of podcasts, the word "pod" had a number of meanings, including primarily reference to the generic category of MP3 players, the "pod" in "podcast," "portable on demand," a small thing connected to a larger thing, and the iPod product.  (Hays Decl. ¶¶ 2-4, 26 and Ex. D at 65-68, 100, 212). The word "podcast" is a generic term meaning a digital recording made available on the Internet for downloading to a personal audio player or computer.  (See Hays Decl. ¶ 3 and Ex. A). Podfitness sells fitness podcasts, except that unlike traditional podcasts, the Podfitness product is individually created and customized for the consumer.  (See Hays Decl. ¶ 4).

---

[7] Eventually, the word "podcast" was named the "word of the year" for 2005 by the New Oxford American Dictionary.  (See Hays Decl. ¶ 3, Ex. A).

6

## C.  POD-FORMATIVE, i-FORMATIVE, AND EVEN iPOD-FORMATIVE WORDS ABOUND ON THE INTERNET AND IN COMMERCE

As noted, Apple expressly disclaimed to the PTO "POD" and "IPODZ", and emphasized the "i" formative nature of its IPOD mark.  The assertions were well-founded: the use of pod-formative (and even i-formative and iPod-formative) words on the Internet is ubiquitous.

Pod formative words:  A search for pod-formative marks on the PTO website returns 1,233 live marks.  Results include terms like POD, MPOD, AIRPOD, SUNPOD, J POD, MY POD, and POD CAST GO.  (See Wayment Decl. ¶ 19, Ex. 8).  Similarly, a Google search with the word "pod" turns up 180,000,000 results, and the word IPOD does not even appear on the first page.  (See Wayment Decl. ¶ 11, Ex. 9).  Rather, the organic[8] results include PODS (first hit) (a portable moving and storage company), "Payable on Death" (second hit) (a band), "POD" (fourth hit) for podrestaurant.com, and so on.  (See Wayment Decl. Ex. 9).

Furthermore, the first reference in the Google organic search result to downloadable music (which is not Podfitness' market) refers to "P.O.D. MP3 Downloads," and not to "IPOD," and is for the site "mp3.com."  The link displayed on Google states that "MP3.com offers legal POD music downloads as well as all of your favorite POD music videos."  (See Wayment Decl. ¶ 11, Ex. 9).  Clicking on this link leads to the mp3.com webpage, marketing music and video for all "POD" players, i.e., the iPod, the Microsoft Zune player, and other MP3 players.  (See Wayment Decl. ¶ 12, Ex. 10).

The term "podcast" has become so common on the Internet that a Google search reveals 94,000,000 "hits" for the term.  Results include sites such as podcast.com, Podcast.net, PodcastAlley.com, and Podcast Pickle.[9]  (See Wayment Decl. ¶ 13 and Ex. 11).

---

[8]  Although perhaps not clear from the Exhibit, the first two results are "Sponsored Links," which means an advertising fee was paid to Google to show these links to someone conducting a search for the word "pod."  The "original" search results are those returned by Google through its search engine, and are not paid advertising.

[9]  Even some federal district courts offer their own podcasts.  *See, e.g.,* http://www.ca7.uscourts.gov/ca7_rss.htm.  Despite the fact that "podcast" is a generic word, after it had obtained its IPOD registration by disclaiming "POD," Apple sent cease and desist letters to various companies, in an attempt to take the generic word "podcast" as its own.  (*See* Wayment

_i-formative words:_  Even though the PODFITNESS mark is *not* an i-formative term, it is

notable that i-formative words are extremely common, and consumers thus face a crowded field

of such marks and names, including iLounge (offering "All things iPod, iPhone, iTunes and

beyond"); iThings and ithings.co.uk.; iTrainer and itrainer.com (identified as "The Personal

Trainer on your iPod – Get Fit and Lose Weight – MP3 Fitness Programs"); iTrain and

itrain.com (offering "iTread," iCycle," "iClimb," iRow," iStrength," and numerous other "i"

formative programs); iFitnessDirect and ifitnessdirect.com, iFitness Solutions Club and

ifitness.net; iAmplify; iHome (offering an "iH" formative line of products, such as the iHM1B2

"Portable Speaker for iPod Nano" and the iHM3B "Portable Speaker for MP3 Players"); iSkin

and iskin.com ("iskin touch for iPod classic"); iZap (lithium battery line for the iPod); and

iToner (program to manage iPhone ringtones).  (_See_ Wayment Decl. ¶ 15 and Ex . 13).

       _iPod-Formative Words and the iPod Accessories Market:_  Apple's trademarked term

IPOD, used in reference to Apple's MP3 iPod product, is ubiquitous on the Internet and in

commerce, even though the sellers are *not* Apple.  There are thousands - if not tens of thousands

- of iPod-related accessories (some of which might be marketed in conjunction with Apple, but

most of which are not): ipodcarparts.com; theipodaccessorystore.com; hipipodgear.com;

freeipodplayers.com, iPodCopy software; iPod Hacks and ipodhacks.com; iPodFanatic.com;

allthingsiPod and allthingsipod.co.uk; iProng.com and iProng Magazine ("the publication for

iPod and iPhone users"); everythingiPod.com ("The Superstore for your iPod"); iPodLinux;

iFrogz (iWrapz for iPod and iPhone); Ipodgear.com (iPod stuff'n'more); ipodtour.com; and

ipodtraining.com.  (_See_ Wayment Decl. ¶¶ 16 and 17 and Exs. 14 and 15).

## III.    LEGAL STANDARD

       Summary judgment is appropriate where there exists no genuine issue of material fact

and a party is entitled to judgment as a matter of law.  _See_ _Celotex Corp. v. Catrett_, 477 U.S.

