# Exhibit 4

TRADEMARK

Attorney Docket No. 20750-58

Date of Deposit: July 16, 2002

I hereby certify that this paper or fee is being deposited with the United States Postal Service by "First Class Mail" service under 37 C.F.R. 1.8 on the date indicated above and is addressed to the Commissioner for Trademarks, BOX RESPONSES NO FEE, 2900 Crystal Drive, Arlington, VA 22202-3513.

TOWNSEND AND TOWNSEND AND CREW LLP

By: _____

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Examining Attorney: Joseph L. Manalili |
| APPLE COMPUTER, INC. | Trademark Office: 110 |
| Serial No. 75982871 (and Child Application - serial number unassigned) | AMENDMENT |
| Filed: October 18, 2001 | |
| Mark: **IPOD** | |

Commissioner for Trademarks
BOX RESPONSES NO FEE
2900 Crystal Drive
Arlington, VA 22202-3513

Madam:

This responds to the Office Action dated January 16, 2002.

## AMENDMENT

Applicant requests that the description of goods in this application be amended in its entirety as follows:

**Portable and handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data, and audio files; computer software for use in organizing, transmitting, manipulating, and reviewing text, data, and audio files on portable and handheld digital electronic devices in International Class 9.**

APD 000045

## REMARKS

7598287 1

Applicant has filed a Request to Divide (courtesy copy attached as Exhibit A) with the Divisional Unit so that the below-identified goods (being a portion of the goods in Class 9, as amended) become the child application:

> **Portable and handheld digital electronic devices in the nature of MP3 players for recording, organizing, transmitting, manipulating, and reviewing audio files; computer software for use in organizing, transmitting, manipulating, and reviewing audio files on portable and handheld digital electronic devices in International Class 9.**

The remaining goods, as follows, continue in the parent application:

> **Portable and handheld digital electronic devices, except for MP3 players, for recording, organizing, transmitting, manipulating, and reviewing text, data, and audio files; computer software for use in organizing, transmitting, manipulating, and reviewing text, data, and audio files on portable and handheld digital electronic devices in International Class 9.**

### I. BECAUSE THERE IS NO LIKELIHOOD OF CONFUSION BETWEEN APPLICANT'S MARK AND THE PRIOR-FILED MARKS, THE APPLICATION SHOULD BE APPROVED FOR PUBLICATION

As amended in the child application, Applicant seeks to register **IPOD** for its well-known handheld digital music player. See *www.apple.com*. Subject to entry of the above clarifying amendment, Applicant believes that the Examining Attorney's initial concerns about confusion with several prior-filed applications for a variety of distinct and unrelated goods are unfounded. Applicant therefore requests that the Examining Attorney approve at least the child application[1] for publication after entry of the clarifying amendment requested above.

---

[1] Pursuant to telephone discussions with the Examining Attorney on July 8, 2002, Applicant understands that the Examining Attorney may not agree after considering this response that both the parent and child applications are in condition for publication. Applicant requests that the Examining Attorney view each application independently on its merits and not delay publication of one while issues concerning the other are outstanding.

The Examining Attorney identified six prior-filed applications as possible impediments to Apple's **IPOD** registration, one of which has since been expressly abandoned.[2] With respect to the remaining applications, no likelihood of confusion could result from registration of Apple's **IPOD** mark for the following reasons:

### A. The goods are unrelated and marketed to different consumers

The goods identified in each of the cited applications are unrelated to Apple's well-known **IPOD** music player. Unrelated goods are not likely to be confused. *In re E.I. DuPont de Nemours & Co.*, 426 F.2d 1357, 1361-62 (C.C.P.A. 1973). Where, as here, goods are not reasonably interchangeable by consumers for the same purpose, the advertising orientation for each will be different, making confusion even more unlikely. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979); *DuPont*, 426 F.2d at 1361-62 (noting that "dissimilarity of established, likely to continue trade channels" is a factor indicating no likelihood of confusion); *Oxford Industries, Inc. v. JBJ Fabrics, Inc.*, 6 U.S.P.Q.2d 1756 (S.D.N.Y. 1988) (no likelihood of confusion between **JBJ WEARING APPAREL** and **JBJ FABRIC PRINTING** since the parties dealt in different channels of trade).

