# Exhibit 17

Dockets.Justia.com

David J, Miclean (#115098/miclean@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, California 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Lisa M. Martens (#195824/martens@fr.com)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Andrew M. Abrams (#229698/abrams@fr.com)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Attorneys for Plaintiff
APPLE COMPUTER, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| APPLE COMPUTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> PODFITNESS, INC., and DOES 1-100, inclusive, <br><br> Defendants. | Case No. C 06-5805 SBA <br><br> **PLAINTIFF APPLE'S OBJECTIONS AND RESPONSES TO DEFENDANT PODFITNESS' FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Apple Computer, Inc. ("Apple" or "Plaintiff) hereby serves upon Defendant Podfitness, Inc. ("Podfitness" or "Defendant") the following Objections and Responses to Defendant's First Set of Interrogatories. These responses are made in accordance with the Federal Rules of Civil

Procedure and are based upon information presently available to Apple. These responses are therefore without prejudice to Apple's right to use or rely upon subsequently discovered information in any future proceedings.

Apple expressly reserves the right to later object to the admissibility of any of this information into evidence on any permissible grounds, including grounds not identified below.

## GENERAL OBJECTIONS

1.      Apple objects to each interrogatory to the extent it seeks information beyond the permissible scope of the Federal Rules of Civil Procedure as being irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence.

2.      Apple objects to each interrogatory to the extent it is vague, ambiguous, indefinite, overly broad, unduly burdensome, oppressive and/or does not reasonably identify the document, information, or thing sought.

3.      Apple objects to each interrogatory to the extent it would impose an unreasonable burden or expense on Apple to produce such documents, information, or things, if any, or requires the creation of material not currently in existence.

4.      Apple objects to each interrogatory to the extent it seeks disclosure of documents or information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Any production of such information by Apple is inadvertent and is not intended as a waiver of the applicable privilege or immunity as to such information.

5.      Apple objects to each interrogatory to the extent it seeks disclosure of confidential, proprietary, trade secret, or other competitively sensitive information.

6.      Apple objects to each interrogatory to the extent it seeks documents or information not in Apple's possession, custody, or control.

7.      Apple objects to each interrogatory to the extent it seeks information from individuals or entities over which Apple has no control.

8.      Apple objects to each interrogatory to the extent it is redundant.

9.     Apple objects to each interrogatory as unduly burdensome to the extent it seeks documents or information subject to a confidentiality agreement with a third party.

10.    Apple objects to each interrogatory that is vague, indefinite, overly broad, unduly burdensome, and/or oppressive because the burden on Apple to search for, gather, and produce such information or documents, if any, far outweighs the relevancy of such information or the likelihood that such information or documents, if any, will lead to the discovery of admissible evidence.

11.    Apple objects to each interrogatory that seeks discovery of information or production of documents or things that are in the public domain and therefore of no greater burden for Podfitness to obtain than Apple.

12.    The foregoing General Objections are applicable to and included in Apple's objections to each and every one of Podfitness' interrogatories, whether or not specifically raised below. The objections set forth below are not a waiver, in whole or in part, of any of the foregoing General Objections.

13.    The following responses reflect Apple's present knowledge, information, and belief, and as permitted by the Federal Rules of Civil Procedure, may be changed, modified, or supplemented based on discovery or as additional facts and circumstances come to Apple's attention. Apple reserves the right to produce evidence of any subsequently discovered fact, to alter or amend its objections and responses set forth herein, and otherwise to assert factual and legal contentions as additional facts are ascertained, analyses are made, and legal research is completed. Apple objects to each request to the extent that it may be construed as limiting or restricting Apple's right to rely upon any information or document for any purposes whatsoever, including, but not limited to, the use of information or responsive documents as evidence at any subsequent hearing, trial, or other proceeding.

14.    The following responses are made without waiving or intending to waive any objection on any ground as to relevancy, privilege, or admissibility of any information provided in

3

response to Podfitness' requests in any subsequent proceeding or at the trial of this or any other action.

## DEFINITION

1.     The term "non-privileged" means information and documents not protected by either the attorney-client privilege or by attorney work-product immunity.

## SPECIFIC RESPONSE TO INTERROGATORIES

## INTERROGATORY NO. 1:

Identify all instance(s) of customer confusion involving the PODFITNESS MARKS and/or any third-party's mark with Apple's IPOD mark, including the identification of any instance of confusion which you allege constitutes actual confusion and all people having knowledge of such instance(s) of confusion including the name, address, and phone number of the customer you allege was confused and the person or persons at Apple most knowledgeable as to each instance.

## RESPONSE TO INTERROGATORY NO. 1:

Apple objects to this interrogatory to the extent it seeks discovery of information not in Apple's possession, custody, or control. Apple further objects to this interrogatory to the extent it seeks information from individuals or entities over which Apple has no control. Apple further objects to this interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this action, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks discovery of information relating to actual confusion between third parties' marks and Apple's IPOD mark. Apple further objects to this interrogatory to the extent it seeks discovery of information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Apple further objects to this interrogatory as premature to the extent that discovery is ongoing in this matter. Apple has received at least one inquiry relating to Apple's association with Defendant. On information and belief, Defendant has received at least one inquiry relating to Defendant's association with Apple. Apple expressly reserves the right to supplement its response to this interrogatory as additional facts are ascertained.

4

## INTERROGATORY NO. 2:

State all facts upon which you rely to support your assertions in your First Cause of Action, ¶¶ 69 - 83, of your Complaint including but not limited to your assertions that Podfitness' "unauthorized" use of the PODFITNESS MARKS is likely to cause confusion, mistake, or deceive consumers or potential consumer wishing to purchase Apple's products and services, and is also likely to confuse consumers as to affiliation between Apple and Podfitness.

## RESPONSE TO INTERROGATORY NO. 2:

Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the extent it asks numerous questions and seeks discovery of ***all*** facts supporting assertions set forth in 15 separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as premature to the extent that discovery is ongoing in this matter. Subject to these objections and the General Objections, Apple responds as follows:

Since its introduction on October 23, 2001, the IPOD player has become an extremely popular and widely recognized consumer product, with over 50 million units sold worldwide. The IPOD player has led digital media player sales in the U.S. for the past several years, garnering tremendous commercial success.

Apple has used and is using its IPOD mark in commerce on and in connection with offering and selling its portable handheld media players and associated goods and services continuously since October 2001.

On information and belief, the POD mark has been used by consumers and industry publications as a slang term for the IPOD mark and product.

Apple owns the following registered IPOD marks in the United States:

• IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing audio files; computer software for use in organizing, transmitting, manipulating, and reviewing audio files on portable and handheld digital electronic devices."

1 • IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing

2 computer hardware."

3 • IPOD NANO – Registration No. 3192683 for "portable and handheld digital

4 electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data,

5 and audio files; computer software for use in organizing, transmitting, manipulating, and

6 reviewing text, data, and audio files on portable and handheld digital electronic devices."

7 Apple also owns eleven pending applications for POD, IPOD and related marks for a wide

8 variety of goods and services, including printed and electronic materials and publications,

9 educational services, entertainment services, software, accessories for portable handheld digital

10 electronic devices, clothing, retail services, and computerized data storage and retrieval services.

11 Every IPOD player is packaged with Apple's white earphones, commonly called earbuds.

12 Apple's distinctive earbuds consist of white circular ear speakers with a gray rim, which are

13 attached to a white cylinder of molded plastic covering the white wire. Apple's earbuds have been

14 prominently displayed in its advertising for the IPOD player, and, most famously, are featured in

15 Apple's popular silhouette advertising campaigns. Such earbuds shall be referred to as the

16 "Earbud Trade Dress."

17 On information and belief, since its introduction in 2001, consumers have used Apple's

18 IPOD products in connection with their fitness activities. As a result, for several years, Apple has

19 marketed and sold IPOD-compatible protective "sports cases" and arm bands to facilitate the use

20 of the IPOD player while exercising. Apple markets such accessories at The Apple Store (at

21 *http://store.apple.com*) under the slogan, "[k]eep you IPOD secure when you're on the go. Perfect

22 for riding, running, and working out."

23 In May 2006 Apple announced that it had entered into a collaboration with shoe

24 manufacturer Nike to release a new product, referred to as Nike +IPOD, that would allow a

25 runner's shoes to communicate with an IPOD player. The Nike + IPOD Sports Kit component of

26 the product is designed to allow an IPOD player to function as a personal trainer or coach, and to

27 help the user achieve individualized fitness goals. The Nike +IPOD product is being promoted by

28

6

1  Apple and Nike in advertisements, some of which feature Apple's Earbud Trade Dress next to a

2  running shoe, and is now available in retail stores and on-line at various websites, including The

3  Apple Store at the URL *http://store.apple.com.*

4      Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable

5  audio files for handheld media players and related services, which it promotes and provides on the

6  Internet through its website located at *www.podfitness.com.*  Consumers pay a monthly

7  subscription fee to download Defendant's digital audio files.  Defendant's digital audio files are

8  customized workout programs created by professional fitness trainers in response to a consumer's

9  stated personal exercise objectives.  The files are then downloaded to the customer's digital media

10  player to be set to music already on the customer's player.  According to the *www.podfitness.com*

11  website, Defendant's consumers must use Apple's ITUNES proprietary digital media player

12  application to facilitate the downloading of Defendant's audio workout files.

13      On information and belief, Defendant's PODFITNESS service is directly competitive with

14  goods and services offered by Apple under its IPOD mark, including, but not limited to Nike

15  +IPOD and iTunes iMixes.

16      Defendant has also adopted the following logo (on the left) (the "PODFITNESS.COM

17  Logo") for its products and services, which it promotes on its website and which incorporates an

18  image of white and grey earbuds:




24      The Earbud Trade Dress is depicted above on the right.

25      Defendant has also copied and prominently displays Apple's registered IPOD mark

26  throughout its *www.podfitness.com* website and particularly on the homepage, including in the

27  tagline: "Put a Personal Trainer right on your IPOD®," and the bold caption: "Customized IPOD

28

1  Workouts" (although Defendant removed both phrases from its home page after communications
2  from Apple). Defendant repeatedly has displayed conspicuous photos of the IPOD product on the
3  site, and has prominently featured images of individuals exercising while wearing Apple's Earbud
4  Trade Dress. Defendant also uses Apple's Earbud Trade Dress in its marketing correspondence
5  and other communications. In the "Support" section of the website, Defendant states that "you
6  will need to have [Apple's] ITUNES 6 installed in order to use the Podfitness software."

