UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| APPLE COMPUTER, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>PODFITNESS, INC., and DOES 1-100, Inclusive,<br><br>    Defendants. | Case No. C 06-05805 SBA<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| PODFITNESS, INC.,<br><br>    Counterclaim Plaintiff,<br><br>  v.<br><br>APPLE COMPUTER, INC.,<br><br>    Counterclaim Defendants. | |

The matter comes before the Court on defendant Podfitness, Inc.'s Motion for Partial Summary Judgment [Docket No. 102]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, and for the reasons articulated below, the Court hereby GRANTS defendant's motion.

# I. BACKGROUND

## A. APPLE

### 1. Overview

Apple is a manufacturer of home computers and other electronic devices, including the iPod, a portable handheld digital media player (sometimes referred to as an "MP3" player) which is offered and sold under the trademark "IPOD." (See First Amended Complaint ("FAC") ¶ 2.) Apple introduced the iPod with the IPOD mark on or about October 23, 2001. (See FAC ¶ 9). Apple's iPod products are marketed through, among other things, certain department stores, member-only warehouse stores, large retail chains, and specialty retail stores, as well as through the channels for Apple's Mac products, and also through its website and online store (www.apple.com/store). (See Declaration of Gregory Wayment ("Wayment Decl.") ¶ 3, Ex. 1 and 2). Apple does not market any products under the "POD" mark.

### 2. Registration of the IPOD Mark

Apple holds three federal trademark registrations for the IPOD mark. Two of them cover "portable and handheld digital electronic devices ... (and) computer software for use ... on portable and handheld digital electronic devices," and the other pertains to "public Internet kiosk enclosure containing computer hardware." (See FAC ¶¶ 15-17). Apple also has applied to register nine additional IPOD-related marks. (See FAC ¶¶ 18-19, 21-27).

Apple submitted its first trademark applications to the U.S. Patent and Trademark Office ("PTO") in October 2001. (FAC ¶ 15-16.) These applications were rejected by the PTO. (See Wayment Decl. ¶ 5, Ex. 3). In its Office Action denying Application No. 75/982,871 ("871 Application"), dated October 21, 2001, the PTO indicated that while there were no similar registered marks, there were six similar applications that had been filed *prior* to the '871 Application, and that "(t)here may be a likelihood of confusion between the applicant's mark and

the marks in the above-noted applications . . . ." (Id. ¶ 5, Ex. 3 at 1.) Notably, of the six prior registrations, three were for the exact same "IPOD" mark, two were for "POD", and one was for "IPODZ." (Wayment Decl. ¶ 5, Ex. 3 at 1 and 4-10.)

To assuage the PTO's concerns and ultimately convince the PTO to approve its applications, Apple expressly represented that there was "*no likelihood of confusion between Applicant's mark and the prior-filed marks*" because (among other things) the "IPOD" was different in appearance and sound from the "POD" mark. (Id. ¶ 6, Ex. 4 at 2 and 3-10 (emphasis added)). Citing the multi-factor test of In Re E.I. DuPont de Nemours & Co., 426 F. 2d 1357, 1361-62 (U.S.C.C. Pa. 1973), Apple first argued its goods were unrelated to the goods/services sold under the prior marks, and that they were marketed to different consumers. (See Wayment Decl. ¶ 6, Ex. 4 at 3-6.) Particularly germane here, Apple vigorously argued that POD and IPODZ were "*clearly different*" from IPOD in "appearance, pronunciation, meaning, and commercial impression" thus making "confusion *unlikely*." (Id. ¶ 6, Ex. 4 at 5, (emphasis added)).

Apple also emphasized to the PTO that potential customers would exercise sufficient care that they would not be confused. Specifically, Apple claimed that "(c)onsumers are likely to use care in purchasing expensive goods. DuPont, 426 F. 2d at 1361-62. Apple's IPOD product sells for about $400-$500…. Individual consumers of prestige personal electronics devices such as Apple's IPOD player are also mindful of brand sources. These two consumer groups – distinct from each other but both focused on distinguishing product source – *are not likely to mistakenly believe that Apple's IPOD and the various applied-for goods are related with respect to source*." (Id. ¶ 6, Ex. 4 at 6 (emphasis added)).

Finally, Apple argued that any possible confusion with the prior marks was further reduced because Apple's goods were sold in entirely distinct sales channels than the prior applicant's products and services. As a result, Apple claimed that there was no "interface" between Apple and the prior applicants. (Id. ¶ 6, Ex. 4 at 7.) Apple later reiterated its position "that the well-known Apple IPOD music player *could not be confused as to source* with the unrelated goods in the referenced applications." (Id. ¶ 7, Ex. 5 (emphasis added).)

