David J. Miclean (#115098/miclean@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, California 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Lisa M. Martens (#195824/martens@fr.com)
Andrew M. Abrams (#229698/abrams@fr.com)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Attorneys for Plaintiff and
Counterclaim Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| APPLE INC., | Case No. C 06-5805 SBA |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF APPLE INC.'S OPPOSITION TO DEFENDANT PODFITNESS, INC.'S PARTIAL MOTION FOR SUMMARY JUDGMENT [REDACTED]** |
| v. | |
| PODFITNESS, INC., and DOES 1-100, inclusive, | |
| Defendants. | Honorable Saundra B. Armstrong |
| | Date: June 3, 2008 |
| | Time: 1:00 p.m. |
| | Room: 3 |
| PODFITNESS, INC., | |
| Counterclaim Plaintiff | |
| v. | |
| APPLE INC., | |
| Counterclaim Defendant | |

Dockets.Justia.com

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................3

III.   ARGUMENT........................................................................................................9

   A.   The Summary Judgment Standard....................................................................9

   B.   The Eight-Factor Test for Trademark Infringement ........................................10

      1.   Strength of the IPOD Mark .......................................................................11

      2.   Bad Faith Intent ........................................................................................12

      3.   Actual Confusion ......................................................................................15

      4.   Proximity of the Goods and Services .......................................................17

      5.   Likelihood of Expansion ...........................................................................19

      6.   Marketing and Trade Channels.................................................................19

      7.   Similarity of the Marks..............................................................................20

      8.   Degree of Purchaser Care ........................................................................22

   C.   Defendant's Use of Apple's Trademarks is Not Fair Use ................................23

      1.   The Doctrine of Prosecution Estoppel is Inapplicable Here....................24

   D.   Unfair Competition ...........................................................................................25

IV.    CONCLUSION ....................................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page (s)</u>

## <strong>FEDERAL CASES</strong>

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000) ..............................................................................17

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .........................................................................3, 10

*Adams/Green Industry Publishing, Inc. v. International Labmate Ltd.*,
  45 U.S.P.Q. 2d 1046 (N.D. Ill. 1997) ................................................................24

*Alpha Industries v. Alpha Steel, Inc.*,
  616 F.2d 440 (9th Cir.1980) ...............................................................................20

*American Stock Exchange, Inc. v. American Express Co.*,
  207 U.S.P.Q. 356 ................................................................................................22

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989) ...........................................................................................25

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ...........................................................................11

*California Cooler v. Loretto Winery, Ltd.*
  774 F.2d 1451 (9th Cir. 1985) ...........................................................................20

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) ...........................................................................20

*Elvis Presley Enterprises Inc. v. Capece*,
  141 F.3d 188, 46 U.S.P.Q. 2d 1737 (5th Cir. 1998) .........................................15

*Eniva Corp. v. Global Water Solutions, Inc.*,
  440 F. Supp. 2d 1042 (D. Minn. 2006) ..............................................................24

*Ez Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*,
  213 U.S.P.Q. 597 ................................................................................................24

*FTC v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir. 1997) .............................................................................9

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
  314 F.2d 149 (9th Cir. 1963), .............................................................................12

*Interstellar Starship Services, Ltd. v. Epix, Inc.*,
  304 F.3d 936 (9th Cir.2002) ...............................................................................11

ii

**TABLE OF AUTHORITIES (cont)**

**Page (s)**

*Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*,
963 F.2d 350 (Fed. Cir. 1992) ........................................................................11, 17

*Levi Strauss & Co. v. Blue Bell, Inc.*,
778 F.2d 1352 (9th Cir. 1985) ..............................................................................10

*New Kids on the Block v. News America Publishing, Inc.*,
971 F.2d 302 (9th Cir. 1992) ................................................................................23

*Nike, Inc. v. Nikepal Intern., Inc.*,
2007 WL 2782030, 6 (E.D. Cal. 2007) .................................................................21

*Polo Fashions, Inc. v. Extra Special Products, Inc.*,
451 F. Supp. 555 (S.D.N.Y. 1978) .......................................................................24

*Recot, Inc. v. Becton*,
214 F.3d 1322 (Fed. Cir. 2000) .............................................................................22

*Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*,
148 F.3d 417, 47 U.S.P.Q. 2d 1465 (4th Cir 1998) ..............................................15

*Thane International, Inc. v. Trek Bicycle Corp.*,
305 F.3d 894 (9th Cir. 2002) ................................................................................10

*The Coca-Cola Company v. Los Angeles Brewing Company*,
44 U.S.P.Q. 190 (S.D. Cal., 1939) ........................................................................22

*Ty, Inc. v. Jones Group, Inc.*,
237 F.3d 891 (7th Cir. 2001) ................................................................................21

*United States Jaycees v. San Francisco Junior. Chamber of Commerce*,
354 F. Supp. 61 (D.C.Cal., 1972) ...........................................................................9

**STATE CASES**

*Mattel, Inc. v. Robarb's, Inc.*,
2001 WL 913894 (S.D.N.Y. 2001) .......................................................................15

**FEDERAL STATUTES**

Fed. R.Civ.P. 56(C) .................................................................................................9

iii

Plaintiff Apple Inc. ("Apple") respectfully submits the following Memorandum of Points and Authorities in Opposition to the Motion for Partial Summary Judgment filed by Defendant Podfitness, Inc. ("Defendant" or "Podfitness"). This Memorandum is filed concurrently with the Declarations of Andrew Abrams and Greg Joswiak.

## I.    INTRODUCTION

The instant action was filed by Apple due to Podfitness' intentional infringement of Apple's IPOD trademark, and Podfitness' pattern of unlawful attempts to appear associated with Apple. In its Motion for Partial Summary Judgment ("Motion"), however, Podfitness ignores substantial evidence of customer confusion over a possible association between Podfitness and Apple (including its founder's personal acknowledgement in deposition that customer confusion has occurred), and instead encourages the court to believe that Apple's trademark infringement case is entirely based on Defendant's use of "Pod" in the Podfitness name. Lost in all of the rhetoric over "Goliath[s]" and  Apple's supposed "pod monopoly", is the fact that this action was filed after Podfitness intentionally refused to take steps to disassociate itself from Apple – this despite receiving cease and desist letters from Apple *before the launch* of the Podfitness website and service[1]. Further, despite knowing Apple's concerns over trademark infringement, Podfitness thereafter went on to intentionally create a false sense of association between Podfitness and Apple through its conspicuous use of the IPOD mark (as well as other Apple trademarks and trade dress) on its website and marketing materials, as well as through its imitations of Apple's famous silhouette advertisements.

Apple initiated this lawsuit due to the countless actions taken by Podfitness to blatantly associate itself with Apple and free ride off of the enormous goodwill established in the world-famous IPOD brand. Numerous examples, all of which were omitted from the instant Motion, include:

- The "Steve Jobs" advertising campaign where Podfitness launched its service with a full page

---

[1] Defendant's "pod monopoly" argument has already been recycled numerous times throughout this dispute, and has previously been rejected by this Court as inapt. In denying Defendant's Motion to Stay, the Court agreed with Apple that this case was not a general referendum on "pod," but instead, "the gravamen of Apple's lawsuit is that '[Podfitness'] entire marketing strategy appears to consist of hitching its star to Apple's wagon.'" May 10, 2007 Order, p.2:11-13.