317, 322 (1986).  A factual dispute is genuine only if the non-moving party can offer "concrete

---

Decl. ¶ 14 and Ex. 12).  Apple has probably not, however, threatened the federal courts to stop
them from using the word "podcast."

evidence" such that a reasonable jury could return a verdict in its favor. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986). The burden on the moving party may be discharged by identifying to the court "that there is an absence of evidence to support the non-moving party's case." <u>See</u> <u>Celotex</u>, 477 U.S. at 325. This Court has recognized that summary judgment on trademark infringement issues such as likelihood of confusion is appropriate where "there are no facts in dispute and the issue of confusing similarity is based solely upon a comparison of the marks in the context of extrinsic facts." <u>JouJou Designs, Inc. v. JOJO Ligne Internationale, Inc.</u>, 821 F. Supp. 1347, 1352 (N.D. Cal. 1992) (Armstrong, J).

## IV. ARGUMENT

### A. APPLE CANNOT ESTABLISH THE REQUISITE LIKELIHOOD OF CONFUSION

To prevail on its trademark claim, Apple must plead and prove that Podfitness is likely to confuse its customers into believing that they are dealing with Apple. <u>Instant Media, Inc. v. Microsoft Corp.</u>, 2007 WL 2318948 at *6 (N.D. Cal. 2007) (Armstrong, J.). In this Circuit, "(c)onfusion is tested by asking 'whether a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.... Confusion must be "probable, not simply a possibility." <u>Instant Media</u>, 2007 WL 2318948, at *6 (citations omitted); <u>see also</u> <u>JouJou</u>, 821 F. Supp. at 1353 ("The important inquiry is whether the *average purchaser* would be likely to believe that the infringer's product has 'some connection' with the mark's owner.") (emphasis in original).

To assess the likelihood of confusion, the court considers the eight factors articulated in <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F. 2d 341 (9th Cir. 1979), as "non-exhaustive guidance." <u>Instant Media</u>, 2007 WL 2318948, at *6 (listing factors). Where the Internet is involved, "the three most important <u>Sleekcraft</u> factors in evaluating a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods and services, and (3) the parties' simultaneous use of the Web as a marketing channel." <u>Interstellar Starship Servs. Ltd. v. Epix, Inc.</u>, 304 F. 3d 936, 942 (9th Cir. 2002); <u>Instant Media</u>, 2007 WL 2318948 at *7. This analysis, commonly referred to as the "controlling troika" or "Internet trinity," applies here since Podfitness' primary business is through the Internet. (<u>See</u> Hays Decl. ¶ 7).

9

## B. THE RELEVANT MARKS ARE NOT SIMILAR, AS A MATTER OF LAW

"The Ninth Circuit considers the 'similarity of the marks' factor to be a '*critical question*' in the likelihood of confusion analysis." Instant Media, 2007 WL 2318948, at * 7 (emphasis added). To assess similarity, the court must compare the sight, sound and meaning of the marks. Id.; Surfvivor Media, 406 F. 3d at 631. Because there is no likelihood of confusion between the marks IPOD and PODFITNESS as a matter of law, Podfitness is entitled to judgment as to Apple's trademark claims. See JouJou Designs, 821 F. Supp. at 1353 & n. 6 (likelihood of confusion is principal test for federal and California state trademark infringement / unfair competition claims); see also, Surfvivor Media, Inc. v. Survivor Prods., 406 F. 3d 625, 635 (9th Cir. 2005) (affirming summary judgment dismissal of federal trademark claims); Thane Int'l v. Trek Bicycle Corp., 305 F. 3d 894, 901 (9th Cir. 2002) (likelihood of confusion is "'core element' of trademark infringement law."); Moose Creek, Inc. v. Abercrombie & Fitch Co., 331 F. Supp. 2d 1214, 1225 (C.D. Cal. 2004) (same). As set forth below, there is no likelihood of confusion because the PODFITNESS and IPOD marks are so strikingly *dis*similar.

### 1. Apple's is Estopped from Claiming a Likelihood of Confusion Based on its Prior Representations to the PTO

A party cannot seek to enforce its trademark rights by taking a position contrary to statement it made to the PTO in obtaining approval of its trademark application. In Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F. 3d 463 (3d Cir. 2005), the Third Circuit affirmed the trial court's summary judgment on plaintiff's trademark claims, in part because of the plaintiff's prior representations to the PTO:

> The district court viewed (the plaintiff's) representations to the USPTO through the lens of judicial estoppel. Whether we view the district court's treatment of (the plaintiff's) prior representations about the commercial availability of the marks containing the word "freedom" as judicial estoppel, an admission, waiver, or simply hoisting (the plaintiff) by its own petard, we agree with the district court's conclusion. . . . (*The plaintiff's*) *own statements and actions, together with* (*the defendant's*) *undisputed evidence of the widespread and common use of "freedom," undermines* (*the plaintiff's*) *belated attempt to establish likelihood of confusion from the juxtaposition of "FREEDOM" and Chase's housemark.*

Freedom Card, 432 F. 3d at 476 (emphasis added).  Similarly, Lampi Corporation v. American Power Products, Inc., 1995 WL 723764 (N.D. Ill. Dec. 5, 1995) granted summary judgment to a defendant based upon the plaintiff's prior representations to the PTO, noting that judicial estoppel "forbids a litigant from obtaining a victory in a prior proceeding and then reputing the grounds for that victory in a different case in order to win a second victory."  Id. at * 3 (citation omitted); see also Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F. 3d 88, 94 (4th Cir. 1997) (noting that plaintiff's prior inconsistent statements to PTO undercut its current arguments to the court); c.f., Top Tobacco, L.P. v. North Atlantic Operations Co., 509 F. 3d 380 (7th Cir. 2007) (affirming summary judgment for defendant on trademark infringement claim, including because plaintiff had assured the PTO "that it was claiming only limited rights in the word 'top'); Instant Media, 2007 WL 2318948, at *8-9, 10-11, 13 (accepting parties' prior representations to the PTO on issues such as visual similarity of the marks, sound of the marks, relatedness of the goods and services, and strength of the marks in a "crowded field.").