### 1. IPOD (Ser. No. 78/018,061)

The '061 application is for a "public Internet kiosk enclosure containing computer hardware." This product apparently allows consumers to surf the internet from a publicly available kiosk. Apple's **IPOD**, on the other hand, allows consumers to store, manage, and play audio files on a "pocket-sized" device. Apple's **IPOD** device is not an internet surfing tool for public use, but a personal music player with embedded file management software. Apple's

---

[2] Voice Technologies Group's express abandonment of its application for **POD** (U.S. Serial No. 75/854,962) moots the Examining Attorney's concerns about this reference.

hand-held music player and the computer kiosk in the referenced application serve different functions, not in any manner interchangeable.

2. **IPOD** (Ser. No. 76/090,687)

The '687 application covers "prerecorded computer software for generating printed products over a global communications network." Either printing services or consumers wishing to custom order printed products, such as brochures, checks, envelopes, forms, and business cards, would be the market for such products. Again, Apple's **IPOD** music player has no functions related to the design or sale of custom-printed items. Consumers could not create printed greeting cards or the like using Apple's **IPOD** player, and would logically not expect that they would be able to, given the nature of Apple's audio player and related software. Apple's **IPOD** player thus is not related to the applied-for internet print-on-demand software product, making confusion unlikely.

3. **IPODZ** (Ser. No. 76/071,644)

The '644 application for **IPODZ**, a different mark, covers a wide variety of goods and services, none related to Apple's **IPOD**. Specifically, in Class 9, the '644 application is for "flight simulator machines; computerized amusement rides; computer automated retail recreational machines; communications software for connecting flight simulator machines and users over a global computer network; computer game software and video game software; eyewear, namely sunglasses and goggles." Such goods appear to be intended for consumers wishing to engage in flight simulation games, either in simulator machines or over the internet. Apple's **IPOD** player and software have nothing to do with flight simulation, amusement rides, retail recreation machines, computer/video games, eyewear, or any of the other goods and services listed in the '644 application. Because Apple's **IPOD** music player and the wide variety of goods and services identified in the **IPODZ** application serve completely different functions,

they are likely to be marketed to distinct consumer groups through different channels, and unlikely – in any event – to be confused with respect to source.

4. POD (Ser. No. 76/068,419)

Similarly, the goods listed in the '419 application are unrelated to Apple's **IPOD** player. The '419 application is for "computer programs, namely client software programs for managing, viewing and editing files, messages, multimedia content, audio and video content, appointments, contacts, and other digital materials in conjunction with a network server in the field of user productivity, entertainment, and communication," whereas Apple's amended and divided application identifies Apple's **IPOD** as a "portable and handheld digital electronic device in the nature of an MP3 player for recording, organizing, transmitting, manipulating, and reviewing audio files [and] computer software for use in organizing, transmitting, manipulating, and reviewing audio files on portable and handheld digital electronic devices." It is clear from the '419 application that the **POD** product, unlike Apple's **IPOD**, is a network-based file sharing utility. Apple's **IPOD** music player, in contrast, is a hand-held device, widely promoted and praised for being small, lightweight, and self-contained. The **IPOD** software enables file downloading from the user's computer onto the **IPOD** player and then manages and plays those downloaded files on the player. Apple's **IPOD** software is not capable – as its appears the **POD** product is – of coordinating computer files on a networked server to enhance business productivity. Indeed, as a leisure-time device, Apple's **IPOD** would not likely be associated by consumers with network-based software with business applications, such as the **POD** product appears to be.

5.   **IPOD** (Ser. No. 75/854,960)

The goods identified in the '960 application[3] are also unrelated to Apple's **IPOD** player and related software. The '960 application is for a "protocol converter for changing proprietary digital station set information to a standard protocol suitable for transmission over an internet provider." The goods described in the '960 application convert data at the network-level from a proprietary format to a standard format in order to effect transmission over the internet. Apple's **IPOD** music player, on the other hand, is a consumer electronics device designed for personal entertainment. Apple's **IPOD** and the protocol converter in the '960 application serve completely different functions, are marketed to different groups of consumers through distinct channels, and are thus not likely to be confused as to source.

B.   **The marks are different in appearance, pronunciation, meaning, and commercial impression**

Dissimilar marks are not likely to be confused. *DuPont*, 426 F.2d at 1361-62. As detailed below, various differences between Apple's **IPOD**, a fanciful term coined by Apple and closely linked in commercial impression with Apple's family of well-known "I"-formative marks,[4] and the marks in the referenced applications with respect to appearance, pronunciation, meaning, and commercial impression, make confusion unlikely.