7  On information and belief, Defendant has directly copied images of the IPOD player from
8  Apple's website at *www.apple.com* to use on its own *www.podfitness.com* website.

9  Defendant has used Apple's registered IPOD mark in the metatags of each page on its
10  *www.podfitness.com* website, causing Defendant's website to appear as a "hit" when a query is
11  conducted through a search engine for the following phrases: "IPOD workout music"; "I POD
12  trainer"; "I POD workout"; "I POD workouts"; "IPOD workouts"; "IPOD trainer."

13  Defendant has also been listed as a sponsored link on the search engine *www.google.com*
14  in connection with the keywords "IPOD Workout" and "IPOD Fitness," causing a link to the
15  *www.podfitness.com* website to appear prominently in the top banner or right margin of the screen
16  in response to a search query for such terms.

17  Defendant registered and uses the domain names *ipodfitness.com* and *ipodworkouts.com* to
18  automatically re-direct to its homepage at podfitness.com.

19  On March 16, 2006, Defendant ran a full-page advertisement in the Wall Street Journal,
20  which stated in large type:

21      Dear Steve Jobs,
        Thanks for the IPOD®.
22      Best,
        Jeff Hays
23
        P.S. Wait till you hear what we did with it!
24      Call me, 801-990-3238

25  The bottom of the advertisement prominently displayed the white earbuds shown in the
26  PODFITNESS.COM Logo mark along with the tagline "Your Music. Your Workout. Your Way."
27  Underneath the logo in smaller print, the advertisement read:

28

8

"If you're not Steve, and would like to download unlimited, customized training sessions mixed with your music, it's only $19.95 per month. For you Steve, it's on the house. www.podfitness.com/steve."

Also on the PODFITNESS website at *www.podfitness.com/steve*, Defendant posted the following promotional statement:

Dear Steve,

Thanks for coming to the site.

Can I tell you a quick story?

Like millions of others, in December of 2004 my 44-year-old wife and I got iPods for Christmas. My 25 year old son was on his 3rd, our teenagers were on their 1st or 2nd. But when my techno-phobic wife got one... well, it was obvious that the iPod had crossed the chasm. Like the rest of the business world, I couldn't wait to be involved.

So, a month later (January 2005), I filed a couple of patent applications for an idea that I'd been tinkering with for a while. I called it Podfitness. The idea was to create a service that would create customized, downloadable, personalized audio workouts that could each be mixed with the users' own favorite music. So, off we went...

After we embarked on a yearlong programming journey, as you know, Apple went on to sell 32 million more iPods. (Congratulations, by the way!) This was terrific, but of course "competitors" started appearing. Dang it! None of them were creating anything new, no technology, it was just people taking static workouts and converting them to mp3. We could have done that on our first day, (heck, my 15 year old does it every day, what's the big deal about ripping a CD?) It was pure hell to sit back and watch people enter the market with... well, nothing. All the while, we're quietly working away, burning cash, programming, partnering and recording. And the clock was ticking...

Well, it took us over a year and a couple of million dollars, but we did it.

It is widely known to the public that Steve Jobs is the CEO of Apple. Neither Steve Jobs, nor Apple, authorized this use of his name in Defendant's advertisements for the PODFITNESS product.

Defendant also provides the following explanation for the inspiration behind the creation of PODFITNESS on its *www.podfitness.com* website:

**Supernova Marketplace: The Intersection of Music, iPod and Fitness**
When Podfitness was founded in January 2005, Apple had sold just over 10 million iPods. Sensing a major shift coming, CEO Jeff Hays gambled that the iPod-led

9

MP3 revolution had the potential not only to change the economics of the music business, but also the fitness industry. This began a multimillion-dollar process of conceptualizing, building, and refining the idea of Podfitness.

Now, in 2006, there have been over 50 million iPods sold, and the "Made for iPod" market is white-hot. In addition, the number of people focusing on fitness has never been higher: there are 40 million fitness club members in the U.S. alone.

Not coincidentally, at this exact time, Podfitness is at the culmination of 18 months' efforts...

*https://podfitness.com/web/template/corporate?aff=home*

Defendant has also adopted the following arrow logo (on the left is an image from the *podfitness.com* web site) for its products and services (the "Arrow Logo"), which it promotes on its website and which is identical to Apple's shuffle logo, the subject of U.S. Registration No. 3,067,950 for "portable and handheld digital electronic devices, and parts therefore sold together as a unit, for recording, organizing, transmitting, manipulating, and reviewing data and audio files; computer software for use in organizing, transmitting, manipulating, and reviewing data and audio files on portable and handheld digital electronic devices" (the "Shuffle Logo").

 

Apple's Shuffle Logo is depicted on the right.

Defendant also uses aspects of Apple's MADE FOR IPOD logo, the subject of U.S. Application Serial No. 78/689,534, to promote and sell its goods and services.

Defendant utilizes Apple's proprietary iTunes software in connection with its goods and services without permission from Apple. In order to create its customized audio files, Defendant requires its subscribers to install the iTunes software on his own computer. Defendant then mixes a trainer's voice with music from a subscriber's iTunes media library. The result is an audio

1   workout that plays the subscriber's music as background music to the trainer's voice instruction.

2   Defendant allows a user to select 1) a particular trainer, 2) a particular exercise, and 3) a particular

3   iTunes playlist (i.e. the subscriber's music). Defendant's application has the capability to cater the

4   trainer's voice to the subscriber (i.e. according to the selected exercise, the user's fitness level

5   controls cadence, number of reps, number of sets, etc.). But on information and belief, Defendant

6   depends on iTunes, via iTunes' Application Programmer Interface, to store, manage, play, and

7   control the audio content. On information and belief, Defendant's services depend on and do not

8   function without Apple's iTunes software.

9          On information and belief, Defendant entered into a collaborative agreement with a

10  television network in connection with the production of an exercise program, pursuant to which

11  Defendant agreed to provide the network with free access to its service, as well as a new IPOD

12  player.

13         On information and belief, Defendant's initial plans for the launch of its service included

14  giveaways for free IPOD players.

15         Apple has not consented to any of Defendant's uses of its iTunes software, its IPOD mark

16  or its product images, nor any mark comprised in whole or part of POD, nor has Apple sponsored,

17  endorsed or approved the goods or services offered and promoted by Defendant. Nor is there any

18  affiliation between Apple and Defendant.

19         The most prominent element of the Podfitness Marks, "POD," comprises the most

20  prominent element of Apple's IPOD mark. In addition, the dominant element of the Podfitness

21  Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

22         On information and belief, Defendant uses, or intends to use, the Podfitness Marks on

23  goods and services that are identical, or at least highly related, to Apple's IPOD goods and related

24  services.

25         On information and belief, the goods and services offered and/or sold by Defendant under

26  the Podfitness Marks are moving and will continue to move through the same channels of trade,

27  and are being offered and/or sold through the same channels of advertising and to the same

28

11

1  consumer groups, as the goods and services that are offered and sold by Apple under the IPOD

2  mark.

3      On information and belief, Defendant's promotion and sales of its goods and services

4  under the Podfitness Marks are directed to consumers of Apple's IPOD products.

5      Apple expressly reserves the right to supplement its response to this interrogatory as

6  additional facts are ascertained.

7  **INTERROGATORY NO. 3:**

8      State all facts upon which you rely to support your assertions in your Second Cause of

9  Action, ¶¶ 85 - 90, of your Complaint including but not limited to your assertions that Podfitness'

10  use of the PODFITNESS MARKS constitutes a false designation of origin, false or misleading

11  description, and/or false or misleading representation of fact, and that Podfitness' use of the

12  PODFITNESS MARKS is likely to cause confusion, mistake, or deception of others regarding the

13  affiliation, connection, sponsorship, association or approval of Podfitness' goods and services as

14  those of Apple and/or to falsely imply an association with Apple.

15  **RESPONSE TO INTERROGATORY NO. 3:**

16      Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to

17  circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the

18  extent it asks numerous questions and seeks discovery of ***all*** facts supporting assertions set forth in

19  six separate paragraphs of Apple's Complaint.  Apple further objects to this interrogatory as

20  premature to the extent that discovery is ongoing in this matter.  Apple further objects to this

21  interrogatory to the extent it is duplicative of Defendant's Interrogatory No. 2.  Subject to these

22  objections and the General Objections, Apple responds as follows:

23      Since its introduction on October 23, 2001, the IPOD player has become an extremely

24  popular and widely recognized consumer product, with over 50 million units sold worldwide.  The

25  IPOD player has led digital media player sales in the U.S. for the past several years, garnering

26  tremendous commercial success.

27

28

1   Apple has used and is using its IPOD mark in commerce on and in connection with

2   offering and selling its portable handheld media players and associated goods and services

3   continuously since October 2001.

4       On information and belief, the POD mark has been used by consumers and industry

5   publications as a slang term for the IPOD mark and product.

6       Apple owns the following registered IPOD marks in the United States:

7       •   IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld

8   digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing

9   audio files; computer software for use in organizing, transmitting, manipulating, and reviewing

10  audio files on portable and handheld digital electronic devices."

11      •   IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing

12  computer hardware."

13      •   IPOD NANO – Registration No. 3192683 for "portable and handheld digital

14  electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data,

15  and audio files; computer software for use in organizing, transmitting, manipulating, and

16  reviewing text, data, and audio files on portable and handheld digital electronic devices."

17      Apple also owns eleven pending applications for POD, IPOD and related marks for a wide

18  variety of goods and services, including printed and electronic materials and publications,

19  educational services, entertainment services, software, accessories for portable handheld digital

20  electronic devices, clothing, retail services, and computerized data storage and retrieval services.

21      Every IPOD player is packaged with Apple's Earbud Trade Dress.

22      On information and belief, since its introduction in 2001, consumers have used Apple's

23  IPOD products in connection with their fitness activities.  As a result, for several years, Apple has

24  marketed and sold IPOD-compatible protective "sports cases" and arm bands to facilitate the use

25  of the IPOD player while exercising.  Apple markets such accessories at The Apple Store (at

26  *http://store.apple.com*) under the slogan, "[k]eep you IPOD secure when you're on the go.  Perfect

27  for riding, running, and working out."