2

[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Relying on Apple's detailed representations and explanation as to why their IPOD registration would not be confusing given the preexisting registrations, the PTO approved Apple's trademark application on April 27, 2004, and issued Trademark Registration No. 2,835,698. (See FAC ¶ 16 and Ex. B thereto).

### 3. Apple Does Not Own Any Rights to "POD"

On July 29, 2004, Apple filed United States Trademark Application Serial No. 78/459,101 for the "POD" mark. (See FAC ¶ 28). However, Apple's application is based upon an *intent to use*, rather than on actual past use. Apple has no *registration* for "POD", and the registration has been opposed and challenged by a number of parties.

## B. PODFITNESS

### 1. Podfitness' Business is Limited to Exercise and Fitness

Podfitness is an Internet-based company that markets an innovative customized audio personal training *service*. Subscribers to Podfitness' service can create individually-tailored downloadable fitness workouts that can be downloaded to and played through the user's portable digital media player, such as Microsoft's Zune player, an iPod, or virtually any other MP3 music player. Each user is able to select from a multitude workout regimes designed by a wide array of well known fitness trainers. The workout is tailored specifically to each user's fitness profile, personal goals and available equipment. (See Declaration of Jeff Hays ("Hays Decl.") ¶¶ 8, 10-12, 14 and Ex. B). According to Podfitness, one of the unique features of their service is that it allows the user to combine the custom workouts with music tracks on the subscriber's portable digital media player to create a dynamic and unique workout experience.

Podfitness does not sell iPods, MP3 players or any other type of portable digital media device nor does it sell music. In its website, Podfitness makes it clear that is not affiliated with Apple. And although Podfitness' website indicates that its service is compatible with the iPod, Podfitness also emphasizes but may be used on any number of digital media players, such as the competing Microsoft Zune. (Id. ¶¶ 15-16, 18-21 and Ex. B). Likewise, Podfitness' sites and advertising include an unequivocal disclaimer, stating that "iPod is a registered trademark of Apple, Inc. Podfitness is *not affiliated with or endorsed or supported by Apple, Inc.*" (See id.

[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

¶ 25 and Ex. B, passim (emphasis added)).[1]

### 2. The Podfitness Name

The name Podfitness was chosen partly in response to the increasing popularity of the term "podcast" or "podcasting," but also because it was a domain name still available to purchase. At the time, because of the media and other discussion about the popularity of podcasts, the word "pod" had a number of meanings, including primarily reference to the generic category of MP3 players, the "pod" in "podcast," "portable on demand," a small thing connected to a larger thing, and the iPod product. (Hays Decl. ¶¶ 2-4, 26 and Ex. D at 65-68, 100, 212). The word "podcast" (which was named "word of the year" for 2005 by the New Oxford American Dictionary) is a generic term meaning a digital recording made available on the Internet for downloading to a personal audio player or computer. (See Hays Decl. ¶ 3 and Ex. A). Podfitness sells fitness podcasts, except that unlike traditional podcasts, the Podfitness product is individually created and customized for the consumer. (See Hays Decl. ¶ 4).

### C. PROCEDURAL SUMMARY

On September 21, 2006, Apple filed a Complaint in this Court against Podfitness alleging eight claims for relief against Podfitness. On August 1, 2007, Apple filed its First Amended Complaint, adding two additional claims (for a total of ten claims) for relief. Seven of Apple's ten claims for relief are premised upon a theory that defendant's use of its "Podfitness" trademark infringes Apple's IPOD trademark and otherwise violates the federal Lanham Act and California law.[2] Podfitness now moves for summary judgment on these claims, specifically Apple's first, second, fourth, fifth, sixth, seventh and eighth claims for relief.

## II. LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the

---

[1] In fact, the first version of Podfitness was not compatible with Apple's Mac product, and could only be used through the Microsoft Windows platform. (See Hays Decl. ¶ 26 and Ex. D at 293-294). Today, the Podfitness homepage prominently states that "Podfitness is now allied with Microsoft Health Vault," and prominently displays Microsoft, a rival of Apple, as the first of Podfitness' corporate partners. (See Hays Decl. ¶ 12 and Ex. B).

[2] This order does not address Apple's remaining claims based upon trade dress infringement, breach of contract and cyber squatting.

moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment must demonstrate there are no genuine issues of material fact. See <u>Horphag v. Research Ltd. v. Garcia</u>, 475 F.3d 1029, 1035 (9th Cir.2007). A factual dispute is genuine only if the non-moving party can offer "concrete evidence" such that a reasonable jury could return a verdict in its favor. See <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986). The burden on the moving party may be discharged by identifying to the court "that there is an absence of evidence to support the non-moving party's case." See <u>Celotex</u>, 477 U.S. at 325.