Wall Street Journal advertisement directed to, and mentioning, Apple founder Steve Jobs.
- The creation of imitation "silhouette" advertisements featuring images of Apple's iPod and Apple's white Earbud Trade Dress being used by silhouetted people.
- The copying of Apple's Earbud Trade Dress by using a digital copy of Apple's Earbud Trade Dress and merely removing the "r", and revising the dots to create Defendant's corporate logo.
- Defendant's copying and prominent display of Apple's registered IPOD mark throughout its *www.podfitness.com* website, including in the home page tagline: "Put a Personal Trainer right on your IPOD®," and the bold caption: "Customized IPOD Workouts. Defendant also copied images of the iPod player from Apple's website at *www.apple.com* to use on its own *www.podfitness.com* website.
- Defendant's use of Apple's registered IPOD mark in the metatags of each page on its *www.podfitness.com* website to draw Internet traffic to the site.
- Defendant's listing as a sponsored link on the search engine *www.google.com* in connection with the keywords "IPOD Workout" and "IPOD Fitness.
- Defendant's use and registration of the domain names *ipodfitness.com* and *ipodworkouts.com* to automatically re-direct Internet searchers to the Podfitness homepage at *www.podfitness.com*.
- Defendant's giveaways of IPOD products in connection with its services.
- Podfitness' packaging of the iPod Nano with the Podfitness retail box.
- Defendant's unauthorized adoption and use of Apple's registered Shuffle Logo, and certain aspects of Apple's registered MADE FOR IPOD logo.
- The required use by Defendant's subscribers of Apple's proprietary ITUNES software in order to access Defendant's services.
- Defendant's admission that Podfitness was created to take advantage of the "white hot" made for-IPOD market.

Not surprisingly, there is also no mention in the Motion of Podfitness' founder Jeff Hays' acknowledgement of the fame of the IPOD mark (Declaration of Andrew M. Abrams in support of Apple Inc.'s Partial Motion for Summary Judgment (hereinafter "Abrams Decl.") Ex. 1, 02/05/08 Jeffery Hays Depo. Tr. At, 79:6-23; 225:13-226:1), or Podfitness' acknowledgement and awareness of customers and others who thought the company was associated with Apple (Abrams Decl.-Ex. 1, Hays Depo Tr. at 135:4-7). In an email to Podfitness from a prospective **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 2, PF 000489) Further, an online article entitled "Fashion Fuse" by Skot Hess, makes the following erroneous statement about Podfitness: "Building on the ever-booming Ipod craze, Apple is offering a fresh fitness twist with Ipodfitness ([www.podfitness.com](www.podfitness.com))." (Abrams Decl., Ex. 3, PF 00158) In an e-mail **REDACTED – [FILED UNDER SEAL]** (Abrams Decl., Ex. 4, PF000517) These facts are

2

completely ignored in Podfitness' motion.

Perhaps the most egregious example of subterfuge in the Motion is the fiction that the name PODFITNESS was chosen due to the concept of "podcasting." (Motion, p. 6:14-15.) Defendant's founder Jeff Hays parrots this story in his sworn testimony to the Court, and declares under oath that the Podfitness service is a podcast. (Hays Decl. ¶ 4; Abrams Decl. Ex. 1: Hays Depo Tr. at 82:10-12; Motion, at 6:22.) But Defendant's very own website states that the Podfitness service is NOT a podcast, suggesting that the Podfitness name refers to the iPod. Thus, it is apparent that the "podcast" explanation is merely a convenient story concocted after the fact for the purposes of litigation. It should be noted that Defendant did not mention its "podcast" theory a single time during all of the correspondence between the parties from Defendant's launch in April 2006 and the filing of the complaint in September 2006. On information and belief, the first mention of this theory was in connection with the mediation in April 2007. (Abrams Decl. at ¶ 8.)

The overwhelming evidence adduced in this case establishes both actual customer confusion and intent to infringe (as well as other trademark infringement elements under _Sleekcraft_[2]), and yet is largely ignored in Podfitness' motion. Therefore, Defendant's motion for summary judgment with respect to likelihood of confusion must be denied, and Apple permitted to present its case to a jury.

## II.    STATEMENT OF FACTS

Apple brings this action against Defendant for trademark infringement, trade dress infringement, unfair competition, and trademark dilution, as well as other violations[3] arising out of Defendant's attempt to give the impression to consumers of an association between Apple and Defendant's business.

Since its introduction on October 23, 2001, Apple's iPod player has become an extremely popular and widely recognized consumer product. As of the end of the fiscal year 2007, the iPod had sold over 140 million units worldwide, making it the best-selling digital audio player series in history. (Apple Decl. ¶ 2.) The iPod player has truly become a cultural phenomenon, garnering tremendous commercial

---

[2]    _AMF Inc. v. Sleekcraft Boats_, 599 F.2d 341, 348-49 (9th Cir. 1979).
[3]    Apple amended its Complaint to add causes of action against Defendant for breach of contract and cybersquatting.

success and leading Business 2.0 to state that "[t]he iPod ranks as one of the greatest consumer electronics scores of all time." (Abrams Decl. Ex. 5, The Cult of iPod (2005) by Leander Kahney.) As may be expected, such success has spawned a virtual industry of those who seek to improperly profit off of the goodwill established by Apple. Podfitness is one such entity which has aggressively tried to trade off of Apple's goodwill and recognized trademarks.

Podfitness provides workouts set to songs on a customer's iTunes playlist[4]. The Podfitness service launched in April 2006 <u>after</u> Apple objected to Defendant's infringement of Apple's marks. (Abrams Decl. ¶ 8.) Podfitness' formation, as well as its entire business model, is based upon the popularity of the iPod players in the fitness arena[5]. Fittingly, Defendant's campaign to attach itself to Apple's coattails began with a full-page $44,000 advertisement in the Wall Street Journal on March 16, 2006, which was directed to Apple's founder and stated in large type:

> Dear Steve Jobs,
> Thanks for the IPOD®.
> Best,
> Jeff Hays
> P.S. Wait till you hear what we did with it!
> Call me, 801-990-3238

(Abrams Decl. Ex. 6, PF00705, Abrams Decl. Ex 1: Hays Depo Tr. at 232:10-21.) Neither Steve Jobs nor Apple have ***ever*** authorized the use of his name or of the IPOD brand in connection with Defendant's services; nor have they ever been affiliated with or sponsored Defendant's services. (Apple Decl. ¶ 3.) Yet that is the very insinuation that Defendant has attempted to create from the beginning.

On the PODFITNESS website at *www.podfitness.com/steve*, Defendant also posted another "letter" to Steve Jobs from Jeff Hays which adds further insight into the creation of Podfitness. The letter states that by December 2004, "it was obvious that the iPod had crossed the chasm. Like the rest of the business world, I couldn't wait to be involved." (Abrams Decl. Ex, 7.) Other proposed text for

---

[4] The first iteration of Defendant's service required subscribers to own and use Apple's proprietary iTunes software. Subsequent to the filing of this complaint, Defendant has expanded its capability to allow for compatibility with Microsoft's music downloading software.