Here, Apple's own prior representations to the PTO demonstrate that even Apple itself sees no similarity between the IPOD and PODFITNESS marks.  The PTO initially *rejected* Apple's application for the IPOD mark based upon a perceived likelihood of confusion between "IPOD" and *prior* applications for the marks "POD," "IPOD," and "IPODZ."  Apple convinced the PTO to reconsider its rejection by arguing that the sight, sound and meaning of its proposed IPOD mark and the POD and IPODZ marks were so dissimilar that no confusion was likely.

For example, Apple asserted to the PTO that its IPOD mark was "***clearly different in appearance and sound***" from the POD and IPODZ marks.  (See Wayment Decl. ¶ 6, Ex. 4 at 6 (emphases added)).  Apple emphasized – *not* the "pod" portion of its mark, but rather the use of the "i" in the mark, which Apple claimed distinguished the IPOD mark from the others:

> Dissimilar marks are not likely to be confused.  DuPont,  426 F.2d at 1361-62. As detailed below, various differences between Apple's IPOD, a fanciful term coined by Apple and closely linked in commercial impression with Apple's family of well-known "I"-formative marks: and the marks (footnote: IMAC®, IBOOK®, IPHOTO EXPRESS®, IPHOTO PLUS & Design®, IPHOTO$^{TM}$, IMOVIE$^{TM}$, IPOD$^{TM}$, IDVD$^{TM}$, and ITUNES$^{TM}$) in the referenced applications with respect to appearance, pronunciation, meaning, and commercial impression, make confusion unlikely.

> Two of the identified applications are for marks <u>clearly different in appearance and sound from Apple's:  POD and IPODZ....</u>

(Wayment Decl. ¶ 6, Ex. 4 at 6)[APD000050] (underline emphasis added)).

Based upon these representations to the PTO, Apple is judicially estopped from now arguing that its mark is similar to PODFITNESS, that "pod"-formative marks (i.e., anything without the crucial "i") are similar to its IPOD trademark, and from asserting any rights based upon "pod."[10]  Apple's sight, sound and meaning disclaimers to the PTO call for the application of the rule of <u>Instant Media</u>, <u>Lampi</u>, and <u>Freedom Card</u>.

### 2.    Apple Cannot Otherwise Establish a Likelihood of Confusion

Aside from Apple's representations to the PTO, comparison of the IPOD and PODFITNESS marks shows they are dissimilar in sight, sound and meaning, and confusion is unlikely as a matter of law.

First, the terms IPOD and PODFITNESS are strikingly different in appearance:



(<u>See</u> Hays Decl. ¶ 7).  "Podfitness" has 10 letters while "IPOD" only has four letters.  The only common sequential letters, "pod," appear at the end of the IPOD mark and at the beginning of the "Podfitness" mark.  Further, PODFITNESS is typically written in green lettering, with light green for the "pod" portion, medium green for the "fitness" portion, and dark green for the ".com" portion of the mark.  By contrast, the IPOD mark is typically in grey text, with no difference in the colors of the letters.  PODFITNESS also begins with a capital letter, while IPOD begins with the lower-case "i."  The visual comparison of the marks is clearly not similar.  The Apple and Podfitness websites are also strikingly different and, as noted below, call for

---

[10]  Indeed, if Apple were allowed trademark rights in the term "pod," then Apple could (by way of example) bring claims against persons using the term "podcast."  However, no amount of time or money spent to promote a generic term can convert that term into a trademark, or remove the ability to use the term from the marketplace.  *See infra*.

12

1    completely different types of customer interaction.[11]  (See Hays Decl. ¶¶ 8-12, 15, 17-18, 23-24

2    and Ex. B); (See Wayment Decl. ¶ 3 and Ex. 1).

3           Second, the marks sound entirely dissimilar when spoken.  IPOD has just two syllables

4    and begins with a hard "i" sound, with the phonetic emphasis on the "I," while PODFITNESS

5    has three syllables, begins with the "pod" sound, with the phonetic emphasis on "fitness."

6           Third, while the term "IPOD" appears to have no particular meaning,[12] the word "fitness"

7    in "Podfitness" invokes health and exercise, concepts that "IPOD" does not evoke.

8           Finally, in the *context* in which they are used, there is no likelihood of confusion as the

9    Podfitness website is completely different from the Apple site, includes disclaimers of any

10   association with Apple on virtually every page, and prominently states, including on its home

11   page, that Podfitness is a partner with Apple's chief rival Microsoft.  (See Hays Decl. ¶ 12, 25,

12   26 and Ex. B).

13          Consequently, the respective marks are not similar in sight, sound, or meaning.  See, *e.g.*,

14   Alladin Plastics, 362 F. 2d at 534 (summary judgment dismissal for no likelihood of confusion

15   upon "simple comparison of the sound, appearance, and meaning of the two marks."); Freedom

16   Card, Inc. v. JPMorgan Chase & Co., 432 F. 3d 463, 482 (3rd Cir. 2005) (affirming summary

17   judgment where there was no likelihood of confusion between "Chase Freedom" card and

18   "Freedom Card").

19          The mere fact that both IPOD and PODFITNESS use the word "pod" does not change the

20   fact that these two marks *as a whole and in context* are plainly different.  Aside from Apple's

21   successful argument to the PTO (which Apple is estopped to deny) that the term "POD" is

22

23   _____
     [11]  Ironically, in Microware Systems Corp. v. Apple Computer, Inc., 126 F. Supp. 2d 1207, 1213,
24   n. 6 (S.D. Iowa 2000), Apple successfully argued that even though the case involved the literally
     *identical* marks "OS-9", there was no likelihood of confusion because the Court should consider
25   the context in which the marks were presented.  Specifically, Apple urged "a broader reading of
     similarity so as to embrace not just similarities in sight and sound, *but to consider the*
26   *"circumstances under which the marks are encountered in the marketplace*."  Id. at 1214
     (emphasis added) (denying preliminary injunction and granting Apple's motion for summary
27   judgment on "fair use" defense).