Two of the identified applications are for marks clearly different in appearance and sound from Apple's: **POD** and **IPODZ.** The **POD** mark in the '419 application for network software

---

[3] It appears that Intel Corporation acquired Voice Technologies, the original applicant for the '960 application, in February of 2000 and has renamed the product the **INTEL NETSTRUCTURE.** *See* Intel press release and product specification attached as Exhibit B. Apple expects that the referenced application will thus go abandoned in due course. For this reason, in addition to those set forth above, the '960 application should not impede publication of Apple's **IPOD** application.

[4] IMAC®, IBOOK®, IPHOTO EXPRESS®, IPHOTO PLUS & Design®, IPHOTO™, IMOVIE™, IPOD™, IDVD™, and ITUNES™

also has a distinct meaning, being an acronym for "Professional Online Desktop." *See* excerpt from OmniPod's website at Exhibit C. Presumably, the **IPOD** mark in the '687 application for online custom printing software is an acronym for "Internet Print on Demand" or the like.

Given the significant difference in goods, it is unlikely that any commercial impression formed by the prior pending applicants' dissimilar marks would be "carried over" to the different audience of consumers seeking a handheld, portable electronic audio player.

C. **Considering all the factors, there is no likelihood of confusion between Apple's IPOD and the marks in any of the prior filed applications**

Other *DuPont* factors confirm that confusion would be unlikely between Apple's **IPOD** and any of the marks in the referenced applications.

Consumers are likely to use care in purchasing expensive goods. *DuPont*, 426 F.2d at 1361-62. Apple's **IPOD** product sells for about $400 to $500. It appears that the goods in the referenced applications are also expensive, not likely to be purchased on impulse.

Professional buyers of technical goods such as internet kiosks ('061 Application) and networked and commercial software goods ('687, '419, and '960 Applications) are also presumed to be brand discriminating. Individual consumers of prestige personal electronics devices such as Apple's **IPOD** player are also mindful of brand sources. These two consumer groups – distinct from each other but both focused on distinguishing product source – are not likely to mistakenly believe that Apple's **IPOD** and the various applied-for goods are related with respect to source.

Due to the completely different channels of trade for sales of the prior applicants' products and Apple's **IPOD** players, there is no "interface" between Apple and the prior applicants, further reducing the likelihood of confusion. *Id.*

Finally, in determining likelihood of confusion in infringement litigation, courts consider evidence of the intent of the adopting party. *AMF v. Sleekcraft*, 599 F.2d 341 (9th Cir. 1979);

Restatement of Torts §§ 729, 731. Consideration of this factor may also assist the Examining Attorney in his *ex parte* examination. In this case, the marks, goods, and channels of trade for the goods of the respective parties are so different that Apple would not have believed, and still does not believe, that there could be any likelihood of confusion. Such good faith adoption is further evidence that registration of Apple's **IPOD** mark for its music player device is unlikely to create consumer confusion.

For all of the reasons stated above, there is no likelihood that the relevant class of cautious consumers would confuse the goods to be offered under the prior pending marks with the unrelated music players sold under Apple's dissimilar mark.

## CONCLUSION

Applicant believes that the child application, if not also the parent application, is now fully in condition for passage to publication and prompt action to that end is earnestly solicited. If a telephone conversations would advance this application, please call the undersigned. The Applicant appreciates the Examining Attorney's thoughtful assistance in preparing this response.

Respectfully submitted,

TOWNSEND and TOWNSEND and CREW LLP

Dated: July 16, 2002        By: _____
                                John C. Baum
                                *Attorneys for Applicant*

Two Embarcadero Center, 8th Floor
San Francisco, CA 94111-3834
Telephone: (415) 576-0200
Direct: (415) 273-7523
Facsimile: (415) 576-0300
SF 1352808 v1

COPY

TRADEMARK
Attorney Docket No. 20750-58

Date of Deposit: July 16, 2002

I hereby certify that this paper or fee is being deposited with the United States Postal Service by "First Class Mail" service under 37 C.F.R. 1.8 on the date indicated above and is addressed to the Commissioner for Trademarks, Box ITU FEE/DIVISIONAL UNIT, 2900 Crystal Drive, Arlington, VA 22202-3513.