28

13

1    In May 2006 Apple announced that it had entered into a collaboration with shoe
2  manufacturer Nike to release a new product, referred to as Nike +IPOD, that would allow a
3  runner's shoes to communicate with an IPOD player. The Nike + IPOD Sports Kit component of
4  the product is designed to allow an IPOD player to function as a personal trainer or coach, and to
5  help the user achieve individualized fitness goals. The Nike +IPOD product is being promoted by
6  Apple and Nike in advertisements, some of which feature Apple's Earbud Trade Dress next to a
7  running shoe, and is now available in retail stores and on-line at various websites, including The
8  Apple Store at the URL *http://store.apple.com.*

9    Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable
10  audio files for handheld media players and related services, which it promotes and provides on the
11  Internet through its website located at *www.podfitness.com.* Consumers pay a monthly
12  subscription fee to download Defendant's digital audio files. Defendant's digital audio files are
13  customized workout programs created by professional fitness trainers in response to a consumer's
14  stated personal exercise objectives. The files are then downloaded to the customer's digital media
15  player to be set to music already on the customer's player. According to the *www.podfitness.com*
16  website, Defendant's consumers must use Apple's ITUNES proprietary digital media player
17  application to facilitate the downloading of Defendant's audio workout files.

18    On information and belief, Defendant's PODFITNESS service is directly competitive with
19  goods and services offered by Apple under its IPOD mark, including, but not limited to Nike
20  +IPOD and iTunes iMixes.

21    Defendant has also adopted the PODFITNESS.COM Logo for its products and services,
22  which it promotes on its website and which incorporates an image of white and grey earbuds.

23    Defendant has also copied and prominently displays Apple's registered IPOD mark
24  throughout its *www.podfitness.com* website and particularly on the homepage, including in the
25  tagline: "Put a Personal Trainer right on your IPOD®," and the bold caption: "Customized IPOD
26  Workouts" (although Defendant removed both phrases from its home page after communications
27  from Apple). Defendant repeatedly has displayed conspicuous photos of the IPOD product on the

28

14

site, and has prominently featured images of individuals exercising while wearing Apple's Earbud Trade Dress. Defendant also uses Apple's Earbud Trade Dress in its marketing correspondence and other communications. In the "Support" section of the website, Defendant states that "you will need to have [Apple's] ITUNES 6 installed in order to use the Podfitness software."

On information and belief, Defendant has directly copied images of the IPOD player from Apple's website at *www.apple.com* to use on its own *www.podfitness.com* website.

Defendant has used Apple's registered IPOD mark in the metatags of each page on its *www.podfitness.com* website, causing Defendant's website to appear as a "hit" when a query is conducted through a search engine for the following phrases: "IPOD workout music"; "I POD trainer"; "I POD workout"; "I POD workouts"; "IPOD workouts"; "IPOD trainer."

Defendant has also been listed as a sponsored link on the search engine *www.google.com* in connection with the keywords "IPOD Workout" and "IPOD Fitness," causing a link to the *www.podfitness.com* website to appear prominently in the top banner or right margin of the screen in response to a search query for such terms.

Defendant registered and uses the domain names *ipodfitness.com* and *ipodworkouts.com* to automatically re-direct to its homepage at podfitness.com.

On March 16, 2006, Defendant ran a full-page advertisement in the Wall Street Journal, which stated in large type:

> Dear Steve Jobs,
> Thanks for the IPOD®.
> Best,
> Jeff Hays
>
> P.S. Wait till you hear what we did with it!
> Call me, 801-990-3238

The bottom of the advertisement prominently displayed the white earbuds shown in the PODFITNESS.COM Logo mark along with the tagline "Your Music. Your Workout. Your Way." Underneath the logo in smaller print, the advertisement read:

1    "If you're not Steve, and would like to download unlimited, customized training sessions

2    mixed with your music, it's only $19.95 per month.  For you Steve, it's on the house.

3    *www.podfitness.com/steve*."

4        Also on the PODFITNESS website at *www.podfitness.com/steve*, Defendant posted the

5    following promotional statement:

6        Dear Steve,

7        Thanks for coming to the site.

8        Can I tell you a quick story?

9        Like millions of others, in December of 2004 my 44-year-old wife and I got iPods
10       for Christmas. My 25 year old son was on his 3rd, our teenagers were on their 1st
         or 2nd. But when my techno-phobic wife got one... well, it was obvious that the
11       iPod had crossed the chasm. Like the rest of the business world, I couldn't wait to
         be involved.

12       So, a month later (January 2005), I filed a couple of patent applications for an idea
         that I'd been tinkering with for a while. I called it Podfitness. The idea was to
13       create a service that would create customized, downloadable, personalized audio
         workouts that could each be mixed with the users' own favorite music. So, off we
14       went...

15       After we embarked on a yearlong programming journey, as you know, Apple went
         on to sell 32 million more iPods. (Congratulations, by the way!) This was terrific,
16       but of course "competitors" started appearing. Dang it! None of them were creating
         anything new, no technology, it was just people taking static workouts and
17       converting them to mp3. We could have done that on our first day, (heck, my 15
         year old does it every day, what's the big deal about ripping a CD?) It was pure hell
18       to sit back and watch people enter the market with... well, nothing. All the while,
         we're quietly working away, burning cash, programming, partnering and recording.
19       And the clock was ticking...

20       Well, it took us over a year and a couple of million dollars, but we did it.

21       It is widely known to the public that Steve Jobs is the CEO of Apple.  Neither Steve Jobs,

22   nor Apple, authorized this use of his name in Defendant's advertisements for the PODFITNESS

23   product.

24        Defendant also provides the following explanation for the inspiration behind the creation

25   of PODFITNESS on its *www.podfitness.com* website:

26       **Supernova Marketplace: The Intersection of Music, iPod and Fitness**
         When Podfitness was founded in January 2005, Apple had sold just over 10 million
27       iPods. Sensing a major shift coming, CEO Jeff Hays gambled that the iPod-led

28                                                    16

1  MP3 revolution had the potential not only to change the economics of the music business, but also the fitness industry. This began a multimillion-dollar process of
2  conceptualizing, building, and refining the idea of Podfitness.

3  Now, in 2006, there have been over 50 million iPods sold, and the "Made for iPod" market is white-hot. In addition, the number of people focusing on fitness has never
4  been higher: there are 40 million fitness club members in the U.S. alone.

5  Not coincidentally, at this exact time, Podfitness is at the culmination of 18 months' efforts...
6

7  *https://podfitness.com/web/template/corporate?aff=home*

8         Defendant has also adopted the Arrow Logo, which it promotes on its website and which is
9  identical to Apple's Shuffle Logo.

10        Defendant also uses aspects of Apple's MADE FOR IPOD logo, the subject of U.S.
11  Application Serial No. 78/689,534, to promote and sell its goods and services.

12        Defendant utilizes Apple's proprietary iTunes software in connection with its goods and
13  services without permission from Apple.  In order to create its customized audio files, Defendant
14  requires its subscribers to install the iTunes software on his own computer.  Defendant then mixes
15  a trainer's voice with music from a subscriber's iTunes media library.  The result is an audio
16  workout that plays the subscriber's music as background music to the trainer's voice instruction.
17  Defendant allows a user to select 1) a particular trainer, 2) a particular exercise, and 3) a particular
18  iTunes playlist (i.e. the subscriber's music).  Defendant's application has the capability to cater the
19  trainer's voice to the subscriber (i.e. according to the selected exercise, the user's fitness level
20  controls cadence, number of reps, number of sets, etc.).  But on information and belief, Defendant
21  depends on iTunes, via iTunes' Application Programmer Interface, to store, manage, play, and
22  control the audio content.  On information and belief, Defendant's services depend on and do not
23  function without Apple's iTunes software.

24        On information and belief, Defendant entered into a collaborative agreement with a
25  television network in connection with the production of an exercise program, pursuant to which
26  Defendant agreed to provide the network with free access to its service, as well as a new IPOD
27  player.

28

1    On information and belief, Defendant's initial plans for the launch of its service included

2    giveaways for free IPOD players.

3    Apple has not consented to any of Defendant's uses of its iTunes software, its IPOD mark

4    or its product images, nor any mark comprised in whole or part of POD, nor has Apple sponsored,

5    endorsed or approved the goods or services offered and promoted by Defendant.  Nor is there any

6    affiliation between Apple and Defendant.

7    The most prominent element of the Podfitness Marks, "POD," comprises the most

8    prominent element of Apple's IPOD mark.  In addition, the dominant element of the Podfitness

9    Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

10    On information and belief, Defendant uses, or intends to use, the Podfitness Marks on

11    goods and services that are identical, or at least highly related, to Apple's IPOD goods and related

12    services.

13    On information and belief, the goods and services offered and/or sold by Defendant under

14    the Podfitness Marks are moving and will continue to move through the same channels of trade,

15    and are being offered and/or sold through the same channels of advertising and to the same

16    consumer groups, as the goods and services that are offered and sold by Apple under the IPOD

17    mark.

18    On information and belief, Defendant's promotion and sales of its goods and services

19    under the Podfitness Marks are directed to consumers of Apple's IPOD products.

20    Apple expressly reserves the right to supplement its response to this interrogatory as

21    additional facts are ascertained.

22    **INTERROGATORY NO. 4:**

23    State all facts upon which you rely to support your assertions in Third Cause of Action, ¶¶

24    92 - 102, of your Complaint including but not limited to your assertions that Apple's Earbuds

25    qualify as trade dress.

26

27

28

**RESPONSE TO INTERROGATORY NO. 4:**

Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the extent it seeks discovery of *all* facts supporting assertions set forth in 11 separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as premature to the extent that discovery is ongoing in this matter. Subject to these objections and the General Objections, Apple responds as follows:

Every IPOD player is packaged with Apple's stylized and unique white earphones, commonly called earbuds. Apple's distinctive earbuds consist of white circular ear speakers with a gray rim, which are attached to a white cylinder of molded plastic covering the white wire. Apple's earbuds have been prominently displayed in its advertising for the IPOD player, and, most famously, are featured in Apple's popular silhouette advertising campaigns The public's recognition of the Earbud Trade Dress and association of that trade dress with Apple has been recognized in numerous articles and publications, including but not limited to those articles contained in the following links:

*http://www.gothamist.com/archives/2005/02/15/have_ipod_will_get_mugged.php* ("The South Brooklyn police say that the white earphones are what tip the robbers off, and the police even offered to engrave kids' iPods, cellphones, and other techno-sundries with ID numbers.")