This Court has recognized that summary judgment on trademark infringement issues such as likelihood of confusion is appropriate where "there are no facts in dispute and the issue of confusing similarity is based solely upon a comparison of the marks in the context of extrinsic facts." <u>JouJou Designs, Inc. v. JOJO Ligne Internationale, Inc.</u>, 821 F. Supp. 1347, 1352 (N.D. Cal. 1992).

### III. ANALYSIS

#### A. LIKELIHOOD OF CONFUSION

To prevail on its trademark claim, Apple must plead and prove that Podfitness is likely to confuse its customers into believing that they are dealing with Apple. <u>Instant Media, Inc. v. Microsoft Corp.</u>, 2007 WL 2318948 at *6 (N.D. Cal. 2007). "The test for likelihood of confusion is whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." <u>Dreamwerks Prod. Group, Inc. v. SKG Studio</u>, 142 F.3d 1127, 1129 (9th Cir. 1998) (internal quotation marks and citation omitted). Confusion must be "probable, not simply a possibility." <u>Cohn v. Petsmart, Inc.</u>, 281 F.3d 837, 842 (9th Cir. 2002) (per curiam) (internal quotation marks omitted)

To assess the likelihood of confusion, the court generally considers the eight non-exclusive factors articulated in <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F. 2d 341, 348-49 (9th Cir. 1979). The <u>Speedcraft</u> factors are: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) likelihood of

1 expansion of the product lines; and (8) defendant's intent in selecting the mark ("<u>Sleekcraft</u>
2 factors").
3       Where the Internet is involved, "the three most important <u>Sleekcraft</u> factors in evaluating
4 a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods and
5 services, and (3) the parties' simultaneous use of the Web as a marketing channel." <u>Interstellar
6 Starship Servs. Ltd. v. Epix, Inc.</u>, 304 F. 3d 936, 942 (9th Cir. 2002). This analysis, commonly
7 referred to as the "controlling troika" or "Internet trinity," <u>id.</u>, applies here since it there is no
8 dispute Podfitness' primary business is through the Internet.
9       **B.    SIMILARITY OF THE MARKS**
10           **1.    Apple is Estopped from Claiming a Likelihood of Confusion**
11       Podfitness argues that Apple is estopped from claiming a likelihood of confusion in light
12 of its prior representations to the PTO. The Court agrees. It is well settled that a party cannot
13 seek to enforce its trademark rights by taking a position contrary to statement it made to the PTO
14 in obtaining approval of its trademark application. See <u>Instant Media</u>, 2007 WL 2318948, at *8-
15 9, 10-11, 13; <u>Freedom Card, Inc. v. JP Morgan Chase & Co.</u>, 432 F. 3d 463, 476 (3d Cir. 2005);
16 accord <u>Top Tobacco, L.P. v. North Atlantic Ops. Co.</u>, 509 F. 3d 380 (7th Cir. 2007); <u>Petro
17 Stopping Ctrs., L.P. v. James River Petroleum, Inc.</u>, 130 F. 3d 88, 94 (4th Cir. 1997); <u>Lampi
18 Corp. v. American Power Products, Inc.</u>, 1995 WL 723764 at *3 (N.D. Ill. Dec. 5, 1995).
19       Here, in an effort to overcome the PTO's rejection of its trademark applications, Apple
20 expressly represented to the PTO that there was no likelihood of confusion between IPOD and
21 POD (or POD formative marks). As noted, the PTO initially rejected Apple's application for the
22 IPOD mark based upon a perceived likelihood of confusion between "IPOD" and *prior*
23 applications for the marks "POD," "IPOD," and "IPODZ." Apple convinced the PTO to
24 reconsider its rejection by arguing that the sight, sound and meaning of its proposed IPOD mark
25 and the POD and IPODZ marks were so dissimilar that no confusion was likely. For example,
26 Apple asserted to the PTO that its IPOD mark was "*clearly different in appearance and sound*"
27 from the POD and IPODZ marks. (See Wayment Decl. ¶ 6, Ex. 4 at 6 (emphasis added)).
28 Significantly, Apple emphasized – *not* the "pod" portion of its mark, but rather *the use of the "i"*

6
[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*in the mark*, which Apple claimed distinguished the IPOD mark from the others. (See id. ¶ 6, Ex. 4 at 6).)