[5] <u>See</u> Hays' admission that iPod players were commonly used in connection with fitness activities. (Abrams Decl. Ex. 1, Hays Depo Tr at: 156:21-157:19.)

4

Defendant's early advertisements included statements such as: **REDACTED – [FILED UNDER SEAL]** **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 8, PF002121, PF002137. PF000442, and PF000446.)

Defendant also posted the following explanation for the inspiration behind the creation of Podfitness on its *www.podfitness.com* website:

**Supernova Marketplace: The Intersection of Music, iPod and Fitness**
When Podfitness was founded in January 2005, Apple had sold just over 10 million iPods. Sensing a major shift coming, CEO Jeff Hays gambled that the iPod-led MP3 revolution had the potential not only to change the economics of the music business, but also the fitness industry. This began a multimillion-dollar process of conceptualizing, building, and refining the idea of Podfitness.

Now, in 2006, there have been over 50 million iPods sold, and the "Made for iPod" market is white-hot. In addition, the number of people focusing on fitness has never been higher: there are 40 million fitness club members in the U.S. alone.

Not coincidentally, at this exact time, Podfitness is at the culmination of 18 months' efforts…

(Abrams Decl. Ex, 9, PF002974.) An additional telling quote obtained from Defendant during discovery includes: **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 10, PF000432)

Podfitness has always made a concerted effort to intentionally target iPod users who are interested in fitness. As stated by Defendant's Chief Executive Officer and co-founder Teri Sundh, **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 11, PF 001042.) Dave Malone, a creative director who formerly worked with Podfitness, agreed that **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 12, PF000474.) Defendant's business plan included a proposal to **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex 13, PF002049.) By the very nature of its services, Defendant's consumers are comprised primarily of consumers of Apple's iPod products.

Accordingly, Defendant intentionally chose a trade name and domain name, PODFITNESS,

comprised of the same dominant component of Apple's famed IPOD mark: "POD."[6] Furthermore, as set forth herein, prior to and since its founding in April of 2006, Defendant also engaged in numerous other activities, all for the purpose of creating confusion as to the source of its goods and services, and to create a false impression of an association with Apple and Apple's products:

In addition to its name, Defendant deliberately selected a corporate logo which calls to the consumer's mind Apple's iconic white earbuds, which are famously featured in Apple's award-winning silhouette advertising campaigns ("Apple's Earbud Trade Dress.")[7] In selecting a logo for Podfitness, rather than choosing a separate design, REDACTED – [FILED UNDER SEAL] (Abrams Decl. Ex. 15, PF001014; Abrams Decl. Ex. 1,: Hays Depo Tr at 49:8-23.) In a November 29, 2005 marketing meeting, Defendant's principals discussed REDACTED – [FILED UNDER SEAL] (Id.) In comparing the images below, with Defendant's logo to the left and Apple's Earbud Trade Dress to the right, it is clear that this is precisely what occurred. In fact, Defendant testifies that it wanted its earbuds to look as close as possible to Apple's without being exactly the same. (Abrams Decl. Ex. 1, Hays Depo Tr. at 59:1-10.)



Defendant has also repeatedly imitated Apple's renowned silhouette advertisements. One example is a corporate Christmas card sent out by Defendant in the winter of 2005 that shows a silhouette of a

---

[6]  Defendant also filed a trademark application for PODPOCKET, which Defendant admits was intended to be used in connection with a pocket in an article of clothing that would hold an iPod player. (Abrams Decl. Ex 1, Hays Depo Tr. at 222:18-223:2.) A marketing brochure from Podfitness/BodyTraining attempting to get fitness clubs to purchase a Podfitness marketing kit in exchange for a piece of the subscription fees also states: "Profit from 42 million iPods in just three easy steps" and "Show me the Podmoney." (Abrams Decl. Ex. 14, PF000485.) These examples of the Defendant's use of "Pod" shows that the "Pod" in PODFITNESS refers to the iPod player. Clearly, this is the common perception held by consumers, as demonstrated by the following user comments: REDACTED – [FILED UNDER SEAL] (Abrams Decl. Ex. 17, PF009899, PF11986, PF22617 and PF22651.)

[7]  Defendant makes mention of Apple's silhouette advertisements in its business plan, calling the iPod player REDACTED – [FILED UNDER SEAL] (Abrams Decl. Ex. 18, PF002400.)

snowman wearing what is clearly an iPod player with the telltale white earbuds. The caption simply states "Ice Ice Baby: Everyone has their favorite holiday song, what's yours? Happy Holidays from Podfitness and Power Music." (Abrams Decl. Ex. 1, Hays Depo Tr. at 113:22-114:15; Abrams Decl. Ex. 16, PF000043-44.) Another shows a silhouette of an individual in a yoga position wearing the earbuds. This advertisement appeared in Yogalife Magazine in mid-2007 (see below, at left; an example of Apple's advertisement is below, at right). (Abrams Decl. Ex. 1, Hays Depo Tr. at 112:2-16 and 159:22-160:6; Abrams Decl. Ex. 18, PF000648-49.) Defendant also created multiple mock-ups of advertising which Mr. Hays personally admits resembled Apple's silhouette ads, except involving images of athletes in action instead of dancers. (Abrams Decl. Ex.1, Hays Depo Tr. at 107:20-108:16.) As added proof of Defendant's bad faith, its business plan includes the following statement:

**REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 13, PF002407.)



Further, in order to inappropriately direct Apple's targeted consumers to its own web site at *www.podfitness.com*, Defendant used Apple's IPOD trademark in the metatags of Defendant's website and as a paid search engine keyword on *google.com*. (Abrams Decl. Ex. 19, PF001317; Abrams Decl. Ex. 1, Hays Depo Tr. at 153:13-154:3.) Defendant has also registered and used the domain names *ipodfitness.com* and *ipodworkouts.com* to automatically re-direct Internet traffic to its homepage at *podfitness.com*. (Abrams Decl. Ex. 20, PF 001087; Abrams Decl. Ex. 1, Hays Depo Tr. at 115:21-116:10.) In addition, Defendant has copied and prominently displayed Apple's registered IPOD mark throughout its *www.podfitness.com* website, including in the tagline: "Put a Personal Trainer right on

your IPOD®," and the bold caption: "Customized IPOD Workouts" (Podfitness only removed such phrases from its home page after Apple initiated this current litigation). (Abrams Decl. Ex. 21.) Podfitness continues to display conspicuous photos of the IPOD product on its website, and prominently features images of individuals exercising while wearing Apple's Earbud Trade Dress. (Id.)

Additionally, Defendant has given away iPod players, without authorization from Apple, in order to promote its own services. **REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 22, PF002201, PF002228, and PF002243.)

**REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 23, PF005183.) Defendant has also given away iPod players at a Shape Magazine fitness cruise and in connection with a Women's Day magazine promotion. (Abrams Decl. Ex. 1, Hays Depo Tr. at 167:25-168:8.) **REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 24, PF000807.) Defendant has even packaged its Podfitness service *together with an iPod Nano* for sale on retail shelves. (Abrams Decl. Ex. 25, PF001369.) Thus, consumers shopping in an electronics store would view the iPod player in the very same package as the Podfitness service. (Id.)