     [12]  Apple claims IPOD to be an arbitrary and fanciful term, with no descriptive reference.  Yet,
28   Apple refuses to produce any discovery as to the basis for the name.  *See infra*.

                                              13

dissimilar and not confusing to its IPOD mark, the "anti-dissection" rule demands that the marks be compared in their *entirety*, and even the inclusion of a common elements, words or string of letters, does not make the marks confusingly similar.[13]  See Instant Media, 2007 WL 2318948 at * 8 (marks not similar "simply because they contain an identical or nearly identical word").[14]

Moreover, as noted above, the use of "Pod", pod-formative, and even i-formative marks on the Internet is ubiquitous, and "POD" is used (among other things) more broadly and as a generic term for mp3 players, podcasts, etc.  *See supra*.  And, contrary to Apple's anticipated assertions, Apple holds no rights to POD[15] – POD is not a registered mark belonging to Apple, and Apple has *never* used POD in commerce, let alone prior to the Podfitness mark.[16]  See, *e.g.*, Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F. 3d 1036 (9th Cir. 1999) ("'(A)n intent to use a mark creates no rights a competitor is bound to respect.'") (quoting Zazu Designs v. L'Oreal, S.A., 979 F. 2d 499, 504 (7th Cir. 1992).)  In sum, the marks are so dissimilar in sight, sound and meaning that confusion is unlikely as a matter of law.

_____

[13]  Of course, this is exactly the point made by Apple to the PTO when it emphasized "Apple's family of well know 'I' formative marks."  (Wayment Decl. ¶ 6, Ex. 4 at 5 [APD000050]).

[14]  This principle is uniformly accepted in federal case law.  Moose Creek, 331 F. Supp. 2d at 1227, 1229 (concluding that "Moose" was not confusingly similar to "Moose Creek" because "on the whole they sound different because (one) contains an additional word"); Gruner + Jahr USA Publ'n v. Meredith Corp., 991 F. 2d 1072, 1078 (2d Cir. 1993) (dissimilar elements distinguished marks, and "Parent's Digest" did not infringe upon "Parents" magazine, despite common word "parents"); see also Top Tobacco, L.P. v. North Atlantic Operating Co., Inc., 2007 WL 4234454, at * 2 (C.A. 7 (Ill.) (noting that there "is no doubt that 'top' is commonly used in the tobacco business").

[15]  No amount of time and money – even if invested by an industry giant like Apple – can transform a common or generic word like "pod" into a trademark.  As one court noted, "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F. 2d 4, 9 (2nd Cir. 1976).

[16]  Apple has filed an "*intent to use*" application with the PTO for the POD mark, a *de facto* admission that Apple has never *used* "POD" in commerce, and thus will always be junior to the existing Podfitness mark.  Apple's application faces several oppositions.

### C.   APPLE AND PODFITNESS OFFER DISTINCT GOODS AND SERVICES

The second factor of the "Internet trinity" pertains to the relatedness of the goods and services at issue.  "The standard for deciding whether the parties' goods or services are 'related' is whether customers are 'likely to associate' the two product lines."  <u>Surfvivor Media, Inc. v. Survivor Prods.</u>, 406 F. 3d 625, 633 (9th Cir. 2005).  As noted, Apple cannot deny that goods or services bearing the POD mark are "unrelated" and are "not likely to be confused" with IPOD. (Wayment Decl. Ex. 4 at 3 [APD000047] (<u>citing</u> <u>DuPont</u>, 426 F. 2d at 1361-62).

Podfitness does not sell MP3 players.  Rather, Podfitness sells, on a subscription basis, customized, downloadable audio exercise workout routines conducted by celebrity trainers that can be played on any number of portable media players.  On the other hand, the IPOD products consist of portable handheld digital electronic devices for recording, transmitting, manipulating and reviewing text, data, and audio files.  The PODFITNESS mark identifies a *service* while the term "IPOD" describes a tangible, physical *product*, i.e., a portable media player.  Further, although Podfitness' services are compatible with and marketed to MP3 users generally, which includes iPod users, the services are marketed only to a limited segment of that market – MP3 users who are also interested in fitness and exercise.  A user interested in music *but not fitness* has no need for Podfitness.

Podfitness' workouts and Apple's IPOD are not used for the same purpose, not reasonably interchangeable by consumers, and are not marketed to the same consumer class.  In short, "the products . . . are extraordinarily different within the context of the internet."  <u>Instant Media</u>, 2007 WL 2318948 at * 12.  Confusion between the IPOD and PODFITNESS marks is unlikely and summary judgment is proper.  <u>See</u>, *e.g.*, <u>Murray v. Cable Nat'l Broad. Co.</u>, 86 F. 3d 858, 861 (9th Cir. 1996) (affirming summary judgment for defendant where plaintiff's consumer survey services offered were unrelated to television programming and related polling services); <u>see also</u> <u>M2 Software, Inc. v. Madacy</u>, 421 F. 3d 1073, 1082 (9th Cir. 2005) (finding that "sports related music" was "very significantly different" from music CDs) (cited by <u>Instant Media</u>, 2007 WL 2318948 at * 11).

### D.  APPLE AND PODFITNESS USE DIFFERENT CHANNELS OF TRADE

Both Apple and Podfitness sell products through the Internet.  But, Apple indisputably advertises its products more widely and through different channels.  Apple also sells IPOD products through brick and mortar stores, and widely advertises its iPod products on television. The average consumer is therefore unlikely to confuse the products just because both are on the Internet.  See Instant Media, 2007 WL 2318948 at * 10 (sophistication of modern consumers requires comparing products on their merits, rather than lumped under "general rubric of 'Internet-related services'").