TOWNSEND AND TOWNSEND AND CREW LLP

By: _____

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

APPLE COMPUTER, INC.

Serial No. 75982871

Filed: October 18, 2001

Mark: **IPOD**

Examining Attorney: Joseph L. Manalili

Trademark Office: 110

**REQUEST TO DIVIDE; AUTHORIZATION TO CHARGE DEPOSIT ACCOUNT**

Commissioner for Trademarks
Box ITU FEE/DIVISIONAL UNIT
2900 Crystal Drive
Arlington, VA 22202-3513

Madam:

Applicant requests that this application be divided and that the following goods, being part of the Class 9 goods described in the application, be moved to the child application and assigned a new serial number:

> Portable and handheld digital electronic devices in the nature of MP3 players for recording, organizing, transmitting, manipulating, and reviewing audio files; computer software for use in organizing, transmitting, manipulating, and reviewing audio files on portable and handheld digital electronic devices in International Class 9.

APD 000053

Please direct all correspondence to:

John C. Baum, Esq.
TOWNSEND AND TOWNSEND AND CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111
Telephone: 415-576-0200
Facsimile: 415-576-0300

Applicant notes that it is filing a response with the Examining Attorney to his Office Action dated January 16, 2002.

## AUTHORIZATION TO CHARGE DEPOSIT ACCOUNT

Please charge the divisional and new application fees totaling $425.00 to the Deposit Account of Townsend and Townsend and Crew LLP, No. 20-1430. Please charge any additional fees that may be due, or credit any overpayment, to our Deposit Account No. 20-1430.

Respectfully submitted,

TOWNSEND and TOWNSEND and CREW LLP

Dated: July 16, 2002    By: _____
John C. Baum
*Attorneys for Applicant*

Townsend and Townsend and Crew LLP
Two Embarcadero Center, 8th Flr.
San Francisco, CA 94111-3834
Telephone: (415) 576-0200
Facsimile: (415) 576-0300
SF 1363419 v1



United States Home | Select a Location

Site Map | Contact Us

**Products** | **Support**

Home Computing  Business  Developer  Reseller / Provider

**Intel Press Room**
- press releases
- press resources
- corporate Information
- the intel newswire
- quick search [Go]
- advanced search
- site map
- contact Intel PR

Other Languages

# Press Releases

### Intel To Acquire Voice Technologies Group

#### Acquisition Aimed at Enhancing Dialogic PBX Capabilities

- print
- email

Related
- More in this
- Corporate I
- Executive S
- Contact Co

SANTA CLARA, Calif., Feb. 24, 2000 - Intel Corporation today announced it has entered into a definitive agreement to acquire privately held Voice Technologies Group, Inc. (VTG) of Buffalo, N.Y. in a cash transaction. Specific financial terms of the agreement were not disclosed.

The acquisition provides Intel and its Dialogic subsidiary with leading edge capabilities and features to enable most leading private branch exchange (PBX) systems sold worldwide to work with Dialogic's computer telephony server systems and IP gateways (equipment used to link to the Internet). In addition, VTG will help expand Dialogic's current portfolio of PBX products. A PBX is a telephone switch used to route phone calls within an office environment.

The VTG acquisition will further Dialogic's objective of helping to enable the integration of sophisticated applications -- such as IP telephony (using Internet technology for telephone calls) unified messaging (combining functions like voice, fax and e-mail on the same local area network or on the Internet), speech-based auto attendant and call center applications -- with PBX systems. Intel and Dialogic will gain access to VTG product lines, intellectual property, technology, expert engineers, and facilities in order to enable new products that accelerate the convergence of PBX and Internet technologies.

"The acquisition of VTG helps Dialogic and Intel significantly add to the computer telephony and Internet building blocks we're able to provide to our customers," said Howard Bubb, president, Dialogic Corporation and vice president of Intel's Communication Products Group. "With the outstanding engineering talent and technology that VTG provides, we're working to link the Internet and conventional PBXs to Dialogic's Internet and computer telephony products. We look forward to working with the VTG team to achieve this goal."

The acquisition of VTG also allows Intel's Dialogic subsidiary to significantly expand the number of engineers it has for developing standard and customized PBX products. The agreement also provides Dialogic with a state-of-the-art R&D facility with access to leading PBX switch and phone technology. At VTG's Buffalo site, the company will continue to manage the development and support of new and existing PBX products.