*http://cbs2chicago.com/westsuburbanbureau/local_story_314095644.html* ("However, Shannon won't be slipping on those trademark white earphones that come with the popular music player.")

*http://technoidentity.blogspot.com/2006/02/notes-for-20060216.html* ("conventional signal: white iPod earbuds…indicating iPod ownership, which indicates association with apple brand, music-loving, iconoclastic.")

*http://www.macsimumnews.com/index.php/archive/book_review_jai_guru_ipod/* ("Perhaps the most iconic feature of the iPod are the white earbuds. Scholars have studied this subject and

1  have determined that as far as the street, showing your white earbud's cord is a silent signal to

2  other iPod owners that you 'get it.'")

3  Moreover, on information and belief, prior to launching its services, Defendant recognized

4  that Apple possessed trade dress rights in its earbuds and discussed modifying its

5  PODFITNESS.COM Logo.

6  Apple expressly reserves the right to supplement its response to this interrogatory as

7  additional facts are ascertained.

8  **INTERROGATORY NO. 5:**

9  State all facts upon which you rely to support your assertions in your Fourth Cause of

10  Action, ¶¶ 104 - 108, of your Complaint that Podfitness' use of the PODFITNESS MARKS has

11  diluted Apple's IPOD mark, including but not limited to whether Apple is claiming that the

12  alleged dilution constitutes blurring or tarnishment or both, how Podfitness' use of the

13  PODFITNESS MARKS has caused the dilution of a distinctive quality of the IPOD mark, and

14  how Apple has been harmed by Podfitness' use of the PODFITNESS MARKS.

15  **RESPONSE TO INTERROGATORY NO. 5:**

16  Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to

17  circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the

18  extent it asks numerous questions and seeks discovery of ***all*** facts supporting assertions set forth in

19  five separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as

20  premature to the extent that discovery is ongoing in this matter. Subject to these objections and

21  the General Objections, Apple responds as follows:

22  At this time, Apple claims that Defendant's dilution constitutes blurring and tarnishment.

23  Since its introduction on October 23, 2001, the IPOD player has become an extremely

24  popular and widely recognized consumer product, with over 50 million units sold worldwide. The

25  IPOD player has led digital media player sales in the U.S. for the past several years, garnering

26  tremendous commercial success.

27

28

20

1    In the past five years, the IPOD player has truly become a cultural phenomenon. As stated

2    by Andy Serwer in a Fortune magazine article dated June 27, 2005, "[i]t's hard to recall any

3    branded recreational product that ever carried the cultural oomph that the iPod now has. The

4    Hula-Hoop was a fad....As for the Walkman, the iPod's mobile-music ancestor, it generated

5    massive sales. But it never impacted behavior or peripheral markets quite the way the iPod has."

6    As an example of the IPOD player's reach, starting in the fall of 2004, Duke University initiated a

7    program in which all incoming freshman were provided IPOD players, free of charge, to use as

8    high-tech educational tools to record lectures, capture scientific data and play language-training

9    recordings.

10    Apple has used and is using its IPOD mark in commerce on and in connection with

11    offering and selling its portable handheld media players and associated goods and services

12    continuously since October 2001.

13    On information and belief, the POD mark has been used by consumers and industry

14    publications as a slang term for the IPOD mark and product.

15    Apple owns the following registered IPOD marks in the United States:

16    •    IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld

17    digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing

18    audio files; computer software for use in organizing, transmitting, manipulating, and reviewing

19    audio files on portable and handheld digital electronic devices."

20    •    IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing

21    computer hardware."

22    •    IPOD NANO – Registration No. 3192683 for "portable and handheld digital

23    electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data,

24    and audio files; computer software for use in organizing, transmitting, manipulating, and

25    reviewing text, data, and audio files on portable and handheld digital electronic devices."

26    Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable

27    audio files for handheld media players and related services, which it promotes and provides on the

28

1  Internet through its website located at *www.podfitness.com*. Consumers pay a monthly

2  subscription fee to download Defendant's digital audio files. Defendant's digital audio files are

3  customized workout programs created by professional fitness trainers in response to a consumer's

4  stated personal exercise objectives. The files are then downloaded to the customer's digital media

5  player to be set to music already on the customer's player. According to the *www.podfitness.com*

6  website, Defendant's consumers must use Apple's ITUNES proprietary digital media player

7  application to facilitate the downloading of Defendant's audio workout files.

8        Apple has not consented to any of Defendant's uses any mark comprised in whole or part

9  of POD, nor has Apple sponsored, endorsed or approved the goods or services offered and

10  promoted by Defendant. Nor is there any affiliation between Apple and Defendant.

11        The most prominent element of the Podfitness Marks, "POD," comprises the most

12  prominent element of Apple's IPOD mark. In addition, the dominant element of the Podfitness

13  Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

14        On information and belief, the goods and services offered and/or sold by Defendant under

15  the Podfitness Marks are moving and will continue to move through the same channels of trade,

16  and are being offered and/or sold through the same channels of advertising and to the same

17  consumer groups, as the goods and services that are offered and sold by Apple under the IPOD

18  mark.

19        On information and belief, Defendant's promotion and sales of its goods and services

20  under the Podfitness Marks are directed to consumers of Apple's IPOD products.

21        Apple expressly reserves the right to supplement its response to this interrogatory as

22  additional facts are ascertained.

23  **INTERROGATORY NO. 6:**

24        State all facts upon which you rely to support your assertions in Fifth Cause of Action, ¶¶

25  110 - 114, of your Complaint including but not limited to your assertions that Podfitness' use of

26  the PODFITNESS MARKS constitutes unfair competition, which is injurious to the public interest

27

28

22

1  and has damaged Apple, including damage to Apple's market, reputation, and goodwill, and

2  discouraged customers and potential customers from dealing with Apple.

3  **RESPONSE TO INTERROGATORY NO. 6:**

4      Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to

5  circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the

6  extent it asks numerous questions and seeks discovery of ***all*** facts supporting assertions set forth in

7  five separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as

8  premature to the extent that discovery is ongoing in this matter. Apple further objects to this

9  interrogatory to the extent it is duplicative of Defendant's Interrogatory Nos. 2 and 3. Subject to

10  these objections and the General Objections, Apple responds as follows:

11      Since its introduction on October 23, 2001, the IPOD player has become an extremely

12  popular and widely recognized consumer product, with over 50 million units sold worldwide. The

13  IPOD player has led digital media player sales in the U.S. for the past several years, garnering

14  tremendous commercial success.

15      Apple has used and is using its IPOD mark in commerce on and in connection with

16  offering and selling its portable handheld media players and associated goods and services

17  continuously since October 2001.

18      On information and belief, the POD mark has been used by consumers and industry

19  publications as a slang term for the IPOD mark and product.

20      Apple owns the following registered IPOD marks in the United States:

21      •    IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld

22  digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing

23  audio files; computer software for use in organizing, transmitting, manipulating, and reviewing

24  audio files on portable and handheld digital electronic devices."

25      •    IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing

26  computer hardware."

27

28

1  •  IPOD NANO – Registration No. 3192683 for "portable and handheld digital

2  electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data,

3  and audio files; computer software for use in organizing, transmitting, manipulating, and

4  reviewing text, data, and audio files on portable and handheld digital electronic devices."

5       Apple also owns eleven pending applications for POD, IPOD and related marks for a wide

6  variety of goods and services, including printed and electronic materials and publications,

7  educational services, entertainment services, software, accessories for portable handheld digital

8  electronic devices, clothing, retail services, and computerized data storage and retrieval services.

9       Every IPOD player is packaged with Apple's Earbud Trade Dress.

10      On information and belief, since its introduction in 2001, consumers have used Apple's

11  IPOD products in connection with their fitness activities.  As a result, for several years, Apple has

12  marketed and sold IPOD-compatible protective "sports cases" and arm bands to facilitate the use

13  of the IPOD player while exercising.  Apple markets such accessories at The Apple Store (at

14  *http://store.apple.com*) under the slogan, "[k]eep you IPOD secure when you're on the go.  Perfect

15  for riding, running, and working out."

16      In May 2006 Apple announced that it had entered into a collaboration with shoe

17  manufacturer Nike to release a new product, referred to as Nike +IPOD, that would allow a

18  runner's shoes to communicate with an IPOD player.  The Nike + IPOD Sports Kit component of

19  the product is designed to allow an IPOD player to function as a personal trainer or coach, and to

20  help the user achieve individualized fitness goals.  The Nike +IPOD product is being promoted by

21  Apple and Nike in advertisements, some of which feature Apple's Earbud Trade Dress next to a

22  running shoe, and is now available in retail stores and on-line at various websites, including The

23  Apple Store at the URL *http://store.apple.com.*

24      Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable

25  audio files for handheld media players and related services, which it promotes and provides on the

26  Internet through its website located at *www.podfitness.com.*  Consumers pay a monthly

27  subscription fee to download Defendant's digital audio files.  Defendant's digital audio files are

28

1   customized workout programs created by professional fitness trainers in response to a consumer's

2   stated personal exercise objectives. The files are then downloaded to the customer's digital media

3   player to be set to music already on the customer's player. According to the *www.podfitness.com*

4   website, Defendant's consumers must use Apple's ITUNES proprietary digital media player

5   application to facilitate the downloading of Defendant's audio workout files.

6         On information and belief, Defendant's PODFITNESS service is directly competitive with

7   goods and services offered by Apple under its IPOD mark, including, but not limited to Nike

8   +IPOD and iTunes iMixes.

9         Defendant has also adopted the PODFITNESS.COM Logo for its products and services,

10  which it promotes on its website and which incorporates an image of white and grey earbuds.

11        Defendant has also copied and prominently displays Apple's registered IPOD mark

12  throughout its *www.podfitness.com* website and particularly on the homepage, including in the

13  tagline: "Put a Personal Trainer right on your IPOD®," and the bold caption: "Customized IPOD

14  Workouts" (although Defendant removed both phrases from its home page after communications

15  from Apple). Defendant repeatedly has displayed conspicuous photos of the IPOD product on the

16  site, and has prominently featured images of individuals exercising while wearing Apple's Earbud

17  Trade Dress. Defendant also uses Apple's Earbud Trade Dress in its marketing correspondence

18  and other communications. In the "Support" section of the website, Defendant states that "you

19  will need to have [Apple's] ITUNES 6 installed in order to use the Podfitness software."