Whether viewed "as judicial estoppel, an admission, waiver, or simply hoisting [Apple] by its own petard," Apple's prior statements that IPOD would not be confused with POD forecloses their present claim regarding the likelihood of confusion. Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 476 (3rd Cir. 2005); Instant Media, 2007 WL 2318948 at *8. The Court thus agrees that Apple is judicially estopped from now arguing that its mark is similar to PODFITNESS, that "pod"-formative marks (i.e., anything without the crucial "i") are similar to its IPOD trademark, and from asserting any rights based upon "pod." Apple's sight, sound and meaning disclaimers to the PTO call for the application of the rule of Instant Media, Lampi, and Freedom Card.

### 2. No Likelihood of Confusion

Estoppel aside, the Court finds that there is an insufficient similarity to establish the requisite likelihood of confusion. Similarity of marks "has always been considered a critical question in the likelihood-of-confusion analysis." GoTo.com, Inc. v. Walt Disney Co., 202 F. 3d 1199, 1205 (9th Cir. 2000). To assess similarity, the court must compare the sight, sound and meaning of the marks. Surfvivor Media, 406 F. 3d at 631. A comparison of the IPOD and PODFITNESS marks shows they are dissimilar in sight, sound and meaning, and confusion is unlikely as a matter of law.

First, the terms IPOD and PODFITNESS are strikingly different in *appearance*:



(See Hays Decl. ¶ 7). "Podfitness" has ten letters while "IPOD" only has four letters. The only common sequential letters, "pod," appear at the end of the IPOD mark, while it appears at the beginning of the "Podfitness" mark. Further, PODFITNESS is typically written in green lettering, with light green for the "pod" portion, medium green for the "fitness" portion, and dark green for the ".com" portion of the mark. In contrast, the IPOD mark is typically in grey text,

7

with no differentiation in color. PODFITNESS also begins with a capital letter, while IPOD begins with the lower-case "i" – which particularly is significant given Apple's stated emphasis that the "i" is what distinguishes its products. In addition, the visual comparison of the marks shows that they are plainly dissimilar. Finally, the Apple and Podfitness websites are strikingly different and, as noted below, call for completely different types of customer interaction. (See Hays Decl. ¶¶ 8-12, 15, 17-18, 23-24 and Ex. B); (See Wayment Decl. ¶ 3 and Ex. 1).

Second, the marks *sound* entirely dissimilar when spoken. IPOD has just two syllables and begins with a hard "i" sound, with the phonetic emphasis on the "I," while PODFITNESS has three syllables, begins with the "pod" sound, with the phonetic emphasis on "fitness."

Third, while the term "IPOD" appears to have no particular *meaning*, the word "fitness" in "Podfitness" invokes health and exercise, concepts clearly not embodied in "IPOD." Moreover, in the *context* in which they are used, there is no likelihood of confusion as the Podfitness website is completely different from the Apple site, includes disclaimers of any association with Apple on virtually every page, and prominently states, including on its home page, that Podfitness is a partner with Apple's chief rival, Microsoft. (See Hays Decl. ¶ 12, 25, 26 and Ex. B).

The mere fact that both IPOD and PODFITNESS use the word "pod" does not change the fact that these two marks, *as a whole and in context*, are plainly different. Aside from Apple's successful argument to the PTO that the term "POD" is dissimilar and not confusing to its IPOD mark, the "anti-dissection" rule demands that the marks be compared *in their entirety,* and even the inclusion of a common elements, words or string of letters, does not make the marks confusingly similar. See Instant Media, 2007 WL 2318948 at *8 (marks not similar "simply because they contain an identical or nearly identical word").[3]

---

[3] This principle is uniformly accepted in federal case law. Moose Creek, Inc. v. Abercrombie & Fitch Co., 331 F. Supp. 2d 1214, 1229 (C.D. Cal. 2004) (concluding that "Moose" was not confusingly similar to "Moose Creek" because "on the whole they sound different because (one) contains an additional word"); Gruner + Jahr USA Publ'n v. Meredith Corp., 991 F. 2d 1072, 1078 (2d Cir. 1993) (dissimilar elements distinguished marks, and "Parent's Digest" did not infringe upon "Parents" magazine, despite common word "parents"); see also Top Tobacco, L.P. v. North Atlantic Operating Co., Inc., 2007 WL 4234454, at *2 (C.A. 7 (Ill.) (noting that there

8
[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Moreover, the use of "Pod", pod-formative, and even i-formative marks on the Internet is ubiquitous, and "POD" is used (among other things) more broadly and as a generic term for mp3 players, podcasts, etc. (See Wayment Decl. ¶ 11, Ex. 9; ¶ 12, Ex. 10; ¶ 13, Ex. 11; ¶ 15, Ex.13; ¶¶ 16 and 17, Exs. 14-15; ¶ 19, Ex. 8. In addition, Apple holds no rights to POD – POD is not a registered mark belonging to Apple, and Apple has *never* used POD in commerce, let alone prior to the Podfitness mark.[4] See, e.g., Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F. 3d 1036 (9th Cir. 1999) ("'(A)n intent to use a mark creates no rights a competitor is bound to respect.'") (quoting Zazu Designs v. L'Oreal, S.A., 979 F. 2d 499, 504 (7th Cir. 1992)).