In another act designed to tie Defendant to Apple and its IPOD products, Defendant chose to utilize Apple's proprietary iTunes software without permission from Apple. The original version of Defendant's services ***depended on and did not function*** without Apple's iTunes software. (Abrams Decl. Ex. 1, Hays Depo Tr. at 78:1-10.) Podfitness has admitted that it obtained access to the software (also referred to herein as the "Apple Software") data by agreeing to the terms and conditions of the "iTunes COM for Windows SDK License Agreement." (Abrams Decl. Ex. 26) The iTunes COM for Windows SDK License Agreement expressly provides that "[n]o names, trademarks, service marks or logos of Apple Computer, Inc. may be used to endorse or promote products derived from the Apple

8

Software without specific prior written permission from Apple." Id.

Defendant has also attempted to capitalize on the goodwill created by Apple in some of its other trademarks and logos. Defendant adopted the following logo (on the left is an image from the *podfitness.com* web site) for its products and services, which has promoted on its website and which is almost identical to Apple's Shuffle Logo, the subject of U.S. Trademark Registration No. 3,067,950. (Abrams Decl. Ex. 27.)


(PODFITNESS)


(APPLE)

Apple's Shuffle Logo is depicted on the right. Mr. Hays acknowledged that customers were confused by the Apple logo on the Podfitness website. (Abrams Decl. Ex. 1, Hays Depo Tr. at 274:15-22.) Defendant also has used aspects of Apple's MADE FOR IPOD logo, the subject of U.S. Trademark Registration No. 3,341,286, to promote and sell its goods and services. (Abrams Decl. ¶ 33)

Apple has not consented to any of Defendant's uses of its IPOD mark or its product images, nor any mark comprised in whole or part of POD, nor has Apple sponsored, endorsed or approved the goods or services offered and promoted by Defendant. Nor is there any affiliation between Apple and Defendant. (Apple Decl. ¶ 4.)

## III. ARGUMENT

### A. The Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine issue as to any material fact and [where] the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(C). The moving party has the burden of establishing that no genuine issue of material facts exists. See FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997). All doubts as to whether or not there are particular factual issues in dispute are to be resolved against the moving party. See United States Jaycees v. San Francisco Junior. Chamber of Commerce, 354 F.Supp.

9

61, 68-69 (D.C.Cal., 1972), aff'd, 513 F.2d 1226 (9th Cir. 1975) (per curiam). Furthermore, if there is any reasonable construction of the facts in evidence and under any acceptable theory of law, a grant of summary judgment against the non-moving party is improper. See id.

Here, Apple sues for trademark infringement and Lanham Act violations for unfair competition because of Podfitness' efforts to falsely associate itself with Apple. In trademark cases, there exists a well-established "judicial dislike" for the disposition of trademark infringement and unfair competition cases through summary judgment. See id. In addition, the question of likelihood of confusion is generally a question of fact that is submitted to the jury. See Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1357 n. 5 (9th Cir. 1985). District courts have been cautioned to grant summary judgment motions regarding likelihood of confusion sparingly, because an assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record. See Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901-02 (9th Cir. 2002).

## B. The Eight-Factor Test for Trademark Infringement

Whether or not there is a likelihood of confusion between two marks is the basic test of trademark infringement. In determining whether a likelihood of confusion exists, the following factors are generally most relevant: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

Defendant attempts to restrict the Court's inquiry into each of the Sleekcraft factors by citing the "Internet trinity" doctrine which emphasizes three of the eight Sleekcraft factors when evaluating trademark disputes involving domain names. (Motion, p. 9:26-28.) This doctrine is inapplicable here, however, because Apple's objection is not simply to Defendant's domain name and its corresponding Internet page. See Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1055 (9th Cir. 1999) (applying "Internet trinity" when comparing MOVIEBUFF and

10

MovieBuffOnline.com). Indeed, Apple objects more generally to Defendant's trademark and logo and all of its deceptive marketing practices, whether on the Internet or in the "brick and mortar" world of retail boxes, newspaper and radio advertisements, and promotional giveaways. Accordingly, all eight of the Sleekcraft factors should be evaluated by the court and a jury in this matter[8].

### 1. Strength of the IPOD Mark

Under federal trademark law, famous or strong marks enjoy a wider latitude of protection in the determination of whether there will be a likelihood of confusion. See, e.g., Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 352-53 (Fed. Cir. 1992), cert. denied, 506 U.S. 862, 121 L. Ed. 2d 126, 113 S. Ct. 181 (1992).  In other words, a mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark. Id.

Not only is the IPOD mark strong, but it is that rare trademark which is also famous. Since its introduction on October 23, 2001, Apple's iPod player has become an extremely popular and widely recognized consumer product. As of the end of the fiscal year 2007, Apple had sold over 140 million iPod units worldwide making it the best-selling digital audio player series in history. (Apple Decl. ¶ 2.) The iPod player has truly become a cultural phenomenon, garnering tremendous commercial success and leading Business 2.0 to state that "[t]he iPod ranks as one of the greatest consumer electronics scores of all time." (Abrams Decl. Ex. 5, The Cult of iPod (2005) by Leander Kahney.) As stated by Andy Serwer in a Fortune magazine article dated June 27, 2005, "[i]t's hard to recall any branded recreational product that ever carried the cultural oomph that the iPod now has." (Abrams Decl. Ex. 28.) Steven Levy, author of The Perfect Thing: How the iPod Shuffles Commerce, Culture and Coolness calls the iPod "the most familiar, and certainly the most desirable, new object of the twenty-first century. You could even make the case that it is the twenty-first century." (Abrams Decl. Ex. 29, The

---

[8]     It should be noted that application of the "internet trinity" would not alter the merits (or lack thereof) of Defendant's Motion. The doctrine simply suggests that where the three "Internet factors" indicate that confusion is likely (as they do here), the other factors must "weigh strongly" against a likelihood of confusion to avoid the finding of infringement. Interstellar Starship Services, Ltd. v. Epix, Inc., 304 F.3d 936, 942 (9th Cir.2002) (citing Brookfield, 174 F.3d at 1058). If the Internet trinity does not clearly indicate a likelihood of consumer confusion, a district court must conclude the infringement analysis by balancing all the Sleekcraft factors within the unique context of each case. Id. Here, all of the Sleekcraft factors weigh heavily in favor of a finding of infringement.

Perfect Thing: How the iPod Shuffles Commerce, Culture and Coolness by Steven Levy.)

In the seven years that Apple has been continuously using the IPOD mark in interstate commerce, it has spent hundreds of millions of dollars advertising and promoting its goods and services under the IPOD mark in a variety of media, including but not limited to television, radio, a wide variety of general circulation and specialized print media, billboards, trade shows and the Internet. (Apple Decl. ¶ 5.)