Apple more than anyone must concede that different channels of trade are sufficient to prevent confusion.  For example, when Apple went to market with the IPHONE mark without permission from Cisco (the owner of the IPHONE mark), Steve Jobs explained that because there exists very defined channels of trade, and Apple was "the first company ever to use iPhone *for a cell phone*," (as opposed to a regular phone) there would be no confusion with Cisco.  (See Wayment Decl. ¶¶ 8-9, Exs. 6,7).  This same standard more than favors Podfitness.

## V.  THE REMAINING *SLEEKCRAFT* FACTORS LIKEWISE ESTABLISH NO LIKELIHOOD OF CONFUSION AS A MATTER OF LAW

The remaining Sleekcraft factors "are relatively unimportant to the likelihood of confusion analysis in Internet-related cases."  Instant Media, 2007 WL 2318948 at *14; see also GoTo.com, Inc. v. Walt Disney Co., 202 F. 3d 1199, 1120 (9th Cir. 2000).  That said, consideration of those factors actually underscores that there is no likelihood of confusion.

### A.  THE STRENGTH OF THE IPOD MARK IS INAPT

To the extent that Apple attempts to tout the strength of the IPOD mark, the Court should preclude it from doing so.  During discovery, Podfitness sought documents from Apple regarding its decision to select that name.  In response, Apple refused to produce any such documents, claiming that they were *irrelevant*.[17]  (See Wayment Decl. ¶ 21, Ex. 19 at 1).  Having staked out

---

[17] In its interrogatories, Podfitness specifically requested that Apple explain "why (it) and/or its predecessors chose to use the name IPOD."  Apple first *agreed* to "produce documents from which the answer to this interrogatory may be ascertained pursuant to Fed. R. Civ. P. 33(d),"

that position, Apple should now be precluded from making any argument based on the strength

of the mark.  See Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc., 254 F. Supp.2d

985, 993 (N.D. Ill. 2002) (precluding argument of infringement in trademark case, and granting

summary judgment, where party had refused to produce discovery on same issue); c.f., Zhang v.

American Gem Seafoods, Inc., 339 F. 3d 1020, 1028 (9th Cir. 2003) (affirming district court's

exclusion of evidence not produced during discovery).

The word "pod" was obviously in existence long before the iPod, or even Apple as a

company.  The word "pod" has multiple meanings, and as Apple told the PTO, the word "pod" is

separate and distinct in meaning from IPOD.  Thus, even to the extent the IPOD mark is a strong

mark, it is not based upon "pod," as a stand-alone.  The "i" in IPOD is, as Apple told the PTO,

more of an identifier for the product, as Apple has a series of "i-formative" marks.  Therefore, to

the extent there is strength in the IPOD mark, that strength arises from the *dis*similarities with the

PODFITNESS mark.  At most, the "pod" portion of the mark is suggestive of something related

to the many definitions of "pod"[18] and as a suggestive mark, IPOD is only "worthy of some

protection," Surfvivor Media, 406 F. 3d at 632, but it is not entitled to the protection afforded

arbitrary or fanciful marks "that have no connection with the actual product."  Id. at 631.

And, despite any strength of the IPOD mark, both that mark and – to an extent beyond

challenge – the term "POD," are in an extremely "crowded field."[19]  "Where a plaintiff's mark

resides in a crowded field, 'hemmed in on all sides by similar marks on similar goods,' that mark

---

(See Wayment Decl. ¶¶ 19 and 20, Ex. 17 at 45 and Ex. 18 at 1-2).  Apple later abruptly reversed
itself and *refused* to produce any information about why it chose the IPOD mark, claiming it was
irrelevant.  (See Wayment Decl. ¶ 21, Ex. 19 at 1).

[18]  Obviously, it would be nice to know the basis for Apple's selection of "pod" to include with
the "i" in its family of i-formative marks, but since Apple believes such information is irrelevant,
it should be precluded from asserting the strength of the mark based upon the creation of the
name.

[19]  Ironically, Apple has prevailed upon a similar argument in other trademark litigation,
persuasively demonstrating in a case involving the "OS-9" mark that there were seven registered
products using the letters "OS" with a number, ten registered marks using "OS" only, and 27
nonregistered titles using "OS" in the name without a number.  See Microware Systems Corp. v.
Apple Computer, Inc., 126 F. Supp. 2d 1207, 1213, n. 6 (S.D. Iowa 2000) (denying preliminary
injunction and granting Apple's motion for summary judgment on "fair use" defense).

17

1   is weak as a matter of law." Instant Media, 2007 WL 2318948 at *12 (quoting PostX Corp. v.

2   docSpace Co., Inc., 80 F. Supp, 2d 1056, 1061 (N.D. Cal. 1999).) (holding that crowded field of

3   "IM" mark, including over 600 registered marks with variations of "IM," "I'M," or "I AM"

4   "countervails any strength Instant Media's marks may have"); accord Petro Stopping Centers,

5   130 F. 3d at 92 (concluding that other registrations of PETRO mark supported trial court's

6   finding mark was weak).  The PTO database reveals an astounding number of POD formative

7   marks, and i-formative and even iPod-formative marks are ubiquitous on the Internet.  (See

8   Wayment Decl. ¶¶ 15-17 and Exs. 13, 14, and 15).

9       **B.  NO INTENT TO INFRINGE**

10      Lack of intent weighs in Podfitness' favor.  See Universal Money Ctrs., Inc. v. American

11  Tel. & Tel. Co., 22 F. 3d 1527, 1531-32 (10th Cir. 1994); see also Surfvivor, 406 F. 3d at 634

12  (granting summary judgment for defendants despite defendants' prior awareness plaintiff's

13  mark); GoTo.Com, 202 F.3d at 1208.  By virtue of its market, Podfitness targets some iPod

14  users, since they necessarily are a subset of all MP3 users.[20]  But there is no evidence that

15  Podfitness intended to deceive the public into believing that it was Apple.  In fact, Podfitness

16  expressly disclaims any such connection.  (See Hays Decl. ¶¶ 15, 18-21, 25 and Ex. B).