The acquisition is subject to regulatory approval and certain closing conditions. It is expected to become final in the second quarter of this year.

Dialogic, an Intel Company, provides the critical building blocks and technical services that enable its customers to develop solutions serving the converging Internet and telecommunications market segments. Dialogic products are used in voice, fax, data, speech recognition and synthesis, call center management and Internet Protocol (IP) telephony applications in both customer premise equipment (CPE) and public network environments. For more information, visit the Dialogic Web site at www.dialogic.com.

Intel, the world's largest chip maker, is also a leading manufacturer of computer, networking and communications products. Additional information about Intel is available at www.intel.com/pressroom

*Legal Information | Privacy Policy

©2002 Ir

Intel To Acquire Voice Technologies Group

APD 000056



- contents    - search    - contact us    - support

**Intel® Communication Systems Products Home**

- Telecom Products
- products & services
- solutions
- resources
- marketing programs
- news & events

*information for:*
- resellers
- business
- developers
- service providers

# Intel® Communications Systems Products Newsletters

## Cost-Effective IP Telephony Migration with Intel® NetStructure™ PBX-IP Media Gateway

By Chris Meszaros, Product Line Manager, Intel Communications Group

It has been estimated that 90% of enterprises with multiple locations will start switching to IP systems for voice over the next five years*. Looking at the advantages of IP, packet switched networks, it is easy to understand why:

- Dramatically reduced bandwidth usage as compared to circuit-switched telephony
- Packet-switched networks allow valuable control information to be transmitted simultaneously
- Increased service offerings, including voice portals, voice-enabled Web site, Web-enabled contact centers, unified messaging, and more
- Reliable, scalable, easy to use since IP telephony runs on the existing data communications infrastructure

Developers looking for a way to cash in on the numerous opportunities building and deploying IP networking solutions are finding that many enterprise customers may not be willing or able to make the leap to IP and abandon their significant legacy PBX investments.

The question is how to bridge the enterprise customers' legacy networks to IP-based networking solutions including Voice Over IP (VOIP), messaging, interactive voice response (IVR), call center, and wireless networking. The answer is not a bridge but a gateway - the Intel® NetStructure™ PBX-IP media gateway.

### One Small Step, One Giant Leap

The Intel NetStructure PBX-IP media gateway (formerly known as the iPOD digital gateway) is a phased approach to IP networking migration that converts proprietary digital signals from existing digital telephone equipment into a format that is suitable for transmission over standard IP networks. Employing the H.323 protocol, voice can be transmitted over a company's LAN/WAN to IP phones, wireless phones, IP servers, and similar devices in almost any location.

With support for H.323, the leading standard for IP telephony, the Intel NetStructure PBX-IP media gateway offers a simplified, cost-effective solution for converging voice and data across a managed packet network. It supports H.323-based applications running on networked servers and H.323 devices or terminals.

The gateway is an external solution, so no additional changes to the PBX software are necessary. In addition, the Intel NetStructure PBX-IP media gateway also supports PBX equipment from leading manufacturers such as Mitel Networks, Nortel Networks, and Avaya

allowing for a greater number of enterprises to deploy the Intel NetStructure PBX-IP media gateway into their infrastructure today.

With a low price point (suggested retail price of under US$3,000) and hot swap capability when two or more units are deployed, the Intel NetStructure PBX-IP media gateway can even satisfy the issues of return on investment (ROI) and of Quality of Service (QoS) that often stymied the implementation of IP networking into a legacy environment.

### A Virtual Solution

The Intel NetStructure PBX-IP media gateway extends the power and reach of network-hosted voice applications to remote/virtual offices, helping to efficiently and cost-effectively connect employees in branch offices, home offices, customer sites, or other locations to the corporate PBX.

Enterprise contact centers can add features such as transfer, hold, and message waiting indicators to remote locations, reducing equipment and communications infrastructure costs, and giving home-based and geographically dispersed call center agents access to corporate databases for more efficient call center operations.

The Intel NetStructure PBX-IP media gateway is suitable for:

- Small to medium enterprises
- IP-enabling PBX networks
- Deploying VOIP in the enterprise
- Extending VOIP to branch offices
- Providing the generic ability to integrate various voice and call processing capabilities in an enterprise LAN/WAN environment

### Building More Complete Solutions

Developers can combine Intel IP telephony building blocks and build more complete IP-based solutions for customers. The Intel® Internet Phone Software Development Kit (SDK) is an easy-to-use programming interface that lets developers build H.323 Internet phones, or add H.323 calling functions to their existing solutions.