20        On information and belief, Defendant has directly copied images of the IPOD player from

21  Apple's website at *www.apple.com* to use on its own *www.podfitness.com* website.

22        Defendant has used Apple's registered IPOD mark in the metatags of each page on its

23  *www.podfitness.com* website, causing Defendant's website to appear as a "hit" when a query is

24  conducted through a search engine for the following phrases: "IPOD workout music"; "I POD

25  trainer"; "I POD workout"; "I POD workouts"; "IPOD workouts"; "IPOD trainer."

26        Defendant has also been listed as a sponsored link on the search engine *www.google.com*

27  in connection with the keywords "IPOD Workout" and "IPOD Fitness," causing a link to the

28

25

1  *www.podfitness.com* website to appear prominently in the top banner or right margin of the screen

2  in response to a search query for such terms.

3      Defendant registered and uses the domain names *ipodfitness.com* and *ipodworkouts.com* to

4  automatically re-direct to its homepage at podfitness.com.

5      On March 16, 2006, Defendant ran a full-page advertisement in the Wall Street Journal,

6  which stated in large type:

7      Dear Steve Jobs,
    Thanks for the IPOD®.

8      Best,
    Jeff Hays

9      P.S. Wait till you hear what we did with it!

10      Call me, 801-990-3238

11  The bottom of the advertisement prominently displayed the white earbuds shown in the

12  PODFITNESS.COM Logo mark along with the tagline "Your Music. Your Workout. Your Way."

13  Underneath the logo in smaller print, the advertisement read:

14      "If you're not Steve, and would like to download unlimited, customized training sessions

15  mixed with your music, it's only $19.95 per month. For you Steve, it's on the house.

16  *www.podfitness.com/steve.*"

17      Also on the PODFITNESS website at *www.podfitness.com/steve*, Defendant posted the

18  following promotional statement:

19      Dear Steve,

20      Thanks for coming to the site.

21      Can I tell you a quick story?

22      Like millions of others, in December of 2004 my 44-year-old wife and I got iPods
    for Christmas. My 25 year old son was on his 3rd, our teenagers were on their 1st

23      or 2nd. But when my techno-phobic wife got one... well, it was obvious that the
    iPod had crossed the chasm. Like the rest of the business world, I couldn't wait to

24      be involved.

25      So, a month later (January 2005), I filed a couple of patent applications for an idea
    that I'd been tinkering with for a while. I called it Podfitness. The idea was to

26      create a service that would create customized, downloadable, personalized audio
    workouts that could each be mixed with the users' own favorite music. So, off we

27      went...

28

After we embarked on a yearlong programming journey, as you know, Apple went on to sell 32 million more iPods. (Congratulations, by the way!) This was terrific, but of course "competitors" started appearing. Dang it! None of them were creating anything new, no technology, it was just people taking static workouts and converting them to mp3. We could have done that on our first day, (heck, my 15 year old does it every day, what's the big deal about ripping a CD?) It was pure hell to sit back and watch people enter the market with... well, nothing. All the while, we're quietly working away, burning cash, programming, partnering and recording. And the clock was ticking...

Well, it took us over a year and a couple of million dollars, but we did it.

It is widely known to the public that Steve Jobs is the CEO of Apple. Neither Steve Jobs, nor Apple, authorized this use of his name in Defendant's advertisements for the PODFITNESS product.

Defendant also provides the following explanation for the inspiration behind the creation of PODFITNESS on its *www.podfitness.com* website:

**Supernova Marketplace: The Intersection of Music, iPod and Fitness**
When Podfitness was founded in January 2005, Apple had sold just over 10 million iPods. Sensing a major shift coming, CEO Jeff Hays gambled that the iPod-led MP3 revolution had the potential not only to change the economics of the music business, but also the fitness industry. This began a multimillion-dollar process of conceptualizing, building, and refining the idea of Podfitness.

Now, in 2006, there have been over 50 million iPods sold, and the "Made for iPod" market is white-hot. In addition, the number of people focusing on fitness has never been higher: there are 40 million fitness club members in the U.S. alone.

Not coincidentally, at this exact time, Podfitness is at the culmination of 18 months' efforts…

*https://podfitness.com/web/template/corporate?aff=home*

Defendant has also adopted the Arrow Logo, which it promotes on its website and which is identical to Apple's Shuffle Logo.

Defendant also uses aspects of Apple's MADE FOR IPOD logo, the subject of U.S. Application Serial No. 78/689,534, to promote and sell its goods and services.

Defendant utilizes Apple's proprietary iTunes software in connection with its goods and services without permission from Apple. In order to create its customized audio files, Defendant requires its subscribers to install the iTunes software on his own computer. Defendant then mixes

a trainer's voice with music from a subscriber's iTunes media library. The result is an audio workout that plays the subscriber's music as background music to the trainer's voice instruction. Defendant allows a user to select 1) a particular trainer, 2) a particular exercise, and 3) a particular iTunes playlist (i.e. the subscriber's music). Defendant's application has the capability to cater the trainer's voice to the subscriber (i.e. according to the selected exercise, the user's fitness level controls cadence, number of reps, number of sets, etc.). But on information and belief, Defendant depends on iTunes, via iTunes' Application Programmer Interface, to store, manage, play, and control the audio content. On information and belief, Defendant's services depend on and do not function without Apple's iTunes software.

On information and belief, Defendant entered into a collaborative agreement with a television network in connection with the production of an exercise program, pursuant to which Defendant agreed to provide the network with free access to its service, as well as a new IPOD player.

On information and belief, Defendant's initial plans for the launch of its service included giveaways for free IPOD players.

Apple has not consented to any of Defendant's uses of its iTunes software, its IPOD mark or its product images, nor any mark comprised in whole or part of POD, nor has Apple sponsored, endorsed or approved the goods or services offered and promoted by Defendant. Nor is there any affiliation between Apple and Defendant.

The most prominent element of the Podfitness Marks, "POD," comprises the most prominent element of Apple's IPOD mark. In addition, the dominant element of the Podfitness Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

On information and belief, Defendant uses, or intends to use, the Podfitness Marks on goods and services that are identical, or at least highly related, to Apple's IPOD goods and related services.

On information and belief, the goods and services offered and/or sold by Defendant under the Podfitness Marks are moving and will continue to move through the same channels of trade,

1  and are being offered and/or sold through the same channels of advertising and to the same

2  consumer groups, as the goods and services that are offered and sold by Apple under the IPOD

3  mark.

4      On information and belief, Defendant's promotion and sales of its goods and services

5  under the Podfitness Marks are directed to consumers of Apple's IPOD products.

6      Apple expressly reserves the right to supplement its response to this interrogatory as

7  additional facts are ascertained.

8  **INTERROGATORY NO. 7:**

9      State all facts upon which you rely to support your assertions in your Sixth Cause of

10  Action, ¶¶ 116 - 119 of your Complaint including but not limited to your assertions that

11  Podfitness' use of the PODFITNESS MARKS dilutes the distinctive quality of the IPOD mark.

12  **RESPONSE TO INTERROGATORY NO. 7:**

13      Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to

14  circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the

15  extent it asks numerous questions and seeks discovery of ___all___ facts supporting assertions set forth in

16  four separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as

17  premature to the extent that discovery is ongoing in this matter. Apple further objects to this

18  interrogatory to the extent it is duplicative of Defendant's Interrogatory No. 5. Subject to these

19  objections and the General Objections, Apple responds as follows:

20      Since its introduction on October 23, 2001, the IPOD player has become an extremely

21  popular and widely recognized consumer product, with over 50 million units sold worldwide. The

22  IPOD player has led digital media player sales in the U.S. for the past several years, garnering

23  tremendous commercial success.

24      In the past five years, the IPOD player has truly become a cultural phenomenon. As stated

25  by Andy Serwer in a Fortune magazine article dated June 27, 2005, "[i]t's hard to recall any

26  branded recreational product that ever carried the cultural oomph that the iPod now has. The

27  Hula-Hoop was a fad....As for the Walkman, the iPod's mobile-music ancestor, it generated

28

massive sales. But it never impacted behavior or peripheral markets quite the way the iPod has."
As an example of the IPOD player's reach, starting in the fall of 2004, Duke University initiated a program in which all incoming freshman were provided IPOD players, free of charge, to use as high-tech educational tools to record lectures, capture scientific data and play language-training recordings.

Apple has used and is using its IPOD mark in commerce on and in connection with offering and selling its portable handheld media players and associated goods and services continuously since October 2001.

On information and belief, the POD mark has been used by consumers and industry publications as a slang term for the IPOD mark and product.

Apple owns the following registered IPOD marks in the United States:

• IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing audio files; computer software for use in organizing, transmitting, manipulating, and reviewing audio files on portable and handheld digital electronic devices."

• IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing computer hardware."

• IPOD NANO – Registration No. 3192683 for "portable and handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data, and audio files; computer software for use in organizing, transmitting, manipulating, and reviewing text, data, and audio files on portable and handheld digital electronic devices."

Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable audio files for handheld media players and related services, which it promotes and provides on the Internet through its website located at *www.podfitness.com*. Consumers pay a monthly subscription fee to download Defendant's digital audio files. Defendant's digital audio files are customized workout programs created by professional fitness trainers in response to a consumer's stated personal exercise objectives. The files are then downloaded to the customer's digital media

PLAINTIFF APPLE'S OBJECTIONS AND RESPONSES TO
DEFENDANT PODFITNESS' FIRST SET OF INTERROGATORIES
Case No. C 06-5805 SBA

1  player to be set to music already on the customer's player.  According to the *www.podfitness.com*

2  website, Defendant's consumers must use Apple's ITUNES proprietary digital media player

3  application to facilitate the downloading of Defendant's audio workout files.

4       Apple has not consented to any of Defendant's uses any mark comprised in whole or part

5  of POD, nor has Apple sponsored, endorsed or approved the goods or services offered and

6  promoted by Defendant.  Nor is there any affiliation between Apple and Defendant.