Consequently, the Court concludes that the respective marks are not similar in sight, sound, or meaning and that there is no likelihood of confusion. See Alladin Plastics, 362 F. 2d at 534 (summary judgment proper because there was no likelihood of confusion upon "simple comparison of the sound, appearance, and meaning of the two marks."); Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F. 3d 463, 482 (3rd Cir. 2005) (affirming summary judgment where there was no likelihood of confusion between "Chase Freedom" card and "Freedom Card").

### C. RELATEDNESS OF GOODS AND SERVICES

The second factor of the "Internet trinity" pertains to the relatedness of the goods and services at issue. "The standard for deciding whether the parties' goods or services are 'related' is whether customers are 'likely to associate' the two product lines." Surfvivor Media, Inc. v. Survivor Prods., 406 F. 3d 625, 633 (9th Cir. 2005). In that regard, the court considers "whether the buying public could reasonably conclude that the products came from the same source." Id. Setting aside the fact that Apple previously represented goods or services bearing the POD mark are "unrelated" and are "not likely to be confused" with IPOD, the Court concludes that this factor weighs in favor of Podfitness.

---

"is no doubt that 'top' is commonly used in the tobacco business").

[4] Apple has filed an "*intent to use*" application with the PTO for the POD mark, a *de facto* admission that Apple has never *used* "POD" in commerce, and thus will always be junior to the existing Podfitness mark. Apple's application faces several oppositions.

9
[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

It is undisputed that Podfitness does not sell iPods, mp3 players or any other portable digital media player device. Rather, Podfitness sells, on a subscription basis, customized, downloadable audio exercise workout routines conducted by celebrity trainers that can be played on any number of portable media players. Podfitness service is markedly different from Apple's IPOD products, which consist of portable handheld digital electronic devices for recording, transmitting, manipulating and reviewing text, data, and audio files. In other words, the PODFITNESS mark identifies a *service* while the term "IPOD" describes a tangible, physical *product*, i.e., a portable media player. And though Podfitness' services are compatible with and marketed to mp3 users generally, which includes iPod users, the services are marketed only to a limited segment of that market – mp3 users who are also interested in fitness and exercise. A user interested in music *but not fitness* has no need for Podfitness.

The Court also notes that Podfitness' workouts programs and Apple's iPod are not used for the same purpose, not reasonably interchangeable by consumers, and are not marketed to the same consumer class. In short, "the products … are extraordinarily different within the context of the internet." Instant Media, 2007 WL 2318948 at *12. Confusion between the IPOD and PODFITNESS marks is unlikely and summary judgment is proper. See, e.g., Murray v. Cable Nat'l Broad. Co., 86 F. 3d 858, 861 (9th Cir. 1996) (affirming summary judgment for defendant where plaintiff's consumer survey services offered were unrelated to television programming and related polling services); see also M2 Software, Inc. v. Madacy, 421 F. 3d 1073, 1082 (9th Cir. 2005) (finding that "sports related music" was "very significantly different" from music CDs).

### D. MARKETING CHANNELS

Both Apple and Podfitness sell products through the Internet. But, Apple indisputably advertises its products more widely and through different channels. Apple also sells IPOD products through brick and mortar stores, and widely advertises its iPod products on television. The average consumer is therefore unlikely to confuse the products even though both are presented on the Internet. See Instant Media, 2007 WL 2318948 at *10 (sophistication of modern consumers requires comparing products on their merits, rather than lumped under

[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1 "general rubric of 'Internet-related services'").

## IV. REMAINING <u>SLEEKCRAFT</u> FACTORS

The Court agrees that the Internet trinity of <u>Sleekcraft</u> factors alone are sufficient to justify summary judgment for Podfitness, and that the remaining factors "are relatively unimportant to the likelihood of confusion analysis in Internet-related cases." <u>Instant Media</u>, 2007 WL 2318948 at *14. That said, the Court finds that consideration of those factors actually underscores that there is no likelihood of confusion.