Defendant's founder Jeff Hays fully acknowledges that the IPOD mark is famous. (Abrams Decl. Ex. 1, Hays Depo Tr. at 79:16-23.) Podfitness' argues that because Apple's considers the decision-making *process* for selecting the IPOD name irrelevant, it should be precluded from making any argument based on the strength of the mark. This is nonsensical. (Motion p. 16:24-17:2.) The strength of the IPOD mark (relating to which Apple produced volumes of documents) is wholly unrelated to any decision-making in coming up with the name, and is a completely separate issue. Jeff Hays testified, "I remember this year [2005] almost every catalog that came to my wife had an iPod on the front. There were magazines that had iPods on the front, there -- Bed Bath & Beyond in their Christmas catalog had an iPod on the front cover. It was on the front cover of Brookstone. It was on the front cover of Sharper Image. It was absolutely a star." (Abrams Decl. Ex. 1, Hays Depo Tr. at 225:13-226:7.) Thus, Podfitness can hardly ignore the fame and strength of the IPOD mark.

## 2. Bad Faith Intent

Courts have held that if a defendant intended confusion, there is a presumption that confusion in fact occurred: "the very act of the adopter has indicated that he expects confusion and resultant profit. … If such an intent is shown it raises a presumption that deception and confusion resulted." Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 158 (9th Cir. 1963), cert. denied, 374 U.S. 830 (1963).

As demonstrated in the Statement of Facts (see also Introduction, infra, p. 2:19-3:7), Apple possesses overwhelming evidence of Defendant's bad faith. Such evidence is sufficient to lead to a jury finding of infringement, and it certainly is sufficient to at least create an issue of material fact for the jury to consider. Thus, Defendant's primary argument in support of this Motion relies upon a total

12

mischaracterization of this dispute as one involving a single, narrow issue: the comparison of the marks IPOD and PODFITNESS in a vacuum. This is subterfuge. Despite Defendant's attempt to create a false "straw man," the use of "Pod" by Defendant in its trade name only encompasses a portion of the issues implicated in this litigation. The lengthy list of Defendant's bad faith marketing tactics must be taken into account.

In addition to Defendant's bad faith in attempting to insinuate a non-existent relationship with Apple, Defendant appears to also be engaging in some questionable litigation tactics with respect to "creating" a new explanation for the naming of Podfitness. In its Motion, Defendant claims that the name PODFITNESS was chosen in 2004 due to the concept of "podcasting." (Motion, p. 6:14-15.) Defendant's founder Jeff Hays sticks with this story in his sworn testimony to the Court, and declares under oath that the Podfitness service is a podcast. (Abrams Decl. Ex. 3, PF000518; Abrams Decl. Ex. 1, Hays Depo Tr. at 82:10-12; Motion, p. 6:22.) But Defendant's very own website explicitly contradicts such testimony. On a version of Defendant's website dated September 26, 2006 (the week Apple filed its initial complaint), Defendant boldly proclaims:

**Is this a Podcast?**

**No! A Podcast works from a "one-to-many" model, which means it's a single pre-recorded audio file that is downloaded to many listeners. Podfitness is "one-to-one," which means that your workouts are made only for you...**

(Abrams Dec. Ex. 30, Podfitness website printout dated September 26, 2006.) Defendant's current website contains the following information:

**Is this a Podcast?**

**Certainly not! Unlike other sites on the internet that serve up canned audio workouts, Podfitness learns your likes and dislikes each time you use it.**

(Abrams Dec. Ex. 31, Podfitness website printout dated January 4, 2008.) According to Mr. Hays' deposition testimony, he and his son Brandon review and approve all of the content on the *podfitness.com* website. (Abrams Decl. Ex. 1, Hays Depo Tr. at 84:1-3.)

Apple's technical analysis of the Podfitness software confirms that it does *not* fit the accepted

13

definition of a podcast. (Apple Decl. ¶ 6.) Combined with the overwhelming evidence that Podfitness was created specifically for and named after Apple's iPod player, it is apparent that the "podcast" explanation is merely a convenient story concocted after the fact for the purposes of litigation. It should be noted that Defendant did not mention its "podcast" theory a single time during all of the correspondence between the parties from Defendant's launch in April 2006 and the filing of the complaint in September 2006. On information and belief, the first mention of this theory was in connection with the mediation in April 2007. (Abrams Decl. ¶ 6.)

Even when caught red-handed, Podfitness has been unrepentant, and willful in its attempts to trade off Apple's goodwill and trademarks. For instance, Defendant continues to use Apple's IPOD trademark as a sponsored keyword with Internet search engines, despite

**REDACTED – [FILED UNDER SEAL]**

(Emphasis added.) (Abrams Decl. Ex. 32, PF001122.) So despite

**REDACTED – [FILED UNDER SEAL]**

, Defendant continues to this very day to use Apple's IPOD trademark in this unauthorized manner. (Abrams Decl. Ex. 1, Hays Depo Tr. at 154:3.)

Defendant's after-the-fact whitewash efforts are not sufficient to avoid its initial intent to trade off Apple's goodwill. In response to Apple's complaint, Defendant removed some of the infringing material from its *podfitness.com* website. It has also more recently added references to Microsoft and its Zune MP3 player, a fact that Defendant repeatedly trumpets in its Motion as "proof" of its targeting of non-iPod users. However, the Zune player was not even available for sale to the public until November 2006, well after the launch of Podfitness, and was not included on the *podfitness.com* website until much later. Thus, to imply that the Zune and iPod players are, and have always been "equals" in the eyes of the Podfitness marketing department is disingenuous.

In any event, liability for trademark infringement is largely unaffected, even where the defendant

subsequently ceases certain infringing activities. See Mattel, Inc. v. Robarb's, Inc., 2001 WL 913894 *3 (S.D.N.Y. 2001); Elvis Presley Enterprises Inc. v. Capece,141 F.3d 188, 46 U.S.P.Q.2d 1737 (5th Cir. 1998). In Elvis Presley Enterprises Inc. v. Capece, the plaintiff challenged the trade name "The Velvet Elvis" as well as advertisements for a night club that implied an association with Elvis Presley. After the plaintiff filed suit, the defendants ceased using the complained-of advertising, but continued using the trade name. 141 F.3d 188 (5th Cir. 1998). The trial court held that an injunction against the advertising was proper despite the partial cessation of the infringing activity. Id. at 198. In addition, the appellate court held that the discontinued advertising should still inform the court's determination of whether the trade name infringes. Id. at 198. The court found that the problematic advertising "imbued 'The Velvet Elvis' mark with a meaning directly related to Elvis Presley, which cannot now be erased by altering the context of the mark's use." Id. at 207. Further, "[b]ecause the Defendants have imbued the mark with an infringing meaning, use [of the trade name] alone in the future would continue the infringement of [Elvis Presley Enterprises'] marks." Id. The court then ordered the trial court to enter broader injunctive relief that prohibited all uses of "The Velvet Elvis." Id.

Similarly, Defendant's long-held practice of improperly trading off Apple's goodwill is not cured by its minimal changes and miniscule disclaimers, all made after the commencement of litigation. Apple has considerable evidence to show a jury Defendant's willful trademark infringement and other unlawful activities. Defendant's limp assertion that "lack of intent weighs in Podfitness' favor" (Motion, p. 18:10) and that it is "clear that it is not affiliated with Apple" (Motion, p. 5:19) are contradicted by the evidence.