17  Moreover, it would be *detrimental* to Podfitness' business to confuse consumers into believing

18  its business was *limited* to only iPod or iTunes users.  (See Hays Decl. ¶ 15, 18, 25, 26 and Ex. D

19  at 169, 291, 293-295).  And, the actual display of the Podfitness mark evidences no intent to

20  confuse.  See, e.g., Instant Media, 2007 WL 2318948, at *16 (Microsoft's use of different color

21  scheme, case, font and stylization elements was evidence of no unlawful intent).

22

23

24  _____

[20] From questioning at Jeff Hays' deposition, it appears Apple may argue that Podfitness' choice
25  to use white earbuds in its advertising leads to a sinister conclusion.  (See Hays Decl. ¶ 26 and
    Ex. D at 46-47, 51-57, 169-170).  Whether Apple has a claim to all white earbuds as a trade dress
26  is not at-issue in this motion, nor are other "intent" arguments that Apple has asserted, such as
    Podfitness' purchase of certain keywords from Google or use of "iPod fitness" in metatags.
27  Podfitness will address these issues in reply if necessary .  Podfitness does note, however, that
    there are literally hundreds (or thousands) of white earbuds, and Apple cannot claim exclusive
28  rights to the color white, even if limited to earbuds.  (*See* Wayment Decl. ¶ 18 and Ex. 16).

If the obvious instructions about how to use Podfitness with *Microsoft's* products are not clear enough, Podfitness uses disclaimers on its website and in other advertisements, which demonstrates that Podfitness is <u>not</u> associated with Apple.  (<u>See</u> Hays Decl. ¶ 25).  It would make no sense for Podfitness to *limit* its business *only* the iPod product, eliminating an entire market of hundreds of *other* types of MP3 players, like Microsoft's Zune.  Similarly, the worst thing for Podfitness would be for a consumer to mistakenly believe that Podfitness was an Apple product, because Podfitness is not offered at Apple's stores or on iTunes.  (<u>See</u> Hays Decl. ¶ 26 and Ex. D at 169, 291, 293-297).

## C.    EVIDENCE OF ACTUAL CONFUSION IS *DE MINIMIS*

In the context of Apple's massive size, the evidence of actual confusion virtually is non-existent.  Apple has identified receipt of only a single e-mail instance[21] of purported actual confusion.  (<u>See</u> Wayment Decl. ¶ 19, Ex. 17).  Also, Apple questioned Podfitness President Jeff Hays about one documents which Apple apparently believes establishes confusion.  (<u>See</u> Hays Decl ¶ 26 and Ex. D at 270-272).  This documents was dated January 2006, months *before* the Podfitness website or product was launched, and did not involve Podfitness' current website or advertising.  These two examples, in the context of thousands, tens of thousands, or millions of consumers, are *de minimis*.  Thus, rather than establishing likely confusion, the evidence establishes the converse.  <u>Microsoft</u>, 126 F. Supp. 2d at 1217 (agreeing with Apple's contention that isolated incidents of actual confusion were insufficient to establish a genuine issue of material fact as to the likelihood of confusion).[22]

---

[21] Having done hundreds of millions of dollars in iPod-related business, Apple likely has *millions* of customer inquiries.  However, Apple has declined to produce such evidence in this case and should be precluded from disputing the significance of its business or the relative insignificance of a single customer inquiry in all the time since Podfitness launched its service.

[22] <u>See, e.g.</u>, <u>Therma-Scan, Inc. v. Thermoscan, Inc.</u>, 295 F. 3d 623, 634 (6th Cir. 2002) ("the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists."); <u>Survivor</u>, 406 F. 3d at 633 (two instances of actual confusion, a single retailer and a single customer, favored the defendant); <u>Thane</u>, 305 F. 3d at 902 ("In some cases, a jury may properly find actual confusion evidence *de minimis* and thus 'unpersuasive as to the ultimate issue.'"); <u>Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center</u>, 109 F. 3d 275, 284 (6th Cir. 1997) ("(I)solated instances of actual

19

## D. NO EVIDENCE OF A LIKELIHOOD OF EXPANSION

Plans by either party to a trademark dispute to expand into directly competing areas *may* weigh in favor of confusion. Instant Media, 2007 WL 2318948, at *16. Vague assertions of expansion, however, are insufficient. Id. Here, Podfitness does not make or sell portable media players, nor does it plan to enter the portable media player market.[23] (Hays Decl. ¶ 9).

## E. CONSUMERS' DEGREE OF CARE WEIGHS AGAINST CONFUSION

The next factor is the degree of care that a consumer is likely to exercise, from the standpoint of "typical buyer exercising ordinary caution." Sleekcraft, 599 F. 2d at 353. "'When the goods are expensive, the buyer can be expected to exercise greater care in his purchases.'" Instant Media, 2007 WL 2318948, at *16 (citation omitted); Savin Corp. v. Savin Group., 391 F. 3d 439, 461 (2d Cir. 2004) (assuming that purchasers of costlier trademarked products will be "more discriminating"). This factor favors Podfitness for several reasons.

First, due to their nature and cost of the products sold under the IPOD and PODFITNESS marks, consumers necessarily will exercise a high degree of care. Apple has acknowledged that "(c)onsumers are likely to use care in purchasing expensive goods. Apple's IPOD product sells for about $400 to $500 . ..."[24] (Wayment Decl. ¶ 6, Ex. 4 at 8). Similarly, Podfitness' subscription service is relatively expensive, $59.95 per quarter, or about $240.00/year. (See Hays Decl. ¶ 22).