Together with the Intel® Converged Communications Platform, the application-ready platform that supports a broad range of standards-based telephony and business applications, peripherals, and services, these modular Intel building blocks can be combined to provide multiple voice-enabled applications interoperating on a single chassis, offering high performance at a lower cost per unit.

### Learn More

Getting started with the Intel NetStructure PBX-IP media gateway is easy. Our computer based training CD-ROM will provide step-by-step instructions for installation and use. In addition, we offer a full range of technical support options for customers to choose the plan that is right for their needs. For more information, contact an Intel technical sales representative at 1-800-755-4444, and ask the operator for sales.

Learn more by visiting these Intel Web pages:

- Intel NetStructure PBX-IP media gateway datasheet
- Whitepaper: IP Telephony in a PBX Environment
- Press release: Intel Announces Integrated Solution For Migration To IP Telephony

APD 000058



*Sign up* for CommNews to receive more articles like this one each month

* Source: Phillips Group, via Aspect; June 2001
* Other names and brands may be claimed as the property of others
Intel and Intel NetStructure are trademarks or registered trademarks of Intel Corporation or its subsidiaries in the United States and other countries.

00-7853-001

back to top

* *Legal Information* and *Privacy Policy* © 2002 Intel Corporation



**RELIABLE SECURE EXTRANET FILE SHARING**

- PRODUCTS & SERVICES
- SUPPORT & DEMOS
- ABOUT OMNIPOD
- CONTACT US

## Professional Online Desktop (POD) Benefits

Unlike many of today's enterprise communication and collaboration platforms require significant investments in infrastructure, IT professionals and mainte Omnipod provides a secure, attractively priced, turnkey technology solution.

### Cost-Effective, Rapidly Deployable Solution

Omnipod's world class data center mitigates the need for dedicated corporate servers and support staff, and also provides an ideal foundation upon which deploy secure, centrally controlled, enterprise intranet / extranet messaging sharing platforms.

### Extremely Robust, Leading-Edge Technology

The POD's robust technology architecture combined with an intuitive user-int enables Omnipod to offer a powerful solution for streamlining communication information sharing across any IP-based network - intranet, extranet or Inte The most noteworthy advantages of the POD platform include:

#### CENTRALIZED STORAGE

Centralized storage obviates the need for synchronization of files and enables users to access stored ir from any location. Enhanced security features, access control and usage monitoring provide critical ad tools. Powerful search capabilities enable users to quickly contact other users and locate important inf Efficient file storage technology maximizes capacity by eliminating duplicate copies of files stored on tr platform (using MD5 hashing).

#### ADVANCED BANDWIDTH AND STREAMING CAPABILITIES

Bandwidth requirements are substantially reduced because all file-sharing transactions occur within th centralized server - zero bandwidth is required to share a file whether it is 2K or 100MB. Advanced sys including proprietary streaming technologies, allow for the efficient access and management of rich m

#### ARCHITECTURE

The POD software is designed for scalability (independent tests have confirmed hundreds of thousand simultaneous users). Redundant systems provide reliable, continuous performance.

**Enhances Corporate Communications**

As today's extended enterprise of employees, customers, suppliers and partr becomes larger and more geographically dispersed, the Internet has become critical medium for conducting business globally. Sophisticated Web-enabled interactive communication and collaboration have become increasingly neces companies seek to become more efficient and effective. The POD directly adc the growing demand for new ways to communicate and collaborate via an inexpensive, easy-to-deploy application.

© 2002 OMNIPOD, INC. All rights reserved.

BENEFITS

APD 000061

PLEASE NOTE THAT THE FOLLOWING DOCUMENTS ARE TO BE PROCESSED BY THE LEGAL INSTRUMENTS EXAMINER.

✓ AMENDMENT TO ALLEGE USE

✓ RESPONSE TO OFFICE ACTION

✓ OTHER ( amdt )

Please do not change the order in which this application has been divided. The application has been divided according to office policy and not according to the corresponding attorney or applicants request to divide.

THANKS,

PORTIA TAYLOR
PARALEGAL SPECIALIST, ITU

APD 000062