7       The most prominent element of the Podfitness Marks, "POD," comprises the most

8  prominent element of Apple's IPOD mark.  In addition, the dominant element of the Podfitness

9  Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

10       On information and belief, the goods and services offered and/or sold by Defendant under

11  the Podfitness Marks are moving and will continue to move through the same channels of trade,

12  and are being offered and/or sold through the same channels of advertising and to the same

13  consumer groups, as the goods and services that are offered and sold by Apple under the IPOD

14  mark.

15       On information and belief, Defendant's promotion and sales of its goods and services

16  under the Podfitness Marks are directed to consumers of Apple's IPOD products.

17       Apple expressly reserves the right to supplement its response to this interrogatory as

18  additional facts are ascertained.

19  **INTERROGATORY NO. 8:**

20       State all facts upon which you rely to support your assertions in your Seventh Cause of

21  Action, ¶¶ 121 - 124, of your Complaint including but not limited to your assertions that

22  Podfitness' business practices are unfair and offend public policy as unlawful, unfair,

23  unscrupulous, and substantially injurious to Apple and consumers.

24  **RESPONSE TO INTERROGATORY NO. 8:**

25       Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to

26  circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the

27  extent it asks numerous questions and seeks discovery of ***all*** facts supporting assertions set forth in

28

1     four separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as

2     premature to the extent that discovery is ongoing in this matter. Subject to these objections and

3     the General Objections, Apple responds as follows:

4        Since its introduction on October 23, 2001, the IPOD player has become an extremely

5     popular and widely recognized consumer product, with over 50 million units sold worldwide. The

6     IPOD player has led digital media player sales in the U.S. for the past several years, garnering

7     tremendous commercial success.

8        Apple has used and is using its IPOD mark in commerce on and in connection with

9     offering and selling its portable handheld media players and associated goods and services

10    continuously since October 2001.

11        On information and belief, the POD mark has been used by consumers and industry

12    publications as a slang term for the IPOD mark and product.

13        Apple owns the following registered IPOD marks in the United States:

14        •     IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld

15    digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing

16    audio files; computer software for use in organizing, transmitting, manipulating, and reviewing

17    audio files on portable and handheld digital electronic devices."

18        •     IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing

19    computer hardware."

20        •     IPOD NANO – Registration No. 3192683 for "portable and handheld digital

21    electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data,

22    and audio files; computer software for use in organizing, transmitting, manipulating, and

23    reviewing text, data, and audio files on portable and handheld digital electronic devices."

24        Apple also owns eleven pending applications for POD, IPOD and related marks for a wide

25    variety of goods and services, including printed and electronic materials and publications,

26    educational services, entertainment services, software, accessories for portable handheld digital

27    electronic devices, clothing, retail services, and computerized data storage and retrieval services.

28

1  Every IPOD player is packaged with Apple's Earbud Trade Dress.

2  On information and belief, since its introduction in 2001, consumers have used Apple's

3  IPOD products in connection with their fitness activities. As a result, for several years, Apple has

4  marketed and sold IPOD-compatible protective "sports cases" and arm bands to facilitate the use

5  of the IPOD player while exercising. Apple markets such accessories at The Apple Store (at

6  *http://store.apple.com*) under the slogan, "[k]eep you IPOD secure when you're on the go. Perfect

7  for riding, running, and working out."

8  In May 2006 Apple announced that it had entered into a collaboration with shoe

9  manufacturer Nike to release a new product, referred to as Nike +IPOD, that would allow a

10  runner's shoes to communicate with an IPOD player. The Nike + IPOD Sports Kit component of

11  the product is designed to allow an IPOD player to function as a personal trainer or coach, and to

12  help the user achieve individualized fitness goals. The Nike +IPOD product is being promoted by

13  Apple and Nike in advertisements, some of which feature Apple's Earbud Trade Dress next to a

14  running shoe, and is now available in retail stores and on-line at various websites, including The

15  Apple Store at the URL *http://store.apple.com.*

16  Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable

17  audio files for handheld media players and related services, which it promotes and provides on the

18  Internet through its website located at *www.podfitness.com.* Consumers pay a monthly

19  subscription fee to download Defendant's digital audio files. Defendant's digital audio files are

20  customized workout programs created by professional fitness trainers in response to a consumer's

21  stated personal exercise objectives. The files are then downloaded to the customer's digital media

22  player to be set to music already on the customer's player. According to the *www.podfitness.com*

23  website, Defendant's consumers must use Apple's ITUNES proprietary digital media player

24  application to facilitate the downloading of Defendant's audio workout files.

25  On information and belief, Defendant's PODFITNESS service is directly competitive with

26  goods and services offered by Apple under its IPOD mark, including, but not limited to Nike

27  +IPOD and iTunes iMixes.

28

33

1   Defendant has also adopted the PODFITNESS.COM Logo for its products and services,
2  which it promotes on its website and which incorporates an image of white and grey earbuds.

3   Defendant has also copied and prominently displays Apple's registered IPOD mark
4  throughout its *www.podfitness.com* website and particularly on the homepage, including in the
5  tagline: "Put a Personal Trainer right on your IPOD®," and the bold caption: "Customized IPOD
6  Workouts" (although Defendant removed both phrases from its home page after communications
7  from Apple). Defendant repeatedly has displayed conspicuous photos of the IPOD product on the
8  site, and has prominently featured images of individuals exercising while wearing Apple's Earbud
9  Trade Dress. Defendant also uses Apple's Earbud Trade Dress in its marketing correspondence
10 and other communications. In the "Support" section of the website, Defendant states that "you
11 will need to have [Apple's] ITUNES 6 installed in order to use the Podfitness software."

12   On information and belief, Defendant has directly copied images of the IPOD player from
13 Apple's website at *www.apple.com* to use on its own *www.podfitness.com* website.

14   Defendant has used Apple's registered IPOD mark in the metatags of each page on its
15 *www.podfitness.com* website, causing Defendant's website to appear as a "hit" when a query is
16 conducted through a search engine for the following phrases: "IPOD workout music"; "I POD
17 trainer"; "I POD workout"; "I POD workouts"; "IPOD workouts"; "IPOD trainer."

18   Defendant has also been listed as a sponsored link on the search engine *www.google.com*
19 in connection with the keywords "IPOD Workout" and "IPOD Fitness," causing a link to the
20 *www.podfitness.com* website to appear prominently in the top banner or right margin of the screen
21 in response to a search query for such terms.

22   Defendant registered and uses the domain names *ipodfitness.com* and *ipodworkouts.com* to
23 automatically re-direct to its homepage at podfitness.com.

24   On March 16, 2006, Defendant ran a full-page advertisement in the Wall Street Journal,
25 which stated in large type:

26   Dear Steve Jobs,
     Thanks for the IPOD®.
27   Best,
     Jeff Hays

28

34

P.S. Wait till you hear what we did with it!
Call me, 801-990-3238

The bottom of the advertisement prominently displayed the white earbuds shown in the

PODFITNESS.COM Logo mark along with the tagline "Your Music. Your Workout. Your Way."

Underneath the logo in smaller print, the advertisement read:

"If you're not Steve, and would like to download unlimited, customized training sessions

mixed with your music, it's only $19.95 per month. For you Steve, it's on the house.

*www.podfitness.com/steve*."

Also on the PODFITNESS website at *www.podfitness.com/steve*, Defendant posted the

following promotional statement:

Dear Steve,

Thanks for coming to the site.

Can I tell you a quick story?

Like millions of others, in December of 2004 my 44-year-old wife and I got iPods
for Christmas. My 25 year old son was on his 3rd, our teenagers were on their 1st
or 2nd. But when my techno-phobic wife got one... well, it was obvious that the
iPod had crossed the chasm. Like the rest of the business world, I couldn't wait to
be involved.

So, a month later (January 2005), I filed a couple of patent applications for an idea
that I'd been tinkering with for a while. I called it Podfitness. The idea was to
create a service that would create customized, downloadable, personalized audio
workouts that could each be mixed with the users' own favorite music. So, off we
went...

After we embarked on a yearlong programming journey, as you know, Apple went
on to sell 32 million more iPods. (Congratulations, by the way!) This was terrific,
but of course "competitors" started appearing. Dang it! None of them were creating
anything new, no technology, it was just people taking static workouts and
converting them to mp3. We could have done that on our first day, (heck, my 15
year old does it every day, what's the big deal about ripping a CD?) It was pure hell
to sit back and watch people enter the market with... well, nothing. All the while,
we're quietly working away, burning cash, programming, partnering and recording.
And the clock was ticking...

Well, it took us over a year and a couple of million dollars, but we did it.

It is widely known to the public that Steve Jobs is the CEO of Apple. Neither Steve Jobs, nor Apple, authorized this use of his name in Defendant's advertisements for the PODFITNESS product.

Defendant also provides the following explanation for the inspiration behind the creation of PODFITNESS on its *www.podfitness.com* website:

> **Supernova Marketplace: The Intersection of Music, iPod and Fitness**
> When Podfitness was founded in January 2005, Apple had sold just over 10 million iPods. Sensing a major shift coming, CEO Jeff Hays gambled that the iPod-led MP3 revolution had the potential not only to change the economics of the music business, but also the fitness industry. This began a multimillion-dollar process of conceptualizing, building, and refining the idea of Podfitness.
>
> Now, in 2006, there have been over 50 million iPods sold, and the "Made for iPod" market is white-hot. In addition, the number of people focusing on fitness has never been higher: there are 40 million fitness club members in the U.S. alone.
>
> Not coincidentally, at this exact time, Podfitness is at the culmination of 18 months' efforts...

*https://podfitness.com/web/template/corporate?aff=home*

Defendant has also adopted the Arrow Logo, which it promotes on its website and which is identical to Apple's Shuffle Logo.

Defendant also uses aspects of Apple's MADE FOR IPOD logo, the subject of U.S. Application Serial No. 78/689,534, to promote and sell its goods and services.

Defendant utilizes Apple's proprietary iTunes software in connection with its goods and services without permission from Apple. In order to create its customized audio files, Defendant requires its subscribers to install the iTunes software on his own computer. Defendant then mixes a trainer's voice with music from a subscriber's iTunes media library. The result is an audio workout that plays the subscriber's music as background music to the trainer's voice instruction. Defendant allows a user to select 1) a particular trainer, 2) a particular exercise, and 3) a particular iTunes playlist (i.e. the subscriber's music). Defendant's application has the capability to cater the trainer's voice to the subscriber (i.e. according to the selected exercise, the user's fitness level controls cadence, number of reps, number of sets, etc.). But on information and belief, Defendant depends on iTunes, via iTunes' Application Programmer Interface, to store, manage, play, and

36

1    control the audio content. On information and belief, Defendant's services depend on and do not

2    function without Apple's iTunes software.