### A. STRENGTH OF THE MARK

The Court finds that the strength of the IPOD mark favors Podfitness. During discovery, Podfitness sought documents from Apple regarding its decision to select that name, but Apple refused to produce any such documents, claiming that they were irrelevant. (<u>See</u> Wayment Decl. ¶ 21, Ex. 19 at 1). Having taken that position, Apple is precluded from making any argument based on the strength of the mark. <u>See</u> <u>Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.</u>, 254 F. Supp.2d 985, 993 (N.D. Ill. 2002) (precluding argument of infringement in trademark case, and granting summary judgment, where party had refused to produce discovery on same issue); <u>c.f., Zhang v. American Gem Seafoods, Inc.</u>, 339 F. 3d 1020, 1028 (9th Cir. 2003) (affirming district court's exclusion of evidence not produced during discovery).

Even if Apple were not foreclosed from arguing this factor, the Court finds Apple's argument uncompelling. As Podfitness correctly points out, the word "pod" is ubiquitous and preexisted the iPod or even Apple as a company. The word "pod" also has multiple meanings and is separate and distinct in meaning from IPOD. Thus, assuming that IPOD is a strong mark, it is not based upon "pod," as a stand-alone word.

Indeed, as Apple represented the PTO, it is the "i" in IPOD, not "pod" that identifies the product, as evidenced by Apple's has a series of "i-formative" marks (i.e., iPhone, iMac, iTunes, etc.). The strength of the IPOD mark is inapt given Apple's emphasis on the "i" in IPOD which appears nowhere in "Podfitness." <u>See</u><u>Surfvivor Media</u>, 406 F. 3d at 631-32 (minimal protection for arbitrary or fanciful marks "that have no connection with the actual product"). In contrast, the term "POD" lies in an extremely "crowded field, rendering it "weak as a matter of law." <u>See</u>

Instant Media, 2007 WL 2318948 at *12 (quoting PostX Corp. v. docSpace Co., Inc., 80 F. Supp, 2d 1056, 1061 (N.D. Cal. 1999)); accord Petro Stopping Centers, 130 F. 3d at 92.[5]

### B. INTENT TO INFRINGE

The next Sleekcraft factor, intent to infringe, also favors Podfitness. There is no evidence that Podfitness intended to deceive the public into believing that it was Apple. Podfitness expressly disclaims any such connection with Apple, and it is evident from the patent dissimilarity of the parties' respective marks that Podfitness had no intent to confuse consumers. See, e.g., Instant Media, 2007 WL 2318948, at *16 (Microsoft's use of different color scheme, case, font and stylization elements was evidence of no unlawful intent). To the contrary, the record shows that it would be *detrimental* to Podfitness' business to confuse consumers into believing its business was *limited* to only iPod or iTunes users. (See Hays Decl. ¶ 15, 18, 25, 26 and Ex. D at 169, 291, 293-295).

### C. EVIDENCE OF ACTUAL CONFUSION

The evidence of actual confusion virtually is non-existent and consists only of a single email. (See Wayment Decl. ¶ 19, Ex. 17). The only relevant document cited Apple preexisted Podfitness' website and launch, and did not involve Podfitness' current website or advertising. (See Hays Decl ¶ 26 and Ex. D at 270-272). These two examples, in the context of thousands if not millions of consumers, are *de minimis*. Thus, rather than establishing likely confusion, the evidence establishes the converse. Microsoft, 126 F. Supp. 2d at 1217 (agreeing with Apple's contention that isolated incidents of actual confusion were insufficient to establish a genuine issue of material fact as to the likelihood of confusion).

### D. NO EVIDENCE OF A LIKELIHOOD OF EXPANSION

Plans by either party to a trademark dispute to expand into directly competing areas *may* weigh in favor of confusion. Instant Media, 2007 WL 2318948, at *16. Vague assertions of expansion, however, are insufficient. Id. Here, it is undisputed that Podfitness does not make or

---

[5] The Court notes that the PTO database reveals a plethora of POD-formative marks, and i-formative and even iPod-formative marks are ubiquitous on the Internet. (See Wayment Decl. ¶¶ 15-17 and Exs. 13, 14, and 15).

sell portable media players, nor does it plan to enter the portable media player market. (Hays Decl. ¶ 9).

### E. DEGREE OF CARE

The next factor is the degree of care that a consumer is likely to exercise, from the standpoint of "typical buyer exercising ordinary caution." <u>Sleekcraft</u>, 599 F. 2d at 353. "'When the goods are expensive, the buyer can be expected to exercise greater care in his purchases.'" <u>Instant Media</u>, 2007 WL 2318948, at *16 (citation omitted); <u>Savin Corp. v. Savin Group.</u>, 391 F. 3d 439, 461 (2d Cir. 2004) (assuming that purchasers of costlier trademarked products will be "more discriminating"). The Court finds that this factor favors Podfitness for several reasons.