### 3. Actual Confusion

Convincing evidence of significant actual confusion occurring under actual marketplace conditions *is* evidence of a likelihood of confusion. Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion. See Sleekcraft, 599 F.2d at 352; Resorts of Pinehurst, Inc. v. Pinehurst National Corp., 148 F.3d 417, 47 U.S.P.Q.2d 1465 (4th Cir 1998) (substantial evidence of actual confusion supports finding summary judgment for the *plaintiff* on likely confusion and infringement).

15

Here, Apple has learned of numerous instances of actual confusion as to the affiliation between the parties. As *any* evidence of actual confusion is noteworthy in a trademark case, the number of instances here is especially significant. An example of such confusion is an email ░░░░░░░

░░░ REDACTED – [FILED UNDER SEAL] ░░░ (Abrams Decl. Ex.2, PF000489.) Mr. Hays has himself commented ░░░ REDACTED – [FILED UNDER SEAL] ░░░ (Abrams Decl. Ex. 4, PF000517.) The article in question is entitled "Fashion Fuse" by Skot Hess, and makes the following erroneous statement in anticipation of the Podfitness launch: "Building on the ever-booming Ipod craze, Apple is offering a fresh fitness twist with Ipodfitness (www.podfitness.com)." (Abrams Decl. Ex. 3, PF000518.)

Defendant also produced in discovery comments from its users which are posted on its website. |

░░░ REDACTED – [FILED UNDER SEAL] ░░░ (Abrams Decl. Ex. 33, PF000979-998.) ░░░

░░░ REDACTED – [FILED UNDER SEAL] ░░░ (Abrams Decl. Ex. 34, PF010056.) "You'd think that Mac support would be a given when the product in question is an Apple."[9] (Abrams Decl. Ex. 35.)

As shown by the last two comments, countless consumers have also expressed anger and confusion at Podfitness' incompatibility with Apple's computers, despite the fact that Podfitness bills itself as an "iPod service." Just several of the examples follow, demonstrating the widely held assumption that Podfitness is somehow affiliated with Apple's iPod product: ░░░ REDACTED – [FILED UNDER SEAL] ░░░ (Abrams Decl. Ex. 38, PF009266, PF009390, PF009899, PF010185, PF010652, PF022651.)

---

[9]    This is just one of many emails to Defendant's customer service department complaining about the Podfitness service's non-compatibility with Apple's Mac product because the consumer thinks Podfitness is likely part of Apple. (See e.g., Abrams Decl. Ex. 36, PF001996, ░░░ REDACTED – [FILED UNDER SEAL] ░░░ ) Defendant's attempt to now highlight this early incompatibility as a point of distinction in its Motion is misleading, as Defendant worked very hard (ostensibly in response to these complaints) to make its service compatible with the Mac (See e.g., Abrams Decl. Ex. 37, PF009471), and eventually succeeded. To characterize its initial failed attempts as disinterest is again, disingenuous. Mr. Hays testifies that Defendant has also received many general complaints regarding the Podfitness software, and admits that the initial beta version of the Podfitness software, which was in commercial use for "6 months to a year" was very "buggy," i.e., filled with software flaws and bugs. (Abrams Decl. Ex. 1, Hays Depo Tr. at 193:7-195:23.) Given the likelihood of confusion between the parties' goods and services, Apple is concerned that Defendant's substandard service may be negatively affecting the reputation of the iPod player.

Mr. Hays also testified as to additional instances of actual confusion regarding the use of a logo that was virtually identical to Apple's Shuffle logo. (Abrams Decl. Ex. 1, Hays Depo Tr. at 274:15-22.) ("people thought that [logo] meant shuffle, and in our case it didn't shuffle…") Defendant ultimately ceased using the logo due to the confusion it caused with Apple's Shuffle logo. Id.

Apple submits that the foregoing evidence of actual consumer confusion establishes the certainty of a likelihood of confusion between the parties' respective marks. In this context, Defendant's assertion that there are absolutely no issues of material fact may indeed be correct, but the end result should be a ruling in favor of Apple.

**4.      Proximity of the Goods and Services**

Famous marks are entitled to broader protection—protection over a wider range of related products and services and variations on visual and aural format. See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 222 (3d Cir. 2000) ("Under the Lanham act, stronger marks receive greater protection"); Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 352-53 (Fed. Cir. 1992), cert. denied, 506 U.S. 862, 121 L. Ed. 2d 126, 113 S. Ct. 181 (1992). As a result, Defendant's services and Apple's goods and services need not be identical for a likelihood of confusion to be found.

Nonetheless, there is a significant overlap between the respective parties goods and services. Defendant's services focus on the downloading of music, audio programs and audio files – this is the very sphere occupied by Apple's IPOD marks and Apple's iTunes software. In fact, subscribers to Defendant's services were previously required to utilize Apple's iTunes software to access the Defendant's audio files. (Abrams Decl. Ex. 1, Hays Depo Tr. at 78:1-10.)

Apple's IPOD brand has always been inextricably linked to fitness. As Defendant itself states in its initial business plan: **REDACTED - [FILED UNDER SEAL]** (Abrams Decl. Ex. 13, PF002396.) As a result of the product's popularity in connection with fitness activities, Apple markets and sells iPod-compatible arm bands to facilitate the use of the iPod player while exercising. (Apple Decl. ¶ 7.) Apple has also partnered with shoe manufacturer Nike to market the Nike+iPod Sports Kit, which is a device which measures and records the distance and pace

17

of a walk or run. (Apple Decl. ¶ 8.) The iTunes software can then be used to view the walk or run history. The kit is able to store information such as the elapsed time of the workout, the distance traveled, pace, or calories burned by the individual wearing the shoes, and display it on the screen or broadcast it through the headphones of an iPod. <u>Id.</u>

Defendant has been aware of the Nike +iPod project since December 2005, long before the commercial launch of the Podfitness service in April 2006 and even prior to the public announcement of the project. (Abrams Decl. Ex. 1, Hays Depo Tr. at 166:14-19.) There is substantial evidence that Defendant considers the Nike +iPod product to be a competitor of the Podfitness service. (<u>See</u> Abrams Decl. Ex. 39, PF001867 **REDACTED – [FILED UNDER SEAL]** ); PF001919 **REDACTED – [FILED UNDER SEAL]** ; PF002014-2016 **REDACTED – [FILED UNDER SEAL]** . According to Defendant in an email relating to a proposed promotion with Life Fitness: **REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 40, PF005167.) At one point, Defendant even explored a partnership with Nike +iPod, though the relationship never came to fruition. (Abrams Decl. Ex. 1, Hays Depo Tr. at 184:6-14.)

Apple's iTunes Store features numerous downloadable podcasts, "iMixes" (pre-made audio file mixes), and celebrity playlists which incorporate a fitness theme. (Apple Decl. ¶ 9.) Such products compete *directly* with Defendant's audio files, and are marketed to consumers under a link entitled "Nike Sport Music."  (Apple Decl. Exhibit 1) In addition, Apple already licenses its MADE FOR IPOD logo to several companies in connection with their exercise machines, including ICON Health and Fitness, Horizon Fitness, Life Fitness, Cybex and Unisen Limited. (Apple Decl. ¶ 11.) Accordingly, the proximity of the respective goods and services is another factor which weighs heavily in favor of a finding of infringement. At the very least, there are triable issues of fact for a jury to consider.