---

confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite."); Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F. 2d 601, 606-07 (9th Cir. 1987) (affirming trial court's finding that, in light of both parties' high volume of business, several instances of actual confusion were *de minimis*); Moose Creek, 331 F. Supp. 2d at 1230 (limited instances of actual confusing supported finding of no likelihood of confusion, given volume of business).

[23] Apple may argue that it has expanded into the fitness market through its collaboration with Nike through the Nike + IPOD Sports Kit which allows a Nike shoe to "talk to an IPOD Nano." The argument has no merit. First, the Podfitness mark is senior to the Nike + IPOD mark. Second, Apple Computer has not asserted that "Podfitness" infringes the "Nike + IPOD" mark— it has asserted infringement of "IPOD" and the unregistered POD marks by "Podfitness." Third, the products are different – Nike + IPOD is not used to market customized audio workouts, but is rather a means to market more "iTunes" music or non-interactive and *non-customized* products. Fourth, Podfitness pre-dates the Nike + iPod campaign.

[24] The price for Apple's IPOD products has come down in recent years. However, iPods are still among the most expensive, "high end" of the MP3 player market.

20

Second, unlike the purchase of a tangible good, a Podfitness subscription demands an ongoing and very high degree of care and commitment. To use Podfitness, the consumer must be interested in spending money on a workout or fitness program, and desire physical and time consuming interaction with the product. (See Hays Decl. ¶¶ 23-24 and Exs. B and C). Use of the Podfitness product and website requires the consumer's active and thoughtful participation. Specifically, a user must customize the product for their personal needs, including by making numerous specific decisions which could involved hundreds (or thousands) of different possible combinations of decisions, and interacting with multiple screens and options – hardly a process promoting inadvertence or mistake. Some of the steps, including the *choice* between Microsoft's Zune or Apple's iTunes software, are reflected in a document sometimes called "Podfitness101," which is available to users through the Podfitness webpage (See Hays Decl. ¶ 24 and Ex. C).

Third, as Apple told the PTO, "(i)ndividual consumers of prestige personal electronics devices such as Apple's IPOD player are also mindful of brand sources." (Wayment Decl. ¶ 6, Ex. 4 at 7 [APD000051] (emphasis added)).

Fourth, it takes a certain minimal level of sophistication to purchase, understand, operate, and use an iPod. A consumer must use not only the iPod but also a personal computer, and almost certainly be able to complete relatively complex transactions and procedures over the Internet.

Fifth, purchase and use of an iPod, or any MP3 player, is not an "impulse" purchase like a bag of nuts in the checkout line of the grocery store. Nor is the use of the Podfitness product. See, e.g., Beer Nuts, Inc. v. Clover Club Foods, Co., 805 F. 2d 920, 926 (10th Cir. 1986) (inexpensive snack foods purchased with little care).

Finally, and perhaps most decisively, there can be no confusion because the user of the Podfitness product must not only be sophisticated enough to understand and interact with the relatively time-consuming and complicated webpages, but as a *necessary* step a user *must* choose between using a Microsoft ZUNE format, or an Apple iTunes:



(See Hays Decl. ¶ 21).  As another example, under the "Getting Started" heading on the

Podfitness site, a user is told the following:

**I own an iPod, how do I get started?**

Click here for a Getting Started tutorial on setting up Podfitness for the first time.

**I own a Zune, how do I get started?**

Click here for a Getting Started tutorial on setting up Podfitness for the first time.

**I don't use an iPod or a Zune, is there anything I should know?**

Yes! If you use an MP3 player that is not an iPod or Zune, you will still need to have iTunes or Zune software installed to mix and download workouts.

(Hays Decl. ¶ 20 and Ex. B).  Similarly, under the Frequently Asked Questions:

**What do I need to run Podfitness?**

All you need is a PC (Windows 2000, XP, or Vista) or Mac (Mac OS 10.4 or greater) running iTunesTM or Zune software, an iPod, Zune, or portable MP3 player, and a broadband internet connection.

(Hays Decl. ¶ 20 and Ex. B).  No user could confuse Podfitness to be part of Apple, when

Podfitness instructs as to the product of Apple's chief rival - Microsoft.

In sum, the Internet trilogy makes clear, there is no likelihood of confusion.  Apple

disclaimed any confusion over "POD" (or even IPOD or PODZ) to the PTO, and consideration

CASE NO. C 06-05805 SBA                    DEFENDANT'S MOTION FOR PARTIAL
                                           SUMMARY JUDGMENT

of the sight, sound and meaning of the two marks confirms Apple's position. But, even under all

of the traditional *Sleekcraft* factors, there is no issue of fact as to likelihood of confusion.

## VI.     IN ANY EVENT, LIMITED USE OF THE "IPOD" MARK IS "FAIR USE"

To the extent that Apple asserts claims based on Podfitness' use of the IPOD mark in any

of its advertising, such use is a "fair use" as a matter of law. See 15 U.S.C. § 1115(b)(4). Under

Ninth Circuit law, "competitors may use a rival's trademark in advertising and other channels of

communication if the use is not false or misleading." New Kids on the Block v. News America

Publishing, Inc., 971 F. 2d 302, 307 (9th Cir. 1992); see also KP Permanent Make-Up, Inc. v.