3        On information and belief, Defendant entered into a collaborative agreement with a

4    television network in connection with the production of an exercise program, pursuant to which

5    Defendant agreed to provide the network with free access to its service, as well as a new IPOD

6    player.

7        On information and belief, Defendant's initial plans for the launch of its service included

8    giveaways for free IPOD players.

9        Apple has not consented to any of Defendant's uses of its iTunes software, its IPOD mark

10    or its product images, nor any mark comprised in whole or part of POD, nor has Apple sponsored,

11    endorsed or approved the goods or services offered and promoted by Defendant. Nor is there any

12    affiliation between Apple and Defendant.

13        The most prominent element of the Podfitness Marks, "POD," comprises the most

14    prominent element of Apple's IPOD mark. In addition, the dominant element of the Podfitness

15    Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

16        On information and belief, Defendant uses, or intends to use, the Podfitness Marks on

17    goods and services that are identical, or at least highly related, to Apple's IPOD goods and related

18    services.

19        On information and belief, the goods and services offered and/or sold by Defendant under

20    the Podfitness Marks are moving and will continue to move through the same channels of trade,

21    and are being offered and/or sold through the same channels of advertising and to the same

22    consumer groups, as the goods and services that are offered and sold by Apple under the IPOD

23    mark.

24        On information and belief, Defendant's promotion and sales of its goods and services

25    under the Podfitness Marks are directed to consumers of Apple's IPOD products.

26        Apple expressly reserves the right to supplement its response to this interrogatory as

27    additional facts are ascertained.

28

**INTERROGATORY NO. 9:**

State all facts upon which you rely to support your assertions in your Eighth Cause of Action, ¶¶ 125 - 128, of your Complaint including but not limited to your assertions that Podfitness' actions have caused, and are likely to continue to cause confusion and mistake, and to deceive as to the affiliation, connection or association of Apple, and as to the origin, sponsorship, or approval of Defendant's goods and services by Apple and/or the origin, sponsorship, or approval of Apple's goods and services by Podfitness.

**RESPONSE TO INTERROGATORY NO. 9:**

Apple objects to this interrogatory as overly broad, unduly burdensome, and designed to circumvent limitations on interrogatories imposed by the Federal Rules of Civil Procedure to the extent it asks numerous questions and seeks discovery of *all* facts supporting assertions set forth in four separate paragraphs of Apple's Complaint. Apple further objects to this interrogatory as premature to the extent that discovery is ongoing in this matter. Apple further objects to this interrogatory to the extent it is duplicative of Defendant's Interrogatory Nos. 2, 3, 6, and 8. Subject to these objections and the General Objections, Apple responds as follows:

Since its introduction on October 23, 2001, the IPOD player has become an extremely popular and widely recognized consumer product, with over 50 million units sold worldwide. The IPOD player has led digital media player sales in the U.S. for the past several years, garnering tremendous commercial success.

Apple has used and is using its IPOD mark in commerce on and in connection with offering and selling its portable handheld media players and associated goods and services continuously since October 2001.

On information and belief, the POD mark has been used by consumers and industry publications as a slang term for the IPOD mark and product.

Apple owns the following registered IPOD marks in the United States:

- IPOD – Registration Nos. 2,835,698 and 3,089,360 for "portable and handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing

38

1  audio files; computer software for use in organizing, transmitting, manipulating, and reviewing
2  audio files on portable and handheld digital electronic devices."

3  •  IPOD – Registration No. 2781793 for "public Internet kiosk enclosure containing
4  computer hardware."

5  •  IPOD NANO – Registration No. 3192683 for "portable and handheld digital
6  electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data,
7  and audio files; computer software for use in organizing, transmitting, manipulating, and
8  reviewing text, data, and audio files on portable and handheld digital electronic devices."

9  Apple also owns eleven pending applications for POD, IPOD and related marks for a wide
10  variety of goods and services, including printed and electronic materials and publications,
11  educational services, entertainment services, software, accessories for portable handheld digital
12  electronic devices, clothing, retail services, and computerized data storage and retrieval services.

13  Every IPOD player is packaged with Apple's Earbud Trade Dress.

14  On information and belief, since its introduction in 2001, consumers have used Apple's
15  IPOD products in connection with their fitness activities.  As a result, for several years, Apple has
16  marketed and sold IPOD-compatible protective "sports cases" and arm bands to facilitate the use
17  of the IPOD player while exercising.  Apple markets such accessories at The Apple Store (at
18  *http://store.apple.com*) under the slogan, "[k]eep you IPOD secure when you're on the go.  Perfect
19  for riding, running, and working out."

20  In May 2006 Apple announced that it had entered into a collaboration with shoe
21  manufacturer Nike to release a new product, referred to as Nike +IPOD, that would allow a
22  runner's shoes to communicate with an IPOD player.  The Nike + IPOD Sports Kit component of
23  the product is designed to allow an IPOD player to function as a personal trainer or coach, and to
24  help the user achieve individualized fitness goals.  The Nike +IPOD product is being promoted by
25  Apple and Nike in advertisements, some of which feature Apple's Earbud Trade Dress next to a
26  running shoe, and is now available in retail stores and on-line at various websites, including The
27  Apple Store at the URL *http://store.apple.com*.

28

PLAINTIFF APPLE'S OBJECTIONS AND RESPONSES TO
DEFENDANT PODFITNESS' FIRST SET OF INTERROGATORIES
Case No. C 06-5805 SBA

1   Defendant has adopted and now uses PODFITNESS as a trademark for its downloadable
2   audio files for handheld media players and related services, which it promotes and provides on the
3   Internet through its website located at *www.podfitness.com*. Consumers pay a monthly
4   subscription fee to download Defendant's digital audio files. Defendant's digital audio files are
5   customized workout programs created by professional fitness trainers in response to a consumer's
6   stated personal exercise objectives. The files are then downloaded to the customer's digital media
7   player to be set to music already on the customer's player. According to the *www.podfitness.com*
8   website, Defendant's consumers must use Apple's ITUNES proprietary digital media player
9   application to facilitate the downloading of Defendant's audio workout files.

10   On information and belief, Defendant's PODFITNESS service is directly competitive with
11   goods and services offered by Apple under its IPOD mark, including, but not limited to Nike
12   +IPOD and iTunes iMixes.

13   Defendant has also adopted the PODFITNESS.COM Logo for its products and services,
14   which it promotes on its website and which incorporates an image of white and grey earbuds.

15   Defendant has also copied and prominently displays Apple's registered IPOD mark
16   throughout its *www.podfitness.com* website and particularly on the homepage, including in the
17   tagline: "Put a Personal Trainer right on your IPOD®," and the bold caption: "Customized IPOD
18   Workouts" (although Defendant removed both phrases from its home page after communications
19   from Apple). Defendant repeatedly has displayed conspicuous photos of the IPOD product on the
20   site, and has prominently featured images of individuals exercising while wearing Apple's Earbud
21   Trade Dress. Defendant also uses Apple's Earbud Trade Dress in its marketing correspondence
22   and other communications. In the "Support" section of the website, Defendant states that "you
23   will need to have [Apple's] ITUNES 6 installed in order to use the Podfitness software."

24   On information and belief, Defendant has directly copied images of the IPOD player from
25   Apple's website at *www.apple.com* to use on its own *www.podfitness.com* website.

26   Defendant has used Apple's registered IPOD mark in the metatags of each page on its
27   *www.podfitness.com* website, causing Defendant's website to appear as a "hit" when a query is

28

conducted through a search engine for the following phrases: "IPOD workout music"; "I POD

trainer"; "I POD workout"; "I POD workouts"; "IPOD workouts"; "IPOD trainer."

Defendant has also been listed as a sponsored link on the search engine *www.google.com*

in connection with the keywords "IPOD Workout" and "IPOD Fitness," causing a link to the

*www.podfitness.com* website to appear prominently in the top banner or right margin of the screen

in response to a search query for such terms.

Defendant registered and uses the domain names *ipodfitness.com* and *ipodworkouts.com* to

automatically re-direct to its homepage at podfitness.com.

On March 16, 2006, Defendant ran a full-page advertisement in the Wall Street Journal,

which stated in large type:

> Dear Steve Jobs,
> Thanks for the IPOD®.
> Best,
> Jeff Hays
>
> P.S. Wait till you hear what we did with it!
> Call me, 801-990-3238

The bottom of the advertisement prominently displayed the white earbuds shown in the

PODFITNESS.COM Logo mark along with the tagline "Your Music. Your Workout. Your Way."

Underneath the logo in smaller print, the advertisement read:

> "If you're not Steve, and would like to download unlimited, customized training sessions

mixed with your music, it's only $19.95 per month. For you Steve, it's on the house.

*www.podfitness.com/steve*."

Also on the PODFITNESS website at *www.podfitness.com/steve*, Defendant posted the

following promotional statement:

> Dear Steve,
>
> Thanks for coming to the site.
>
> Can I tell you a quick story?
>
> Like millions of others, in December of 2004 my 44-year-old wife and I got iPods
> for Christmas. My 25 year old son was on his 3rd, our teenagers were on their 1st
> or 2nd. But when my techno-phobic wife got one... well, it was obvious that the

iPod had crossed the chasm. Like the rest of the business world, I couldn't wait to be involved.

So, a month later (January 2005), I filed a couple of patent applications for an idea that I'd been tinkering with for a while. I called it Podfitness. The idea was to create a service that would create customized, downloadable, personalized audio workouts that could each be mixed with the users' own favorite music. So, off we went...

After we embarked on a yearlong programming journey, as you know, Apple went on to sell 32 million more iPods. (Congratulations, by the way!) This was terrific, but of course "competitors" started appearing. Dang it! None of them were creating anything new, no technology, it was just people taking static workouts and converting them to mp3. We could have done that on our first day, (heck, my 15 year old does it every day, what's the big deal about ripping a CD?) It was pure hell to sit back and watch people enter the market with... well, nothing. All the while, we're quietly working away, burning cash, programming, partnering and recording. And the clock was ticking...