First, due to their nature and cost of the products sold under the IPOD and PODFITNESS marks, consumers necessarily will exercise a high degree of care. Apple has acknowledged that "(c)onsumers are likely to use care in purchasing expensive goods. Apple's IPOD product sells for about $400 to $500 . ..." (Wayment Decl. ¶ 6, Ex. 4 at 8). Similarly, Podfitness' subscription service is relatively expensive, $59.95 per quarter, or about $240.00/year. (<u>See</u> Hays Decl. ¶ 22).

Second, unlike the purchase of a tangible good, a Podfitness subscription demands an ongoing and very high degree of care and commitment. To use Podfitness, the consumer must be interested in investing time and money on a workout or fitness program, and desire physical and time consuming interaction with the product. (<u>See</u> Hays Decl. ¶¶ 23-24 and Exs. B and C). Use of the Podfitness product and website requires the consumer's active and thoughtful participation. Specifically, a user must customize the product for their personal needs, including by making numerous specific decisions which could involved hundreds (or thousands) of different possible combinations of decisions, and interacting with multiple screens and options – hardly a process promoting inadvertence or mistake. Some of the steps, including the *choice* between Microsoft's Zune or Apple's iTunes software, are reflected in a document sometimes called "Podfitness101," which is available to users through the Podfitness webpage (<u>See</u> Hays Decl. ¶ 24 and Ex. C).

Third, as Apple told the PTO, "[i]ndividual consumers of prestige personal electronics devices such as Apple's IPOD player are also mindful of brand sources." (Wayment Decl. ¶ 6,

13
[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Ex. 4 at 7 [APD000051] (emphasis added)).

Fourth, it takes a certain minimal level of sophistication to purchase, understand, operate, and use an iPod. A consumer must use not only the iPod but also a personal computer loaded with the iTunes software, which is necessary to manage the digital media files. The user must be computer literate and almost certainly be able to complete relatively complex transactions and procedures over the Internet.

Fifth, purchase and use of an iPod, or any MP3 player, is not an "impulse" purchase like a bag of nuts in the checkout line of the grocery store. Nor is the use of the Podfitness product. See, e.g., Beer Nuts, Inc. v. Clover Club Foods, Co., 805 F. 2d 920, 926 (10th Cir. 1986) (inexpensive snack foods purchased with little care).

Finally, and perhaps most decisively, there can be no confusion because the user of the Podfitness product must not only be sophisticated enough to understand and interact with the relatively time-consuming and complicated webpages, but as a necessary step a user must choose between using a Microsoft ZUNE format, or an Apple iTunes. (See Hays Decl. ¶ 21). In addition, in the "Getting Started" and "Frequently Asked Questions" sections of the Podfitness site, the user is told to select between the iPod, Microsoft's Zune or *other* MP3 player. Certainly, no reasonable user would confuse Podfitness with Apple, given that Podfitness expressly provides instructions for a product manufactured by its chief rival, Microsoft.

In sum, Internet trilogy alone – and all of the Sleekcraft factors together – convince the Court that there is no likelihood of confusion. Therefore, Apple's claims for trademark infringement under the Lanham Act fail as a matter of law.

## V. IN ANY EVENT, LIMITED USE OF THE "IPOD" MARK IS "FAIR USE"

To the extent that Apple asserts claims based on Podfitness' use of the IPOD mark in any of its advertising, such use is a "fair use" as a matter of law. See 15 U.S.C. § 1115(b)(4). Under Ninth Circuit law, "competitors may use a rival's trademark in advertising and other channels of communication if the use is not false or misleading." New Kids on the Block v. News America Publishing, Inc., 971 F. 2d 302, 307 (9th Cir. 1992); see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F. 3d 596, 607 (9th Cir. 2005).