18

### 5. Likelihood of Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 354. As discussed in the previous section, certain use of the iPod and iTunes products in connection with fitness activities already compete with Defendant's service. In the future, Apple intends to continue to expand its existing line of fitness products and services. (Apple Decl. ¶ 12.)

On information and belief, Defendant also seeks to expand the scope of its services. In its initial business plan, Defendant discusses multiple possibilities, including **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. ¶ Ex. 44, PF002402.) An email from Defendant regarding future marketing ideas stated: **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 41, PF000943.) Such a place would certainly compete with Apple's current business model, namely the sale of downloadable music through iTunes. Additionally, Defendant previously had plans to develop the PodPocket, a pocket in an article of clothing that would hold an iPod player. (Abrams Decl. Ex. 1, Hays Depo Tr. at 222:20-223:2.)

### 6. Marketing and Trade Channels

Convergent marketing channels increase the likelihood of confusion. Sleekcraft, 599 F.2d at 353. Here, the parties' respective customers and marketing channels overlap considerably. This is not by accident. Defendant's business plan included a proposal **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 13, PF002409.) By the very nature of its services, Defendant's consumers are comprised primarily of consumers of Apple's iPod products. A direct quote from Defendant prior to its launch: **REDACTED – [FILED UNDER SEAL]**

(*Id* at PF002405.)

The evidence regarding Defendant's targeted consumer base is overwhelming. Defendant readily

19

admits that **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 11, PF001042) and that **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 12, PF000474.) In responding to a query from a prospective customer regarding whether the Podfitness service functioned with other types of MP3 players, Defendant responded: **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 10, PF000432.) In a market overview presented to Marware as part of a proposal package, Defendant made the following statements: **REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 47, PF001854.) In a discussion relating to potential radio marketing opportunities, Defendant stated: **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 43, PF002034.)

Thus, Defendant's promotional campaigns and Internet advertisements have always been targeted to the very same consumers who purchase iPod players. From the beginning, Defendant's business plan touted: **REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 13, PF002395.) At an early strategy planning meeting, Defendant indicated that **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 44, PF024647-24648.) Note that *all* of the foregoing statements are not about the MP3 player industry in general, but specifically about Apple and Apple's iPod product.

The parties' goods and services are also often sold through the very same Internet channels. *See, e.g.,* the website at *http://www.thisnext.com/item/EADCEDCE/Podfitness-Custom-Audio* (Abrams Decl. Ex. 45) which sells both the Podfitness service and Apple's IPOD player on the same page. Accordingly, the marketing and trade channels factor also strongly favors Apple – it goes without saying that at the very least, Apple has shown the existence of material issues of fact.

### 7. Similarity of the Marks

In analyzing the similarity of the marks, the court is to view the marks as a whole, as they appear in the marketplace. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992) citing California Cooler v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9th Cir.1985); Alpha Industries v.

20

Alpha Steel, Inc., 616 F.2d 440, 444 (9th Cir.1980). The key elements of the marks are their sight, sound, and meaning, and similarities in these characteristics "weigh more heavily than differences." Id., citing Sleekcraft, 599 F.2d at 351. Under traditional rules for determining confusing similarity between marks, the "dominant" portion of a mark will be given greater weight then the surrounding, descriptive elements. See Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 899 (7th Cir. 2001) (likelihood of confusion found between BEANIE BABIES for plush animals and BEANIE RACER for plush toy cars, as the word 'Beanie' was considered the more salient portion of the mark and therefore deserving greater weight than the surrounding elements.").

Here, the overall impression created by the respective marks, viewed in their entireties, is quite similar. The non-distinctive element of Defendant's mark, "fitness," merely describes the primary attribute of Defendant's services, and thus is considered "weak" from a trademark perspective. As the "Pod" element is the only distinctive element of Defendant's mark, the addition of a merely descriptive term does not suffice to differentiate its mark from Apple's famous IPOD mark. See Nike, Inc. v. Nikepal Intern, Inc., 2007 WL 2782030, *6 (E.D. Cal. 2007). (We note that on numerous occasions, **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 46, PF001947; PF001976; PF001990; PF002058; PF002081.)) One emailer goes as far as to clarify her confusion by stating:

**REDACTED – [FILED UNDER SEAL]**

(Abrams Decl. Ex. 47, PF001978.)

Confusion is made all the more likely by Defendant's highlighting of the term "Pod" through use of a separate color from the rest of its logo, as well as its adoption of seemingly the identical font used by Apple. (See Motion p.12:14-16.) Defendant's logo also appears in two-tone green, the same color utilized by Apple in connection with the promotion of its iPod Shuffle. (Apple Decl. Exhibit 2.)

Further, the dominant element of Defendant's mark, "Pod," is identical to the "Pod" slang term commonly used by consumers and industry publications to refer to the IPOD products. (See Abrams Decl. Ex. 54 for numerous printouts of Internet publications and blogs referring to Apple's iPod player

21

as a "Pod.") Despite Defendant's repeated denial of this fact in its pleadings and briefs, the evidence shows that it has long been aware of this nickname. On a May 13, 2006 email, founder Jeff Hays forwarded an article to the Podfitness marketing team pertaining to **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 12, PF000474; see also Abrams Decl. Ex. 49, PF001503 (**REDACTED – [FILED UNDER SEAL]**)). **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 50, PF002271.)

Where the public has come to associate a nickname with a particular company and/or its goods or services as a result, for example, of use of the in the trade and by the news media, that company has a protectable property right in the term, even if the company itself has made no use of the term. See American Stock Exchange, Inc. v. American Express Co., 207 USPQ 356, 364 (TTAB 1980) (AMEX); The Coca-Cola Company v. Los Angeles Brewing Company, 44 USPQ 190 (S.D. Cal., 1939) (COKE).

Defendant protests that there is a "crowded field" of "pod" marks, and that Apple does not have exclusive rights in the term "pod." Such an argument is misleading, for trademarks should not be examined in a vacuum. Indeed, other "pod" marks peacefully coexist with IPOD, but only to the extent that consumers are not likely to be confused as to sponsorship or affiliation on the part of Apple. For instance, AIRPOD for air fresheners, and BABY POD for children's furniture are acceptable uses of "POD." However, the usage of "pod" as the dominant portion of a mark related to downloadable music, handheld devices, and/or other closely related goods and services to those provided by Apple is a different matter. Due to the history of diligent enforcement by Apple in these areas, Apple maintains broadly enforceable rights in "pod" formative marks in such fields. This is particularly true where, as here, a company has engaged in other behavior designed to lead to consumer confusion.

### 8. Degree of Purchaser Care

When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care. Recot, Inc. v. Becton, 214 F.3d 1322, 1329 (Fed. Cir. 2000)

22

Defendant's service falls into the category of low-priced impulse purchases because it gives away its services *for free* to all new subscribers. (Abrams Decl. Ex. 1, Hays Depo Tr. at 201:10-209:20.) Presumably, Defendant hopes that a number of the "free trial" participants will continue to eventually subscribe to its service for a fee, thereby increasing its overall consumer base. Goods and services that are given away as part of a free trial are not likely to be the object of intensive consumer research, but rather subject to spur-of-the-moment impulse "buying." Therefore, it is highly unlikely that consumers would discover any potential mistake about the affiliation between Defendant and Apple before actively engaging the Podfitness service.