Lasting Impression I, Inc., 408 F. 3d 596, 607 (9th Cir. 2005). The "nominative" branch of the

fair use defense applies where a party uses a mark to describe the plaintiff's product, as opposed

to the defendant's own product. See New Kids on the Block, 971 F. 2d at 308. Nominative fair

use exists if: (1) the plaintiff's product is not readily identifiable without use of the mark; (2)

only so much of the mark is used as is reasonably necessary to identify the product; and (3) the

defendant does nothing to suggest sponsorship or endorsement by the trademark holder. *See*

Id.[25]

Ironically, two of Apple's products are used as examples of fair use by McCarthy:

"(T)he hypothetical seller of software trademarked BLOTTO should be entitled to advertise:

*'BLOTTO for your Apple IIGS® personal computer*.' Or a seller of software under the

MACSTAR trademark should be permitted to state: *'MACSTAR for the Macintosh® SE*

*computer*." J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, Volume 4, § 25:51.50

at 25-145 (2006) (emphasis added). In this case, substituting PODFITNESS for "BLOTTO" and

"MACSTAR," and IPOD for "Apple IIGS®" and "Macintosh® SE," proves the obvious point.

---

[25] Where these elements are established, summary judgment on a plaintiff's trademark claims is
appropriate. See, e.g., Rehrig Pacific CO. v. Norseman Plastics, Ltd., Inc., 2003 WL 25667625
at * 34 (C.D. Cal. 2003) (granting summary judgment on fair use defense); Gulfstream
Aerospace Corp. v. Camp Systems Int'l, Inc., 428 F. Supp. 2d 1369, (S.D. Georgia 2006) (same).

23

First, it would be virtually impossible for Podfitness to inform consumers that its product was compatible with Apple's iPod portable MP3 player without using the IPOD mark.[26] "Indeed, it is often *virtually impossible* to refer to a particular product for purposes of comparison, criticism, point of reference, or any other purpose without using the mark." <u>New Kids</u>, 971 F. 2d at 306 (noting that "one might refer to the 'two-time world champions' or 'the professional basketball team from Chicago,' but it is far simpler (and more likely to be understood) to refer to the Chicago Bulls."); <u>Cairns v. Franklin Mint Co.</u>, 292 F. 3d 1139, 1152-53 (9th Cir. 2002) (explaining that "one might refer to the English Princess who died in a car crash in 1997 but it is far simpler (and more likely to be understood) to refer to Princess Diana."). The first requirement of the fair use defense is satisfied as a matter of law. <u>Rehrig</u>, 2003 WL 25667625 at 33 (summary judgment on fair use because defendant "had to identify the (plaintiff's) products to ensure that its customers understood the products compatibility features."); <u>Gulfstream</u>, 428 F. Supp. 2d at 1381 (summary judgment on fair use, first element established because defendant "must use the trademarked 'Gulfstream' name and identify each of the Gulfstream models it services to offer a meaningful description to its customers").

Second, it is necessary that Podfitness inform consumers about the compatibility of the Podfitness product with the iPod, and to allow a user to choose to use Zune or iTunes software, and such references are limited to this purpose. (<u>See</u> Hays Decl. ¶ 18). <u>See</u> <u>Gulfstream</u>, 428 F. Supp. 2d at 1381 (summary judgment on fair use where "there is no evidence in the record from which a jury could decide that (defendant) uses the Gulfstream mark any more than necessary").

Third, Podfitness does not use Apple's IPOD mark to suggest that its products are sponsored or endorsed by Apple, and in fact advised that the Podfitness product works with iPod *or* Zune *or* other MP3 players. Podfitness disclaims affiliation, noting that "IPOD is a registered

---

[26] The PODFITNESS mark does *not* use the *I*POD mark. Many others make fair use of use of the latter mark, however, such as theipodaccessorystore.com; ipodcarparts.com; hipipodgear.com; freeipodplayers.com; ipodhacks.com; iPodFanatic.com; allthingsipod.co.uk; everythingiPod.com, ipodgear.com, ipodtour.com, and ipodtraining.com. *See supra.* Thus, Podfitness' reference to iPod in conjunction with its iPod-compatible product is not only fair use, but much less use of the IPOD mark than made by others in the iPod-accessory market.

1  trademark of Apple" and "Podfitness is not affiliated with or endorsed or supported by Apple."

2  (See Hays Decl. ¶ 25). See Cairns, 292 F. 3d at 1154-55 (fair use, even with no disclaimer);

3  Gulfstream, 428 F. Supp. 2d at 1381 (granting summary judgment on fair use where "there is no

4  evidence that (defendant) suggests sponsorship" and "(defendant) includes an express disclaimer

5  of sponsorship"). Each use of the IPOD name by Podfitness is protected fair use, as a matter of

6  law.

7  **VII.  PODFITNESS IS ENTITLED TO JUDGMENT ON ALL OTHER "LIKELIHOOD OF CONFUSION" AND INFRINGEMENT CLAIMS**

8

9       Podfitness is likewise entitled to summary judgment on Apple's state law and other

10  claims that turn upon a likelihood of confusion analysis, and fail for the fair use defense. See,

11  e.g. Surfvivor, 406 F. 3d at 635 (dismissing state law claims for no likelihood of confusion);

12  Microware, 126 F. Supp. at 1222 ("Given their similarity with the federal claims, the Court also

13  disposes of Plaintiff's Iowa common law claims of infringement and unfair competition.");

14  JouJou Designs, 821 F. Supp. at 1353 & n. 6 (likelihood of confusion principal test for federal

15  and California state trademark infringement and unfair competition claims).

16  **VIII.  CONCLUSION**

17       The Court should grant summary judgment in favor of Podfitness on all claims by Apple

18  arising from or related to a claim of likelihood of confusion between IPOD and PODFITNESS,

19  including the First, Second, Fourth, Fifth, Sixth, Seventh and Eighth claims for relief.

20  DATED this 22ND day of February 2008.

21

22                          **MAGLEBY & GREENWOOD, P.C.**

23

24                          _____
                            JAMES E. MAGLEBY
25                          JASON A. MCNEILL

26                          Attorneys for Defendant and
                              Counterclaim Plaintiff Podfitness, Inc.

27

28