Well, it took us over a year and a couple of million dollars, but we did it.

It is widely known to the public that Steve Jobs is the CEO of Apple. Neither Steve Jobs, nor Apple, authorized this use of his name in Defendant's advertisements for the PODFITNESS product.

Defendant also provides the following explanation for the inspiration behind the creation of PODFITNESS on its *www.podfitness.com* website:

**Supernova Marketplace: The Intersection of Music, iPod and Fitness**
When Podfitness was founded in January 2005, Apple had sold just over 10 million iPods. Sensing a major shift coming, CEO Jeff Hays gambled that the iPod-led MP3 revolution had the potential not only to change the economics of the music business, but also the fitness industry. This began a multimillion-dollar process of conceptualizing, building, and refining the idea of Podfitness.

Now, in 2006, there have been over 50 million iPods sold, and the "Made for iPod" market is white-hot. In addition, the number of people focusing on fitness has never been higher: there are 40 million fitness club members in the U.S. alone.

Not coincidentally, at this exact time, Podfitness is at the culmination of 18 months' efforts...

*https://podfitness.com/web/template/corporate?aff=home*

Defendant has also adopted the Arrow Logo, which it promotes on its website and which is identical to Apple's Shuffle Logo.

1       Defendant also uses aspects of Apple's MADE FOR IPOD logo, the subject of U.S.

2  Application Serial No. 78/689,534, to promote and sell its goods and services.

3       Defendant utilizes Apple's proprietary iTunes software in connection with its goods and

4  services without permission from Apple. In order to create its customized audio files, Defendant

5  requires its subscribers to install the iTunes software on his own computer. Defendant then mixes

6  a trainer's voice with music from a subscriber's iTunes media library. The result is an audio

7  workout that plays the subscriber's music as background music to the trainer's voice instruction.

8  Defendant allows a user to select 1) a particular trainer, 2) a particular exercise, and 3) a particular

9  iTunes playlist (i.e. the subscriber's music). Defendant's application has the capability to cater the

10  trainer's voice to the subscriber (i.e. according to the selected exercise, the user's fitness level

11  controls cadence, number of reps, number of sets, etc.). But on information and belief, Defendant

12  depends on iTunes, via iTunes' Application Programmer Interface, to store, manage, play, and

13  control the audio content. On information and belief, Defendant's services depend on and do not

14  function without Apple's iTunes software.

15       On information and belief, Defendant entered into a collaborative agreement with a

16  television network in connection with the production of an exercise program, pursuant to which

17  Defendant agreed to provide the network with free access to its service, as well as a new IPOD

18  player.

19       On information and belief, Defendant's initial plans for the launch of its service included

20  giveaways for free IPOD players.

21       Apple has not consented to any of Defendant's uses of its iTunes software, its IPOD mark

22  or its product images, nor any mark comprised in whole or part of POD, nor has Apple sponsored,

23  endorsed or approved the goods or services offered and promoted by Defendant. Nor is there any

24  affiliation between Apple and Defendant.

25       The most prominent element of the Podfitness Marks, "POD," comprises the most

26  prominent element of Apple's IPOD mark. In addition, the dominant element of the Podfitness

27  Marks, "POD," is identical to the "POD" slang term used to refer to the IPOD products.

28

43

On information and belief, Defendant uses, or intends to use, the Podfitness Marks on goods and services that are identical, or at least highly related, to Apple's IPOD goods and related services.

On information and belief, the goods and services offered and/or sold by Defendant under the Podfitness Marks are moving and will continue to move through the same channels of trade, and are being offered and/or sold through the same channels of advertising and to the same consumer groups, as the goods and services that are offered and sold by Apple under the IPOD mark.

On information and belief, Defendant's promotion and sales of its goods and services under the Podfitness Marks are directed to consumers of Apple's IPOD products.

Apple expressly reserves the right to supplement its response to this interrogatory as additional facts are ascertained.

**INTERROGATORY NO. 10:**

For Apple's Federal Trademark causes of action, claims 1 - 4 of its Complaint, identify separately and describe with particularity the factual basis for each measure and amount of all damages Apple claims, including a full and complete computation and description of the method(s) of computation used.

**RESPONSE TO INTERROGATORY NO. 10:**

Apple objects to this interrogatory as premature. Apple's computation of damages will be the subject of expert testimony. Apple will make expert disclosures at the appropriate times pursuant to Fed. R. Civ. P. 26(a)(2).

**INTERROGATORY NO. 11:**

For Apple's California Business and Professions Code causes of Action, claims 5 - 8 of its Complaint, identify separately and describe with particularity the factual basis for each measure and amount of all damages Apple claims, including a full and complete computation and description of the method(s) of computation used.

**RESPONSE TO INTERROGATORY NO. 11:**

Apple objects to this interrogatory as premature. Apple's computation of damages will be the subject of expert testimony. Apple will make expert disclosures at the appropriate times pursuant to Fed. R. Civ. P. 26(a)(2).

**INTERROGATORY NO. 12:**

State all facts that form the basis of why Apple and/or its predecessors chose to use the name IPOD.

**RESPONSE TO INTERROGATORY NO. 12:**

Apple objects to this interrogatory as irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence. Apple further objects to this interrogatory to the extent it seeks discovery of confidential, proprietary, trade secret, or other competitively sensitive information. Apple further objects to this interrogatory to the extent it seeks discovery of information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Subject to these objections and the General Objections, Apple expressly reserves the right to produce documents from which the answer to this interrogatory may be ascertained pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 13:**

State all facts upon which you rely to support your assertion that the Apple Earphones are distinctive or have become uniquely associated with Apple.

**RESPONSE TO INTERROGATORY NO. 13:**

Apple objects to this interrogatory as duplicative of Defendant's Interrogatory No. 4. See Apple's response to Interrogatory No. 4.

**INTERROGATORY NO. 14:**

State all facts upon which you rely to support your assertion that the term "pod" is slang for the mark IPOD.

45

**RESPONSE TO INTERROGATORY NO. 14:**

Subject to the general objections, Apple responds that it will produce documents from which the answer to this interrogatory may be ascertained pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 15:**

Specify the amount of money Apple spent on a month-by-month basis to promote, market, and/or advertise the goods and services offered under the IPOD mark during the period Apple alleges trademark infringement.

**RESPONSE TO INTERROGATORY NO. 15:**

Apple objects to this interrogatory as irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence. Apple further objects to this interrogatory to the extent it seeks discovery of confidential, proprietary, trade secret, or other competitively sensitive information. Subject to this objection and the General Objections, Apple responds that after entry of a suitable protective order it will produce documents from which the answer to this interrogatory may be ascertained pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 16:**

Identify all marketing studies, surveys, opinion polls, business plans, and/or strategic plans relating to IPOD and Plaintiff's Goods and Services and the PODFITNESS MARKS and Defendant's Goods and Services.

**RESPONSE TO INTERROGATORY NO. 16:**

Apple objects to this interrogatory as irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence. Apple further objects to this interrogatory to the extent it seeks discovery of information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Apple further objects to this interrogatory to the extent it seeks discovery of confidential, proprietary, trade secret, or other competitively sensitive information. Subject to these objections and the General Objections, Apple responds that it does not possess any marketing studies, surveys, opinion polls,

46

business plans, and/or strategic plans relating to both IPOD and Plaintiff's Goods and Services and the PODFITNESS MARKS and Defendant's Goods and Services.

Dated: February 13, 2007

FISH & RICHARDSON P.C.

By: _____
David J. Miclean
Lisa M. Martens
Andrew M. Abrams

Attorneys for Plaintiff
APPLE COMPUTER, INC.

47

# PROOF OF SERVICE

I am employed in the County of San Mateo. My business address is Fish & Richardson P.C., 500 Arguello Street, Suite 500, Redwood City, California 94063. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On February 13, 2007, I caused a copy of the following document(s):

**PLAINTIFF APPLE'S OBJECTIONS AND RESPONSES TO DEFENDANT PODFITNESS' FIRST SET OF INTERROGATORIES**

to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

Mark W. Ford                              Attorneys For Defendant
1000 Eagle Gate Tower                     PODFITNIESS, INC.
60 East South Utah
Salt Lake City, UT 84111
Telephone: (801) 533-9800
Facsimile: (801) 328-1707
Email: mford@wnlaw.com

| | | |
|---|---|---|
| ☐ | **MAIL:** | Such correspondence was deposited, postage fully paid, with the United States Postal Service on the same day in the ordinary course of business. |
| ☐ | **PERSONAL:** | Such envelope was delivered by hand to the offices of the addressee. |
| ☐ | **FACSIMILE:** | Such document was faxed to the facsimile transmission machine with the facsimile machine number stated above. Upon completion of the transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error. |
| ☐ | **ELECTRONIC MAIL:** | Such document was transmitted by electronic mail to the addressees' email addresses as stated above. |
| X | **FEDERAL EXPRESS:** | Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express. |
| ☐ | **EXPRESS MAIL:** | Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by the United States Postal Service. |

| | |
|---|---|
| **OVERNIGHT DELIVERY:** | Such correspondence was given on the same day in the ordinary course of business to an authorized courier or a driver authorized by that courier to receive documents. |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the above is true and correct. Executed on February 13, 2007, at Redwood City, California.

Diane M. Arceo-Lowenstein

10696865.2.doc

From: Origin ID: PAOA (650)839-5125
Diane Arceo-Lowenstein
FISH & RICHARDSON P.C
500 ARGUELLO STREET

REDWOOD CITY, CA 94063


FedEx
Express

Ship Date: 13FEB07
ActWgt: 5 LB
System#: 3852279/INET2600
Account#: S ********

SHIP TO: (801)533-9800      BILL SENDER

**Mark W. Ford**
**Workman Nydegger**
**1000 Eagle Gate Tower**
**60 East South Temple**
**Salt Lake City, UT 84111**

Delivery Address Bar Code



Ref#: 21869-001EL1
Invoice#:
PO#:
Dept#:

FEB 1 4 2007

WORKMAN NYDEGGER



**PRIORITY OVERNIGHT**                     **WED**

TRK# **7916 3448 5903**   FORM 0201         Deliver By:
                                            14FEB07

                                     **SLC**      A1

**84111**  -UT-US

**WM NPHA**



---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.