| | |
|---|---|
| 1 | The "nominative" branch of the fair use defense applies where a party uses a mark to |
| 2 | describe the plaintiff's product, as opposed to the defendant's own product. <u>See</u> <u>New Kids on</u> |
| 3 | <u>the Block</u>, 971 F. 2d at 308. Nominative fair use exists if: (1) the plaintiff's product is not |
| 4 | readily identifiable without use of the mark; (2) only so much of the mark is used as is |
| 5 | reasonably necessary to identify the product; and (3) the defendant does nothing to suggest |
| 6 | sponsorship or endorsement by the trademark holder. <u>Id.</u> Where these elements are established, |
| 7 | summary judgment on a plaintiff's trademark claims is appropriate. <u>See, e.g.</u>, <u>Rehrig Pacific</u> |
| 8 | <u>CO. v. Norseman Plastics, Ltd., Inc.</u>, 2003 WL 25667625 at *34 (C.D. Cal. 2003) (granting |
| 9 | summary judgment on fair use defense); <u>Gulfstream Aerospace Corp. v. Camp Systems Int'l,</u> |
| 10 | <u>Inc.</u>, 428 F. Supp. 2d 1369, (S.D. Georgia 2006) (same). |
| 11 | First, it would be virtually impossible for Podfitness to inform consumers that its product |
| 12 | was compatible with Apple's iPod portable MP3 player without using the IPOD mark.[6] "Indeed, |
| 13 | it is often *virtually impossible* to refer to a particular product for purposes of comparison, |
| 14 | criticism, point of reference, or any other purpose without using the mark." <u>New Kids</u>, 971 F. 2d |
| 15 | at 306 (noting that "one might refer to the 'two-time world champions' or 'the professional |
| 16 | basketball team from Chicago,' but it is far simpler (and more likely to be understood) to refer to |
| 17 | the Chicago Bulls."); <u>Cairns v. Franklin Mint Co.</u>, 292 F. 3d 1139, 1152-53 (9th Cir. 2002) |
| 18 | (explaining that "one might refer to the English Princess who died in a car crash in 1997 but it is |
| 19 | far simpler (and more likely to be understood) to refer to Princess Diana."). The first |
| 20 | requirement of the fair use defense is satisfied as a matter of law. <u>Rehrig</u>, 2003 WL 25667625 at |
| 21 | 33 (summary judgment on fair use because defendant "had to identify the (plaintiff's) products to |
| 22 | ensure that its customers understood the products compatibility features."); <u>Gulfstream</u>, 428 F. |
| 23 | Supp. 2d at 1381 (summary judgment on fair use, first element established because defendant |
| 24 | "must use the trademarked 'Gulfstream' name and identify each of the Gulfstream models it |

---

[6] Obviously, the PODFITNESS mark does *not* use the IPOD mark. Many others make fair use of use of the latter mark, however, such as theipodaccessorystore.com; ipodcarparts.com; hipipodgear.com; freeipodplayers.com; ipodhacks.com; iPodFanatic.com; allthingsipod.co.uk; everythingiPod.com, ipodgear.com, ipodtour.com, and ipodtraining.com. *See supra*. Thus, Podfitness' reference to iPod in conjunction with its iPod-compatible product is not only fair use, but much less use of the IPOD mark than made by others in the iPod-accessory market.

services to offer a meaningful description to its customers").

Second, it is axiomatic that Podfitness must inform consumers about the compatibility of the Podfitness product with the iPod, and to allow a user to choose to use Zune or iTunes software, and such references are limited to this purpose. (See Hays Decl. ¶ 18). See Gulfstream, 428 F. Supp. 2d at 1381 (summary judgment on fair use where "there is no evidence in the record from which a jury could decide that (defendant) uses the Gulfstream mark any more than necessary").

Third, Podfitness does not use Apple's IPOD mark to suggest that its products are sponsored or endorsed by Apple, and in fact advised that the Podfitness product works with iPod *or* Zune *or* other MP3 players. Podfitness disclaims affiliation, noting that "IPOD is a registered trademark of Apple" and "Podfitness is not affiliated with or endorsed or supported by Apple." (See Hays Decl. ¶ 25). See Cairns, 292 F. 3d at 1154-55 (fair use, even with no disclaimer); Gulfstream, 428 F. Supp. 2d at 1381 (granting summary judgment on fair use where "there is no evidence that (defendant) suggests sponsorship" and "(defendant) includes an express disclaimer of sponsorship"). Each use of the IPOD name by Podfitness is protected fair use, as a matter of law.

## VI. PODFITNESS IS ENTITLED TO JUDGMENT ON ALL OTHER "LIKELIHOOD OF CONFUSION" AND INFRINGEMENT CLAIMS

Podfitness is likewise entitled to summary judgment on Apple's state law and other claims that turn upon a likelihood of confusion analysis, and fail for the fair use defense. See, e.g. Surfvivor, 406 F. 3d at 635 (rejecting state law claims for no likelihood of confusion); Microware, 126 F. Supp. at 1222 ("Given their similarity with the federal claims, the Court also disposes of Plaintiff's Iowa common law claims of infringement and unfair competition."); JouJou Designs, 821 F. Supp. at 1353 & n.6 (likelihood of confusion principal test for federal and California state trademark infringement and unfair competition claims).

## VII. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT Podfitness' motion for partial summary judgment is GRANTED. Podfitness is entitled to summary judgment as to Apple's first, second, fourth, fifth, sixth, seventh, and eighth claims for relief.

IT IS SO ORDERED.

DATED: _____

SAUNDRA BROWN ARMSTRONG
United States District Court