**C. Defendant's Use of Apple's Trademarks is Not Fair Use**

Defendant claims its extensive use of Apple's marks and trade dress is fair use. Such a claim makes a mockery of the doctrine when compared to the evidence of infringement in this case. The case cited by Defendant to support its claim of fair use is New Kids on the Block v. News America Publishing, Inc., 971 F.2d 302, 307 (9th Cir. 1992). Pursuant to this case, nominative fair use *only* exists if "only so much of the mark is used as is reasonably necessary to identify the product." Id. Based on the actions outlined in the Statement of Facts and in the "Bad Faith" sections above, Defendant cannot really claim with a straight face that it followed this guideline. Mr. Hays himself stated in an email to his marketing personnel that **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 51, PF002328.) In accordance with this mantra, Defendant acknowledged in connection with its website design that **REDACTED – [FILED UNDER SEAL]** (Abrams Decl. Ex. 52, PF002048.) Additionally, Mr. Hays admits that the phrase "personal trainer for your iPod" was the "predominant feature" of the initial retail box. (Abrams Decl. Ex. 1, Hays Depo Tr. at 227:8-13.) Ironically, the retail box also contained a small-print notice that the Podfitness service was compatible with all MP3 players – the only type of informative reference to iPod that would have been acceptable under "fair use" standards. (*Id* at 227:21-228:5.) As it stands, Defendant's unauthorized use of Apple's marks and trade dress was and continues to be a part of a campaign to associate itself with Apple and to go after the iPod market – it in no way

ever constituted fair use.

### 1. The Doctrine of Prosecution Estoppel is Inapplicable Here

Defendant claims that Apple is somehow prohibited and estopped from making infringement claims because of its attempt to distinguish the IPOD mark from a particular "POD" mark when it applied to the USPTO for the IPOD mark over six years ago. Defendant misapplies the doctrine of prosecution estoppel. The pertinent authority provides that "statements made during an ex parte prosecution before the U.S. Patent and Trademark Office seeking registration of a trademark do not circumscribe for all time the rights the registrant may acquire thereafter through extensive use." Polo Fashions, Inc. v. Extra Special Products, Inc., 451 F. Supp. 555, 561 (S.D.N.Y. 1978); see also Ez Loader Boat Trailers, Inc. v. Cox Trailers, Inc., 213 U.S.P.Q. 597, 599 (TTAB 1982), aff'd, 706 F.2d 1213, 217 U.S.P.Q. 986 (Fed. Cir. 1983) (an applicant's prior statements in its application for registration or in another proceeding do not give rise to an estoppel in subsequent proceedings.); Adams/Green Industry Publishing, Inc. v. International Labmate Ltd., 45 U.S.P.Q.2d 1046 (N.D. Ill. 1997). Unlike patents, trademarks are dynamic in that they can gain or lose strength over time. As such, arguments made with respect to a certain trademark also may change over time. See Eniva Corp. v. Global Water Solutions, Inc., 440 F. Supp. 2d 1042, 1049 (D. Minn. 2006).

Here, the 2002 office action in question involved an obscure acronym for Professional Online Desktop, a far different product than Defendant's service, with a distinct set of consumers. Of an eight-page response to an office action in 2002, Apple devoted only a single line to the particular differences in appearance between its IPOD mark and a particular pre-existing "POD" mark; otherwise, Apple's entire brief to the USPTO consisted of arguments distinguishing the respective goods and consumers of the two marks. (Abrams Decl. ¶ 59.) Apple's effort in 2002 to distinguish its IPOD mark from a particular "POD" mark does not give Defendant a free pass to infringe Apple's marks and trade dress simply because the term "pod" is part of its infringing marks.

Six years later, the IPOD mark is one of the most famous trademarks in the world, greatly changing the surrounding legal landscape. As previously established, a famous mark such as IPOD is entitled to a

24

far broader scope of protection, even against similar marks used in fields of business that are not closely related to its industry (though in this case, Defendant is in direct competition with Apple). As Mr. Hays himself testified, the iPod mark was ten times more famous in 2005 than it was in 2004. (Abrams Decl. Ex. 1, Hays Depo Tr. at 225:15-20) Obviously, the differences between 2002 and 2008 are even greater. Defendant's attempt to misapply the USPTO office action to a separate context is dubious and completely unwarranted.

### D. Unfair Competition

The test of likelihood of confusion is the touchstone of unfair competition. The law of unfair competition has its roots in the common-law tort of deceit and its concern is with protecting consumers from confusion as to source. See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989).

Here, Apple has established that each and every Sleekcraft factor weighs heavily in favor of a finding of a likelihood of consumer confusion. Significant actual confusion has also already occurred between the parties' respective goods and services. Accordingly, it is clear that consumers are not being protected from confusion as to source. Thus, Defendant's motion for summary judgment must be denied with respect to Apple's Unfair Competition claims.

## IV.   CONCLUSION

Apple respectfully submits that there is substantial evidence to support a finding of likelihood of confusion, and thus, infringement. At the very least, a jury could find genuine issues of material fact with respect to the Sleekcraft factors. For all of the foregoing reasons, Apple requests that Defendant's Motion for Partial Summary Judgment be denied with respect to all claims.


DATED: April 28, 2008                           Respectfully submitted,
                                                FISH & RICHARDSON P.C.


                                          By: /s/David J. Miclean_____
                                             David J. Miclean
                                             Lisa M. Martens

25

Andrew M. Abrams
*Attorneys for Plaintiff* APPLE INC.

# PROOF OF SERVICE

I am employed in the County of San Diego, my business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, CA 92130. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On April 28, 2008, I caused a copy of the following document(s):

**PLAINTIFF APPLE INC.'S OPPOSITION TO DEFENDANT PODFITNESS' PARTIAL MOTION FOR SUMMARY JUDGMENT [REDACTED]**

to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

| | |
|---|---|
| James E. Magleby | Attorneys for Defendant |
| Jason A. McNeill | PODFITNESS, INC. |
| Magleby & Greenwood, P.C. | |
| 170 South Main Street, Suite 350 | |
| Salt Lake City, UT 84101 | |
| (801) 359-9011 (facsimile) | |

[X] **FEDERAL EXPRESS:** Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express

| | |
|---|---|
| James M. Wagstaffe | Attorneys for Defendant |
| Kerr & Wagstaffe LLP | PODFITNESS, INC. |
| 100 Spear Street, Suite 1800 | |
| San Francisco, CA 94105-1528 | |
| (415) 371-0500 (facsimile) | |

[X] **PERSONAL:** Such envelope was delivered by hand to the offices of the addressee.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the above is true and correct. Executed on April 28, 2008, at San Diego, California.

/s/Nicole C. Pino
Nicole C. Pino

10827947.2.doc

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF APPLE INC.'S OPPOSITION TO DEFENDANT PODFITNESS' PARTIAL MOTION FOR SUMMARY JUDGMENT
Case No. C 06-5805 SBA